IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TYRESE CRAWFORD, M20778, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 22 C 4748 |
| | ) | |
| CHARLES TRUITT, Warden, | ) | |
| Stateville Correctional Center, | ) | The Honorable |
| | ) | Virginia M. Kendall, |
| Respondent. | ) | Judge Presiding. |

## ANSWER TO HABEAS PETITION

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts (Habeas Rules), and this Court's order, *see* Doc. 7, respondent answers petitioner's 28 U.S.C. § 2254 petition for a writ of habeas corpus. For the reasons discussed below, this Court should deny the petition and decline to issue a certificate of appealability.

## Background

### I. Petitioner is convicted in state court of first degree murder and armed robbery.

In 2011, after simultaneous trials before separate juries in the Circuit Court of Cook County, petitioner and his co-defendant Tony Benson were convicted of the first degree murder and armed robbery of Johnny Frazier. *See* Exh. E at 1, ¶¶ 2-3. Petitioner was sentenced to a total of 46 years in prison. *Id.* at ¶ 2.

The evidence showed that, on November 4, 2007, Frazier was shot and killed as he sat in the driver seat of a minivan in Calumet Park, Illinois. Exh. A at R1583-

86 (Doc. 26-2 at 167-70). His body was found slumped over the wheel shortly after 11 p.m. *Id.* His front pants pocket had been turned inside-out and a $100 bill was on the floor of the van. Exh. A at R1619-22 (Doc. 26-2 at 200-03). Forensic analysis determined that a bullet had been fired through the driver-side headrest, striking Frazier in the back of the head. Exh. A at R1624-27, 1894-95 (Doc. 26-2 at 205-08, Doc. 26-4 at 47-48).

Benson's girlfriend, Raven Bender, testified that on the day of the shooting, Frazier drove her, Benson, and petitioner around town in the minivan.[1] Initially, Bender was in the front passenger seat, Benson was in the rear driver-side seat, and petitioner was in the rear passenger-side seat. Exh. A at R1667 (Doc. 26-3 at 18). At one point in the evening, the group stopped at a drug house in Chicago, and Bender, Benson, and Frazier went inside, while petitioner stayed in the van. Exh. A at R1682-84 (Doc. 26-3 at 33-35). After a few minutes, Bender and Benson returned to the van, while Frazier remained inside the house. Exh. A at R1684-85 (Doc. 26-3 at 35-36).

When Bender and Benson returned to the van, petitioner had moved to the rear driver-side seat. Exh. A at R1685-86 (Doc. 26-3 at 36-37). Bender got into the front passenger seat, and Benson got into the rear passenger-side seat. Exh. A at

---

[1] Bender testified that she, Benson, and a person she knew as "Moe" were the van's passengers. Exh. A at R1660, 1666-67 (Doc. 26-3 at 11, 17-18). At trial, Bender was unable to identify anyone in the courtroom as "Moe." Exh. A at R1661 (Doc. 26-3 at 12). But Bender testified that she identified "Moe" in a pretrial photo array, Exh. A at R1661-66 (Doc. 26-3 at 12-17), and the parties stipulated that petitioner is the person that Bender identified as "Moe" in the photo array, *see* Exh. A at R724 (Doc. 26-1 at 274).

2

R1686 (Doc. 26-3 at 37). Petitioner then told Benson, "Don't leave no evidence behind. This [n-word]'s dead." *Id.* Bender turned around and saw that petitioner had a gun on his lap. Exh. A at R1686-87 (Doc. 26-3 at 37-38). A short time later, Frazier returned to the van and began driving to Calumet Park. Exh. A at R1689 (Doc. 26-3 at 40).

When the group arrived in Calumet Park, petitioner told Frazier to drop him off at his girlfriend's house and directed Frazier to the location. Exh. A at R1690-91 (Doc. 26-3 at 41-42). Along the way, Frazier stopped the van to talk to a man named Marcus. Exh. A at R1692 (Doc. 26-3 at 43). Frazier then resumed driving until he reached the location that petitioner had identified, pulled over, and parked the van. Exh. A at R1694-95 (Doc. 26-3 at 45-46). Once there, Bender got out and walked toward a bus stop. Exh. A at R1695-96 (Doc. 26-3 at 46-47).

When Bender looked back at the van, she saw petitioner shoot Frazier in the back of the head through the headrest and then run away, while Benson went through Frazier's pockets. Exh. A at R1696-98 (Doc. 26-3 at 47-49). Benson called for Bender to come back to the van, but Bender kept walking toward the bus stop. Exh. A at R1699 (Doc. 26-3 at 50). She then saw Benson run away from the van. *Id.*

When the police visited Bender the next day, she lied about what happened the prior evening. Exh. A at R1700-01 (Doc. 26-3 at 51-52). But two days after the shooting, Bender contacted the police, and the day after that, she went to the police station and identified petitioner in a photo array. Exh. A at R724, 1725-28 (Doc. 26-

1 at 274, Doc. 26-3 at 76-79).  Four months later, she viewed a lineup and identified petitioner as the man who shot Frazier.  Exh. A at R1728-31 (Doc. 26-3 at 79-82).

Bender denied telling the police that she believed Benson arranged Frazier's murder.  Exh. A at R1744-45 (Doc. 26-3 at 95-96).  But the parties stipulated that a police report indicated that Bender told detectives on November 6, 2007, that she believed that Benson arranged the murder.  Exh. A at R826-27 (Doc. 26-2 at 13-14).

Marcus Clemons testified that he was walking to a gas station between 10 and 10:30 p.m. on November 4, 2007, when Frazier pulled up next to him in a minivan and asked if he needed a ride.  Exh. A at R1784-86 (Doc. 26-3 at 135-37).  Clemons said he did not, and Frazier drove away.  Exh. A at R1786 (Doc. 26-3 at 137).  Clemons testified that, during his brief conversation with Frazier, he saw Bender in the front passenger seat of the van, Benson in the rear passenger-side seat behind Bender, and petitioner in the rear driver-side seat behind Frazier.  Exh. A at R1787-89 (Doc. 26-3 at 138-40).

Petitioner did not testify at trial, but the State introduced a videorecorded statement that he gave to police after his arrest in February 2008.  Exh. A at R711-18 (Doc. 26-1 at 261-68).[2]  In the statement, petitioner admitted that he was in the minivan during the shooting, but claimed that he was seated behind Bender, and

---

[2] The video was submitted at trial as People's Exhibit 15A and played for the jury. Exh. A at R718 (Doc. 26-1 at 268).  Respondent's counsel has submitted the video to this Court in accordance with this district's digital media submission policy.  *See* Digital Media Exhibit Submission, U.S. District Court for the Northern District of Illinois, at https://www.ilnd.uscourts.gov/Pages.aspx?page=ExhibitDrop.  The video is cited here as "PE15A."

that Benson was the one who sat behind Frazier. PE15A at 25:05-26:20. According to petitioner, after the group returned to Calumet Park, Benson told Frazier where to pull over. *Id.* at 27:00-27:25, 29:00-29:45. When Frazier did, Benson gave petitioner "a look" and then lifted his left hand from his side to reveal the handle of a gun. *Id.* at 29:45-31:30. Petitioner said that, when he saw the gun, he did not know what Benson planned to do, so he grabbed the door handle and then heard a gunshot. *Id.* at 31:30-31:52. He then opened the door, exited the van, and ran away. *Id.* at 31:52-33:40.

In addition to instructing the jury on the elements of first degree murder and armed robbery, the trial court gave an instruction on accountability principles. Exh. A at 907 (Doc. 26-2 at 94). The jury returned verdicts finding petitioner guilty of both offenses. Exh. A at R940-42 (Doc. 26-2 at 127-29). The state appellate court affirmed on direct appeal, *see* Exh. E, and the Illinois Supreme Court denied leave to appeal in January 2014, *see* Exh. G.

## II. After an evidentiary hearing, the state courts deny petitioner's postconviction actual innocence claim.

In October 2014, petitioner filed a petition for postconviction relief in the state trial court, *see* Exh. H, which he later amended, *see* Exh. I, alleging, as relevant here, that his conviction is unconstitutional because newly discovered evidence demonstrates that he is actually innocent, *see id.* at C239-43. In support of this claim, petitioner submitted two affidavits from Benson and a letter that Benson wrote to petitioner's mother, in which Benson stated that he shot Frazier and acted

5

alone. *Id.* at C260-70.[3] Petitioner argued that this evidence supported a claim of actual innocence under the Illinois Constitution because it was "'new, material, noncumulative,'" and "'so conclusive it would probably change the result on retrial.'" C240 (quoting *People v. Coleman*, 2013 IL 113307, ¶ 96); *see People v. Washington*, 665 N.E.2d 1330, 1337 (Ill. 1996) (recognizing freestanding actual innocence claim under state constitution).

In September 2019, the trial court held an evidentiary hearing on petitioner's actual innocence claim. *See* Exh. J at R71, 74-75. At the hearing, Benson again claimed that he shot Frazier, and that petitioner had not been aware of his plan to do so. *Id.* at R86, 97. Benson testified that he killed Frazier because Frazier was having an affair with Benson's girlfriend (Bender) and because Benson believed that Frazier was responsible for the murder of Benson's friend. *Id.* at 86-87.

Benson testified that, after the stop at the drug house in Chicago, he directed Frazier to drive to the location in Calumet Park where Frazier parked the van. *Id.* at R94-95. According to Benson, he was seated in the rear driver-side seat behind Frazier, and petitioner was in the rear passenger-side seat behind Bender. *Id.* at R90, 93-94, 97. Benson testified that, after Frazier stopped the van, petitioner and Bender exited, and Benson then pulled out a gun and shot Frazier in the head. *Id.*

---

[3] Petitioner also submitted affidavits from Geroise Walker, in which Walker stated that he heard the shooting from his home across the street, looked out the window, and saw a man and woman walking away from the scene. Exh. I at C271-74. Walker stated that he knows petitioner and does not believe that the man he saw was petitioner. *Id.* at C271, 273. But petitioner neither called Walker at the evidentiary hearing on his postconviction petition, nor relied on Walker's affidavits in his subsequent appeal. *See* Exh. N at 3 n.2.

6

at R95-97, 131. Benson testified that he neither showed petitioner the gun before shooting Frazier nor told petitioner that he had a gun that day. *Id.* at R97, 131.

According to Benson, after shooting Frazier, he got out of the van and called for Bender to come back. *Id.* at R98. When Bender returned, he made her go through Frazier's pockets. *Id.* Benson then found Clemons and gave him the gun to dispose of. *Id.* at R98-99. Later, he told Clemons to lie about who was seated where when Frazier stopped the van to talk to him. *Id.* at R110. Benson testified that he spoke with Bender the day after the shooting and told her to keep quiet, but that when he told police that petitioner had shot Frazier, he was unaware of what Bender had told police. *Id.* at R108-110.

Benson conceded that he and petitioner were members of the same gang, *id.* at R96, but claimed that they were not friends, their gang allegiance meant little because they lived on different blocks, and they had not spoken since 2007, *id.* at R111-12. Benson testified that he decided to come forward because it had "been eating [him] up" that petitioner was "an innocent man locked up for something" that he did not do. *Id.* at R113. He testified that he wrote petitioner's mother a letter stating that petitioner was innocent after getting her contact information from a fellow inmate, Santana McCree. *Id.* at R114-17.

The State called McCree, who testified that he, petitioner, and Benson had plotted to get petitioner's conviction overturned in order to collect the money that petitioner would receive for having been wrongfully convicted. *Id.* at R161-62, 196-97. McCree testified that he alerted the State's Attorney's office to the plan and

agreed to testify at the evidentiary hearing in exchange for the State's agreement to recommend a seven-year reduction in his sentence. *Id.* at R156-59. He described himself as a "hustler" and conceded that he had lied in a postconviction filing in his own case. *Id.* at R218-23.

In October 2020, after hearing closing argument and taking the matter under advisement, the trial court denied relief. *Id.* at R323, 338. The court found that Benson "was not credible" and "would be significantly impeached" at a retrial. *Id.* at R337.[4] In particular, the court noted inconsistencies between petitioner's statement to police and Benson's evidentiary hearing testimony concerning (1) whether Benson showed petitioner his gun before the shooting, and (2) when petitioner exited the van in relation to the shooting. *Id.* at R332-34. The court also doubted that petitioner would get out of the van before the shooting, as Benson asserted, if he had no knowledge that Benson planned to shoot Frazier. *Id.* at R334. And the court noted that while the evidence at trial implicated petitioner as the shooter, the jury was instructed that it could find petitioner guilty under accountability principles. *Id.* at R331-32. For all these reasons, the court concluded that Benson's testimony would not change the result on retrial. *Id.* at R337-38.

The state appellate court affirmed. Exh. N. As relevant here, the appellate court determined that the record supported the trial court's finding that Benson was not credible and its conclusion that Benson's evidentiary hearing testimony

---

[4] The trial court found that McCree too lacked credibility and gave little weight to his testimony. *Id.* at R336-37.

"was not sufficient, when considered along with the trial evidence, to probably or likely lead to a different result on retrial." *Id.* at 8-9, ¶¶ 49, 56. Like the trial court, the appellate court relied on the discrepancies between petitioner's statement to police and Benson's evidentiary hearing testimony, and rejected petitioner's contention that the discrepancies were minor and immaterial. *Id.* at 9, ¶¶ 50-53. The appellate court also agreed with the trial court that "Benson's rendition of events — where [petitioner] exited the vehicle *before* Benson pulled out the gun and shot Frazier — could suggest that [petitioner] knew exactly what was about to happen and thus both impeach Benson's own testimony to the contrary and provide significant support for a conviction of [petitioner] on a theory of accountability upon retrial." *Id.* at 9, ¶ 54 (emphasis in original).

The Illinois Supreme Court denied petitioner's petition for leave to appeal in May 2022. *See* Exhs. O & P.

**III.    Petitioner seeks federal habeas relief on his actual innocence claim.**

In September 2022, petitioner filed a habeas petition in this Court. Doc. 1.[5] In an amended petition, petitioner presents a single claim of actual innocence, alleging that the outcome of his trial would have been different had the jury heard Benson's evidentiary hearing testimony. Doc. 16 at 5.

_____

[5] The same month, petitioner (or an inmate purportedly acting on his behalf) filed a separate petition that was docketed under a new case number. *See Crawford v. Truitt*, No. 22 C 5145 (N.D. Ill.) (Doc. 1). This Court dismissed the second petition as duplicative and advised petitioner that he could seek leave to amend the petition filed in this case if he wished. *See id.* (Doc. 5). This Court then granted petitioner's motion to file an amended petition in this case. Doc. 15.

9

## Argument

This Court should deny the petition without an evidentiary hearing because petitioner's actual innocence claim is noncognizable, barred by principles of non-retroactivity, insufficient to overcome the deference owed to the state courts' rejection of the claim under § 2254(d), and meritless even under *de novo* review. Because these issues are not debatable, this Court should also decline to issue a certificate of appealability.

## I.   Petitioner's actual innocence claim is not cognizable on federal habeas review.

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution — not to correct errors of fact." *Id.* The rule likewise rests on the understanding that "the trial is the paramount event for determining the guilt or innocence of the defendant." *Id.* at 416.

Federal habeas law thus "treat[s] claims of 'actual innocence,' not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits, even though his habeas petition would otherwise be regarded as successive or abusive." *Id.* at 416-17; *see id.* at 404 (explaining that "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas

10

petitioner must pass to have his otherwise barred constitutional claim considered on the merits"); *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief").

Petitioner's habeas petition does not present any independent constitutional claims. *See* Doc. 16 at 5-6. Instead, the petition asserts a single claim of actual innocence as a freestanding ground for habeas relief. *Id.* But for the reasons just discussed, "the Supreme Court has never held that actual innocence claims, standing alone — separate and apart from any constitutional error — could support habeas relief," nor has the Seventh Circuit "ever acknowledged such a claim." *Cal v. Garnett*, 991 F.3d 843, 850-51 (7th Cir. 2021).

*Herrera* assumed, without deciding, "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. at 417; *see Perrone v. United States*, 889 F.3d 898, 903 (7th Cir. 2018) (explaining that "[t]he Supreme Court has flagged the possibility that actual innocence might be enough to justify collateral relief in a capital case on the theory that the execution of one who is actually innocent violates the Eighth Amendment"). That narrow exception, if it exists, would not apply here because (1) petitioner was not sentenced to death, and (2) state law afforded him an opportunity to litigate his actual innocence claim.

For all these reasons, petitioner's actual innocence claim is not cognizable on federal habeas review, *see* 28 U.S.C. § 2254(a) (federal habeas relief is available "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States"), and his petition should be denied on that basis.

## II. A newly recognized constitutional rule that a post-trial showing of actual innocence invalidates an otherwise valid conviction would not apply retroactively to petitioner's case.

Even if a court were now to recognize a freestanding actual innocence claim as a cognizable constitutional claim, petitioner would not be entitled to the benefit of that new rule on federal habeas review.

Under the retroactivity framework adopted in *Teague v. Lane*, 489 U.S. 288, 310 (1989) (plurality opinion), "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *See Welch v. United States*, 578 U.S. 120, 128 (2016).[6]  On the other hand, "[n]ew *substantive* rules generally apply retroactively" to cases on collateral review.  *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (emphasis in original).

"To date, an assertion of actual innocence based on evidence post-dating a conviction has not been held to present a viable claim of constitutional error." *Arnold v. Dittmann*, 901 F.3d 830, 837 (7th Cir. 2018); *see also Cal*, 991 F.3d at 850-

---

[6] *Teague* recognized an exception for "watershed rules of criminal procedure," 489 U.S. at 311 (plurality opinion), but the Court has since held that "no new rules of criminal procedure can satisfy the watershed exception" and declared the exception "moribund," *Edwards v. Vannoy*, 141 S. Ct. 1547, 1559-60 (2021).

51 (noting that neither the Supreme Court nor the Seventh Circuit has recognized a freestanding claim of actual innocence as a ground for habeas relief). Accordingly, recognizing the existence of a freestanding actual innocence claim under the federal constitution would announce a new rule for *Teague* purposes because the existence of such a claim is not "*dictated* by precedent existing at the time [petitioner's] conviction became final." *Edwards v. Vannoy*, 141 S. Ct. 1547, 1555 (2021) (internal quotation marks omitted; emphasis in original).

Moreover, for *Teague* purposes, a freestanding actual innocence claim should be characterized as a procedural, rather than substantive, rule. *But see Ewalan v. Holbrook*, No. C20-01497-JLR-SKV, 2022 WL 1477557, at *28 (W.D. Wash. Mar. 28, 2022) (characterizing freestanding actual innocence claim as substantive under *Teague*). "A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes," such as by "narrow[ing] the scope of a criminal statute by interpreting its terms" or by "plac[ing] particular conduct or persons covered by the statute beyond the State's power to punish." *Welch*, 578 U.S. at 129 (internal quotation marks omitted). In contrast, procedural rules "regulate only the *manner of determining* the defendant's culpability," such as by "alter[ing] the range of permissible methods for determining whether a defendant's conduct is punishable." *Id.* (internal quotation marks omitted; emphasis in original). In other words, procedural rules "do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the

13

possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." *Id.* (internal quotation marks omitted).

A freestanding actual innocence claim does not fit neatly into either of these categories, but it is better characterized as a procedural rule because it serves to "regulate . . . the manner of determining the defendant's culpability" after trial, and does not "place particular conduct or persons . . . beyond the State's power to punish." *Id.* (internal quotation marks and emphasis omitted). Stated differently, requiring a conviction to be set aside if the defendant presents new evidence establishing his innocence would effectively mandate a new, post-trial procedure for determining whether the defendant engaged in statutorily prohibited conduct, but it would not undermine a state's constitutional authority to punish particular conduct or persons.

Thus, because the cognizability of a freestanding actual innocence claim as a ground for federal habeas relief is not dictated by existing precedent, let alone precedent in existence when petitioner's conviction became final, a decision recognizing such a claim today would announce a new procedural rule under *Teague* that would not be retroactively applicable to petitioner's case.

## III. Section 2254(d) bars habeas relief because the state appellate court reasonably rejected petitioner's actual innocence claim on the merits.

Cognizability and retroactivity aside, petitioner cannot obtain federal habeas relief on his actual innocence claim because he cannot overcome the deference owed to the state courts' rejection of the claim on the merits.

When a state court has rejected a claim on the merits, a federal court "shall not" grant habeas relief on that claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Brown v. Davenport*, 142 S. Ct. 1510, 1520 (2022). This is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal quotations marks and citation omitted). The question is "not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable — a substantially higher threshold for a prisoner to meet." *Shoop v. Twyford*, 142 S. Ct. 2037, 2043 (2022) (internal quotation marks omitted). The scope of federal habeas review under § 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

An examination of the decision of the state appellate court on postconviction appeal — the last reasoned state court decision rejecting petitioner's actual innocence claim on the merits, *see Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) — demonstrates that petitioner can satisfy neither prong of § 2254(d). First, the state appellate court decision rejecting petitioner's actual innocence claim cannot have contradicted or unreasonably applied clearly established Supreme Court precedent. That is because the Supreme Court has not clearly established the existence of a

freestanding actual innocence claim under the federal constitution. *See McQuiggin*, 569 U.S. at 392 ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *Cal*, 991 F.3d at 851 ("the Supreme Court has never held that actual innocence claims, standing alone . . . could support habeas relief").

Moreover, even when the Supreme Court has assumed (without deciding) that a freestanding claim of actual innocence may be cognizable in capital cases, it has stressed that the standard for prevailing on such a claim would "be extraordinarily high." *Herrera*, 506 U.S. at 417. Indeed, the Court has explained that "a hypothetical freestanding innocence claim" would "require[ ] more convincing proof of innocence than" is necessary to establish a gateway actual innocence claim, *House v. Bell*, 547 U.S. 518, 555 (2006), which itself requires a petitioner to "show that it is more likely than not that no reasonable juror would have convicted him" in light of "new reliable evidence," *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). Here, in accordance with state law, the state appellate court assessed petitioner's actual innocence claim under a less demanding standard: whether his new evidence "'would probably change the result on retrial.'" Exh. N at 7, ¶ 40 (quoting *People v. Robinson*, 2020 IL 123849, ¶ 47). Thus, even if the Supreme Court had clearly established the existence of a freestanding actual innocence claim under the federal constitution, the state appellate court's decision

16

rejecting petitioner's claim did not unreasonably apply the standard that would govern a (hypothetical) freestanding actual innocence claim.[7]

Second, the state appellate court's decision was not "based on an unreasonable determination of the facts in light of the evidence presented" at the postconviction evidentiary hearing. 28 U.S.C. § 2254(d)(2). The appellate court determined that the record supported the trial court's finding that Benson's evidentiary hearing testimony — asserting that he shot Frazier without petitioner's foreknowledge — was not credible. Exh. N at 9, ¶ 56. On federal habeas review, this factual finding is "presumed to be correct" unless petitioner can rebut the presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Woolley v. Rednour*, 702 F.3d 411, 426-27 (7th Cir. 2012) ("State court findings, including credibility determinations, are presumed correct on federal habeas review, unless the petitioner rebuts those findings with clear and convincing evidence.") (internal quotation marks omitted). That presumption is especially strict when a state court's credibility determinations are at issue, because federal habeas courts have "no license to redetermine [the] credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).

---

[7] Although the state appellate court relied on state law when rejecting petitioner's actual innocence claim, its decision should also be regarded as having adjudicated the merits of any federal actual innocence claim. *See Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("if the state-law rule subsumes the federal standard — that is, if it is at least as protective as the federal standard — then the federal claim may be regarded as having been adjudicated on the merits" when the state court rejected the state-law claim).

There is no clear and convincing evidence in the record that rebuts the state courts' factual findings. To the contrary, these findings are amply supported by the record. As the appellate court explained, there are material discrepancies between key assertions in Benson's evidentiary hearing testimony — namely, that he did not show petitioner his gun before the shooting, and that petitioner exited the van before the shooting, Exh. J at R95-97, 131; *see also* Exh. I at C266 (Benson stating in affidavit that petitioner "was already out of the van" and "about eight feet away" when Benson shot Frazier) — and petitioner's statements to police that Benson showed him the handle of the gun before the shooting, *see* PE15A at 29:45-31:30, and that he was still in the van when he heard the gunshot, *id*. at 31:30-33:40. These discrepancies undermine Benson's credibility and diminish the probability that a jury would credit his new version of events over the accounts provided at trial by Bender and Clemons. And they also increase the probability that a jury would find petitioner guilty under a theory of accountability even if it concluded that Benson was the gunman, as the state appellate court explained. *See* Exh. N at 9, ¶ 54. At the very least, the state appellate court's determinations to this effect are not "so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable" under § 2254(d)(2). *Alston v. Smith*, 840 F.3d 363, 370 (7th Cir. 2016) (internal quotation marks omitted).

Because the state courts' finding that Benson's evidentiary hearing testimony was incredible does not "ignore[ ] the clear and convincing weight of the evidence," petitioner cannot show that the state appellate court's decision rejecting his actual

18

innocence claim was based on "an unreasonable determination of the facts" under § 2254(d)(2). *Morgan v. Hardy*, 662 F.3d 790, 801 (7th Cir. 2011). Accordingly, even if a freestanding actual innocence claim were cognizable on federal habeas review and retroactively applicable to petitioner's case, section 2254(d) would bar relief on the claim.

## IV.  Petitioner's actual innocence claim fails even under *de novo* review.

Finally, even absent the deference owed to the state courts' rejection of petitioner's claim under § 2254(d) — or if this Court were to conclude that petitioner can overcome that deference — petitioner's actual innocence claim would still fail under *de novo* review. *See Gacho v. Wills*, 986 F.3d 1067, 1071 (7th Cir. 2021) (if petitioner "surmounts the high bar" of § 2254(d), then federal court "review[s] his claim de novo").

As noted, *see supra* p. 16, the Supreme Court has explained that *if* the federal constitution were to recognize a freestanding actual innocence claim, the standard for prevailing on such a claim would "be extraordinarily high." *Herrera*, 506 U.S. at 417. The Court has stated that "a hypothetical freestanding innocence claim" would "require[ ] more convincing proof of innocence than" is necessary to establish a gateway actual innocence claim. *House*, 547 U.S. at 555. The gateway standard — which is itself "demanding and seldom met," *McQuiggin*, 569 U.S. at 386 (internal quotation marks omitted) — requires a petitioner to present "new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial," and "show that it is

more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 324, 327.

Benson's evidentiary hearing testimony falls far short of satisfying even the gateway actual innocence standard, much less the more demanding standard that would govern a freestanding actual innocence claim. Given the material discrepancies between Benson's postconviction assertions purporting to exonerate petitioner and petitioner's statements to police, *see supra* p. 18, Benson's account cannot be considered "reliable" or "trustworthy," *Schlup*, 513 U.S. at 324. And given those discrepancies — as well as Bender's and Clemons' trial testimony implicating petitioner — it is not "more likely than not that no reasonable juror would have convicted" petitioner in light of Benson's evidentiary hearing testimony. *Id.* at 327.

Because petitioner fails to satisfy the gateway actual innocence standard, he necessarily fails to satisfy the more demanding burden of proving his actual innocence to the degree necessary to obtain habeas relief on a freestanding actual innocence claim. *House*, 547 U.S. at 555; *see Tabb v. Christianson*, 855 F.3d 757, 764 (7th Cir. 2017) (noting that freestanding actual innocence claim would require "objective and highly reliable evidence of actual innocence"). Thus, even reviewed *de novo*, petitioner's actual innocence claim is meritless and should be denied.

## IV. No certificate of appealability is warranted.

When denying the habeas petition, this Court should also deny petitioner a certificate of appealability. *See* Habeas Rule 11(a) ("The district court must issue or

deny a certificate of appealability when it enters a final order adverse to the applicant."); *Gonzalez v. Thaler*, 565 U.S. 134, 143 n.5 (2012) ("Rule 11(a) requires district judges to decide whether to grant or deny a COA in the first instance.").  To obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), such that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Where a district court denies a claim on procedural grounds, the petitioner must show that reasonable jurists would debate both the procedural ruling and the underlying merits of the claim.  *Id.*  Here, reasonable jurists would not debate that petitioner's actual innocence claim is either noncognizable, barred under the non-retroactivity principles of *Teague*, insufficient to overcome the deference of § 2254(d), or meritless under *de novo* review.

**Conclusion**

This Court should deny petitioner's habeas petition and decline to issue a certificate of appealability.

February 3, 2023            Respectfully submitted,

                                        KWAME RAOUL
                                        Attorney General of Illinois

By:     s/ Eric M. Levin
         ERIC M. LEVIN, Bar # 6284971
         Assistant Attorney General
         100 West Randolph Street, 12th Floor
         Chicago, Illinois 60601-3218
         (773) 590-7065
         eric.levin@ilag.gov

         *Counsel for Respondent*

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that on February 3, 2023, I electronically filed the foregoing **Answer** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, and mailed a paper copy of said document via United States Postal Service to the following non-CM/ECF user:

> Tyrese Crawford, M20778
> Stateville Correctional Center
> P.O. Box 112
> Joliet, Illinois 60434

> <u>/s/Eric M. Levin</u>
> ERIC M. LEVIN, Bar # 6284971
> Assistant Attorney General
> 100 West Randolph Street, 12th Floor
> Chicago, Illinois 60601-3218
> (773) 590-7065
> eric.levin@ilag.gov