FILED
3/21/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
E.C

SCANNED AT STATEVILLE CC and E-mailed
3-22-23 by CK 208 pages
date initials No.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TYRESE CRAWFORD, M20778<br>Petitioner, | REQUESTING EVIDENTIARY HEARING |
| V. | No. 22 C 4748 |
| CHARLES TRUITT, Warden, Stateville Correctional Center<br>Respondent. | The Honorable Virginia M. Kendall Judge presiding. |

# PETITIONER'S REPLY TO RESPONDENT'S ANSWER TO FEDERAL HABEAS CORPUS PETITION

1). Petitioner, Tyrese Crawford, is identified as prisoner M20778 and is being held in the unlawful custody of Charles Truitt, warden of Stateville Correctional Center in Joliet, Illinois. Petitioner filed a pro se writ of Habeas Corpus, leave to proceed in forma pauperis, and Motion for Appointment of Counsel on September 6, 2022. Via Motion To Amend pursuant to court order dismissing petitioners habeas corpus action on it's own motion as duplicative # 22 C 5145.

2). petitioner, Tyrese Crawford, motioned the Court

For an extension of Time on February 23, 2023 because petitioner is without a complete copy of the state court record and was forced to read the respondents exhibits which is in "very small print" and i was unable to meet the courts deadline of march 3, 2023. And without the legal knowledge i ask the courts' indulgence to allow me the benefit of the doubt because your honor never ruled on my Motion for Appointment of Counsel.

3). petitioner, Tyrese Crawford, herein can and does establish that his incarceration violates the Constitution, laws, and treaties of the united states pursuant to 28 U.S.C 2254. Estelle v. McGuire, 502 U.S. 62, 67-78; Hass v. Abrahamson, 910 F.2d 384, 389

petitioner's detention violates fundamental liberties safeguarded against state action by the Federal Constitution. Wessling v. Bennett, 410 F. 2d 250; Quoting Townsend v. Sain, 83 S.Ct. 745.

Tyrese crawford habeas corpus petition will demonstrate that he is actually Innocent of the crimes by which he has been convicted.

For the reasons discussed below, the court should grant petitioners writ for habeas corpus. And in the alternative if the Court deem the petitioner didnot demonstrate his burden of actual innocence, i acknowledge that the district Court does not have Authority to grant the writ based on "freestanding claims of innocence" but my ommission of the ineffective assistance of Counsel claim from my application does not foreclose my claim as long as said claim is included in my reply to respondants answer. U.S. v. Page, 972 F. Supp. 1140.

## Background

(I). Petitioner, Tyrese Crawford, was convicted in State Court of First degree murder and armed robbery. Tyrese Crawford and his co-defendant, Tony Benson, stand convicted of 2008 murder of Johnny Frazier in Calumet park, Illinois. Frazier was seated in the driver's seat of a van, and was shot in the head by someone who fired through the headrest and from the backseat. At trial, the evidence primarily consisted of (1) the testimony

of Raven Bender, who was co-defendant Benson's girlfriend who testified that crawford was allegedly the shooter, but she could not identify the perpetrator described as "Moe" the individual she witness shoot Johnny Frazier in court (Exhibit-A). petitioner was not identified in court as The person described as Moe who killed The victim.

(II). marcus clemmons, testified that he was in custody of the Illinois Department of Correction and was a convicted felon. He further testified that, on the evening of November 4, 2007, he was walking to a gas station in calumet park, when a van pulled up alongside him. The driver, Johnny Frazier, asked clemmons if he needed a ride. Clemmons told him no, and Frazier drove away. He also Testified that the van contained four people: Frazier in the driver Seat, "Raven" (ie., Bender) in the front passenger Seat, crawford behind the driver, And Benson behind the passenger Seat. (Tr. R. BB 73-80).

(III). crawford's videotaped interrogation

The Jury viewed A videotape of crawfords interrogation. In the recording, crawford explained that, on november 4, 2007, he saw Frazier and Bender driv-

-ing in Calumet park, Flagged them down, and asked Frazier to take him to buy some marijuana. (State Trial Ex. 15A/ petitioner's Ex. 3 at 7:00-8:10) Frazier agreed, took Crawford to a location to purchase the marijuana, and then drove Crawford back. (Id. 8:05-8:25). Shortly thereafter, Benson and Clemmons approached Crawford. (Id. 8:40-8:55). Benson asked Crawford if he knew where Bender was. (Id 8:40-8:55). Crawford told him he had seen her with Frazier. (Id) Benson and Clemmons walked away. (Id) Benson approached Crawford again later and then called Frazier or Bender and asked them to come pick him up. (Id. 9:30-10:50) Frazier and Bender picked Benson and Crawford up and they drove to Chicago to buy more marijuana (Id. 10:50-11:10, 12:30-13:55, 18:10-19:25). Later that evening, Crawford became worried that his girlfriend, back in Calumet park, would think he had been gone for too long, and Frazier agreed to take him back (Id. 19:40-20:20, 23:30-50).

Contrary to Bender's testimony, Crawford stated that he had been seated behind Bender, that Benson sat behind Frazier, and that they maintained these

positions when they returned to Calumet park. (Id. 21:30-45; 25:20-26:10) when they got back to Calumet Park and didnot find Crawford's girlfriend at the location where Crawford had expected to find her, Crawford asked Frazier to drop him off on Lincoln St. (Id. 22:00-22:25, 26:40-27:50). Benson then inter--jected and asked Frazier to stop on Winchester Ave. instead. (Id. 28:35-29:10). When Frazier stopped, and as Crawford was getting ready to exit the Van, Benson gave Crawford a "look" and Crawford saw just a "little bit" of the handle of a gun in Benson's hand, while the rest of the gun appeared to be between Benson's leg and the door of the Van (Id. 30:35-31:35). Crawford had no idea what Benson planned to do and he tried to get out of the Van as quickly as possible. (Id. 31:30-45). As Crawford opened the door, he heard a shot and ran without looking back. (Id. 31:50-32:00, 32:50-33:03).

(IV). <u>Closing Arguments</u>

The state argued to the jury that Crawford was guilty under three theories: intentional murder, knowing murder, and felony murder. The state

Specifically argued that Crawford was the shooter, but Contended that Crawford and Benson "acted together" in robbing and killing Frazier, and maintained that, under the "law of accountability," they were equally guilty. The jury received an instruction on accountability. Crawford, 2013 IL App (1st) 111345-U. Affirmed.

(V). Petition for post Conviction Relief

In October 2014, petitioner Filed a petition for post conviction relief in the state trial Court, (See: people exhibit H), which he later amended (See: people's exhibit H thereto) there Alleging his conviction is unconstitutional because newly discovered evidence demonstrates That he is actually innocent. And that his Trial Counsel was ineffective for Failure to properly preserve claims for appellate review. The circuit Court dismissed the ineffective assistance claim ruling as to the Substance depriving the petitioner the opportunity to 'develop a record', holding a evidentiary hearing Solely with regards To the actual innocence claim. the Court's Finding that Crawford did not demonstrate presudice was legally incorrect & premature.

## ARGUMENT

This court should grant the petition and Hold an evidentiary hearing because petitioner actual innocence claim has an "independent constitutional violation" which occured as a result of Trial Counsels' ineffective behav-ior and not only did Trial Counsel not preserve any claims but he (David Wiener) failed to investigate or interview Co-defendants Tony Benson who testified that he would have told the truth if petitioner's attorn-ey would have called him as a witness (state exhibit I Ln-18). respondent conveniently omitts petitioner has an 'independant' Constitutional violation under the Sixth and Fourteenth Amendments of the united Constit-ution where trial counselor (david wiener) failed to properly preserve any issues for appellate review Therefore his failure to put the states case to any "mean-ingful and adversarial test" in accordance with U.S. V. Cronic, 466 U.S. 648; Strickland V. Washington, 466 668, 104 S.ct. 2052. Trial Counselor was instructed on numerous occasions to Talk To Co-defendant Tony Benson but to no avail. appellate counselor (Jeffrey

SVEHLA) was ineffective when he denied the petitioner is only appeal 'As of right' Douglas v. California, 372 U.S. 353; Murray v. Carrier, 477 U.S. 478, To rely on A Trial error and omits the 'structural error' which The Sixth Amendment guarantees All citizens The right to effective assist--ance counsel during trial. Petitioner raised A fed--eral claim on post Conviction appeal: (See: exhibit-F)

B.) CRAWFORD'S ineffective Assistance of trial counsel claim required an evidentiary hearing.

U.S. Constitution, Amend. VI & XIV

Illinois Constitution 1970, Art. I § 8

Strictland v. Washington, 466 U.S. 668; People v. Enis, 194 Ill. 2d 361; People v. Harris, 206 Ill. 2d 1; People v. Price, 375 Ill. App. 3d 684.

The Appellate Court's adjudication of this claim on the merits in the state Court was A decision that was contrary to, and involved an unreasonable appl--cation of clearly established federal law As deter--mined by the Supreme Court of the united states, In U.S. v. Cronic, 466 U.S. 648; Strictland, Supra.,

The circuit Court dismissed The ineffective assist-—Ance of Counsel claim prematurely in the second stage without providing the petitioner an evidentiary hearing To "develop A record" Once Mr. Benson Testified "he would have Testified for crawford had his Attorney came to Talk To him prior To trial" The ineffective Assistance counsel claim became ripe for an evidentiary hearing. (See: resp-—ondent's answer Exhibit I Line-18). both Benson's Testimony and Crawfords statement to police Are clear That Crawford had no Knowledge of Benson's plans. (State Trial Ex. 15A / petitioner's Ex. 3 At 31:30; R. 97-98).

Petitioner 'fairly presented' the ineffective ass-—istance of Counsel claim in accordance with the united States Supreme Court of O'Sullivan v. Boerckel, 526 U.S. 838. The Appellate Courts opinion should not be presumed Correct Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, where per paragraph (7) of Mata Id. petitioner was denied Due process of law. where the Appellate Court Factual Determination And fact Finding on this claim was not fairly Supported by the record, And are clearly erroneous.

Where the Appellate Court's opinion on this claim opinioned: "This claim was barred by the doctrine of Collateral estoppel" (And in footnote 1 portion of this order are Taken from our prior disposition of defend-ant's direct appeal. See People v. Crawford, 2013 IL App (1st) 111345-U).

Illinois prisoners Are Allowed to raise claims of ineffective assistance of Counsel on direct appeal if the record Supports such But ineffective assistance of Counsel are more often issues That Are Dhor of the record And the post Conviction petition is The only rem-edy to address Such claims. The appellate courts relia-nce on the doctrine of Collater estoppel is misplaced, because there was no issue regarding the newly discover-ed evidence on direct appeal and the ineffective ass-istance of Counsel was Solely About Trial counsel's fail-ure To properly preserve the Issue pertaining the trial Courts Comments during Jury deliberation Coerced the jury. (opin At slip 3-6).

petitioners ineffective Assistance of Counselor claims in the Amended petition for post Conviction relief were related to trial and Appellate counselors. trial

Counsel's fail to investigate/interview Tony Benson to find out if he wanted to testify on petitioners behalf. And when Benson testified that he would have, the allegations which were erroneously dismissed without an evidentiary hearing at the second stage became viable issues that can only be adjucated at an evidentiary hearing. The circuit court is/was "foreclosed from engaging in any fact finding.... because all well pleaded facts are to be taken as true", People v. Coleman, 183 Ill.2d 366, 380. Petitioner's claims are based on matters outside the record, it is not the intent of the Act that such claims be adjudicated on the pleadings.

The appellate courts conclusion barring the petitioner's ineffective assistance of trial counsel relying on the doctrine of collateral estoppel are clearly erroneous. See: Appellate Court's oppinion attached (Exhibit-G, slip at 13). Such was inaccurate and incomplete ex rel Green v. Greer, 667 F.2d 585; Khines v. Godinez, 7 F.3d 674, The appellate court recognized the correct Rule of law in Strickland v. Washington, 466 U.S. 668, 678 However, it's decision involved and unreasonable application of the law to the facts of the petitioners case, when

it held as it did in it's opinion:

"petitioner was collaterally estopped and barred from relitigating this issue via defendants postconvic--tion claim & this conclusion also bars defendants claim of ineffective assistance of trial counsel. It is axiom--atic that such claim requires defendant to show that his trial counsel's representation fell below an objec--tive standard of reasonableness and that the deficient performance prejudice his defense. Strickland, Id. and defendant has the burden of establishing both prongs of the strickland test (People v. Burks, 343 Ill. App. 3d 775.)

petitioner did not raise the ineffective assistance of Trial Counsel on direct appeal because the newly dis--covered evidence was unavailable, but Codefendant was willing to testify which the petitioner told trial Counsel on numerous occasion but trial counsel never tried to interview Tony benson. petitioner had a Jury trial and but for Trial Counsel's failure to investigate theres a reasonable probability had the co-defendant-Tony Benson been interviewed and called to testify at petitioner's trial the outcome would have been diff-

erent. Such error effected the Jury verdict and deprived the petitioner a fundamentally fair trial.

The appellate Court's reliance on Collateral estoppel was and involved a unreasonable application of the law. Such was inaccurate and incomplete as demonstrated by the previously forementioned. Thus, The Appellate Court's fact finding and factual deter--minations was not fairly supported by the record, But clearly erroneous. The misapplication of the "doctrine of collateral estoppel" as if a mere allegation of trial error where trial counsel failed to properly preserve is not the same claim where trial counsel failed to do any pre-trial investigation or interviews which the "newly discovered evidence" clearly demonstrates would have been fruitful. The sixth and fourteenth amendments of the united states Constitution guarantees the right to Due Process of Law and Equal protections secured to every citizen must be adhered to. u.s. v. Cronic, 466 u.s. 648; Douglas v. California, 372 u.s. 353; Strick--land v. Washington, 466 u.s. 668.

The Severity of the charge required trial Counsel to investigate and interview any and all witness who can

probably exonerate the petitioner. The determin-ative question - whether there's "a reasonable probab-ility that, but for Counsel's unprofessional errors", like failure to preserve, Wainwright v. Sykes, 433 U.S. 72, the result of the proceed would have been different.

Petitioner, Tyrese Crawford stands convicted for a crime he had absolutely nothing to do with, and one day out to purchase marijuana turns into a nightmare which changed his life. Cases such as Nix v. Whiteside, 475 U.S. 157; Lockhart v. Fretwell, 506 U.S. 364, do not justify a departure from a straightfoward application of Strickland when ineffectiveness of Counsel does deprive the petitioner of a substantive or procedural right which the law entitles him. In the instant case, it is undisputed that Crawford had a right - indeed, a constitutionally protected right - to provide the jury with the mitigating/exonerating evidence that his trial Counsel either failed to investigate/discover or failed to offer. And to have the trial Judge to mis-apply the collateral estoppel doctrine and dismiss the ineffective assistance counsel claim without an evid-entiary hearing to find out why trial Counsel did not

investigate/interview Tony Benson, WAS A denial of the petitioners Due process And Equal protections Secured under the Sixth And Fourteenth Amendments of the United States Constitution.

petitioner WAS unable to show/demonstrate that counsel's Represation fell below An objective standard of reasonableness or that A reasonable probability that the results of the proceedings would have been different, because the trial court denied the claim of ineffective Assistance of Counsel—relying on the Collateral estoppel doctrine which WAS inapplicable. A Evidentiary hearing will Allow the petitioner to demonstrate trial counsel WAS constitutionally ineffective, And A substantial violation of A Con-stitutional right has occured.

Not every factual finding/recitation in A state Courts' decision is A determination of A factual issue triggering the presumption of Correctness. A review-ing Courts' Summary of the evidence At trial for exam-ple is merely that And does not represent A finding of fact <u>Williams V. engle</u>, 683 F. 2d 152; State ex rel <u>Smith V. Fairman</u>, 769 F. 2d 386. Thus, where the peti-

-itioner challenges the Illinois Appellate Court's fact finding and factual determinations as inaccur-ate and incomplete and not fairly supported by the record and has shown such to be clearly erroneous, and petitioner has rebutted the presumption by clear and convincing evidence, the Appellate Courts' should not be presumed correct.

The Appellate Court seems to have merged the claim of Trial Court error and ineffective ass-istance of counsel as one in the same when it dism-issed the ineffective assistance counsel at the second stage relying on the doctrine of Collateral estoppel, such fact finding and factual determination was not fairly supported by the record (See: Respondents' exhibit-B at slip-17). Petitioner's allegation was a trial error regarding the trial court answering a Jury's note which the petitioner believes coerced the Jury, which the trial coun-sel neglected to properly preserve via post trial wr-itten motion <u>people v. Enoch</u>, 122 Ill. 2d 176. which the Respondent invoked <u>neder v. u.s.</u>, 527 u.s. 1, indicating the error was harmless.

The error petitioner raised on direct appeal was

A trial error, which the trial counsel failed to properly preserve, People v. Enoch, 122 Ill. 2d 176. The constitutional allegation raised in the Amended petition for postconviction was 'fairly presented' & exhausted in accordance with O'Sullivan v. Boerckel, 526 U.S. 838, 119 S.Ct. 1728. And the Appellate courts factual finding in the state courts' decision was inaccurate and incomplete and not fairly supported by the record when it relied on the "doctrine of collater estoppel" without an evidentiary hearing to adequately assess the ineffective assistance of counsel claim. See: (Exhibit-G, at slip-11)

Petitioners claim on direct appeal were a trial error related to the trial court abuse of discretion regarding responces to juror notes which the trial counsel neglected to preserve in a posttrial written motion. See: (exhibit-H)...... , The constitutional allegations presented in the Amended petition for postconviction were "independant" constitutional claims, Murray v. Carrier, 477 U.S. 478, 106 S.ct. 2639, which the Appellate court conscrued as the same and dismissed them without an evidentiary hearing. The Appellate courts adjudication of the Ineffective Assistance

of Counsel claim as collateral estopped, was contrary to, and involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. United States v. Cronic, 466 U.S. 648; Strickland v. Washington, 466 U.S. 668; Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495.

The respondents reliance on Neder v. United States, 527 U.S. 1, is misplaced (See: respondent Exhibit C).

Where under the Harmless Error analysis Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246 (1991). In a habeas proceedings, in order to determine whether a trial error was harmless the court must determine whether, in the context of the record as a whole, the error 'had a substantial and injurious effect or influence in determining the jury's verdict' which resulted in actual prejudice to the Defendant. Jenkins v. Nelson, 157 F.3d 485, 497 (7th Cir. 1998) (citing Bretch v. Abrahamson, 507 U.S. 619, 638, 113 S.Ct. 1710 (1993); Agnew v. Leibach, 250 F.3d 1123 (7th Cir. 2001), "Where the record is so evenly balanced that a

Conscientious Judge is in 'Grave doubt' as to the harmlessness of the error," The admission of the evidence is not harmless. O'neal v. McAninch, 513 U.S. 432, 437, 115 S.Ct. 992 (1995).

In the instant Case, where certain basic rights, Including Some trial rights, can never be treated as Harmless Error Abrahamson, Id., Such as the right to Counsel and 'Structural defects' Affecting the Framework in which the trial proceeds as opposed to errors in the trial process itself, Those structural errors implicate basic protections and render a criminal trial Funda- - mentally unfair or an unreasonable vehicle for det- - ermining guilt or Innocence. See: Bracy v. Schomig, 286 F.3d 406; united states v. Harbin, 250 F.3d 532 (7th cir. 2001).

Here the Constitutional defects in the petitioner's trial Show exceptional circumstances, 'Seriously Affecting the Fairness, Integrity or Public reputation of the Judicial proceedings', United states v. Olano, 113 S.Ct. 1770; Quoting United states v. Young, 105 S.Ct. 1038 (1985); United v. States v. Romano, 137 F.3d 667, 682 (1st cir. 1998)

Trial Counsel - David Wiener, was const-

-itutionally Ineffective and made no attempts to in- -vestigate or interview any of the states witnesses or interview co-defendant Tony Benson, Said failure neglected to put the states case to the 'meaningful and adversarial Test' articulated in U.S. V. Cronic, 466 U.S. 648; where the states only witness Raven Bender Testified the individual she descibed as "moe" who shot Johnny Frazier in the head was not in the courtroom. See (Exhibit A, E). had the trial court conducted an evidentiary hearing the petit- -ioners' constitutional claim would be ripe for review.

The Appellate Courts decision was clearly erro- -neous and actually involved an unreasonable applic- -ation of law to the facts of the petitioner's case.

Petitioner raised this claim in the Illinois Supreme Court in a petition for leave to appeal as follows: "The First District Appellate Court declined to grant relief and upheld the second-stage dismissal of several issues (ineffective assistance trial counsel / appellate counsel) raised in petitioner's Postconviction Petition, where those arguments were barred by the Doctrine of Collateral estoppel" & Actual Innocence. The P.L.A was denied.

Petitioner has Demonstrated by this claim that his Federal Constitutional rights to Due process and Equal protections of The law Secured under the Sixth and Fourteenth Amendments of The United States Constitution were Violated, and He is being held in custody in violation of the Constitution, Laws and treaties of the United states of America.

Petitioner, Tyrese Crawford raised claim of 'Actual Innocence' in the state of Illinois per people v. Washington, 171 Ill. 2d 475 (1996) predicated upon The 'newly discovered evidence' obtained from Co-defendant, Tony Benson who took full responsibility and testified "he would have testified for petitioner had Counsel Attempted to interview/called him To Testify during petitioners Trial. See:(State Exhibit-I, Ln-18)

"No person Convicted of a crime should be deprived of life or liberty given Compelling evidence of actual Innocence" Washington, Id At 489; See also people v. Bull, 185 Ill.2d 179, 212 (1998)" An important goal of the criminal justice process is the protection of the innocent accused against an erroneous conviction". To Support a claim of actual innocence, the

Petitioner must present "new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial" People v. Coleman, 2013 IL 113307, (citing Washington, 171 Ill. 2d At 489).

In People v. Robinson, The Illinois Supreme Court recently confirmed the standard in Coleman and rejected any "total exoneration" or "total vindication" standard for Actual innocence. 2020 IL 123849. The court held that "total vindication or exoneration" was the "incorrect standard" for evaluating actual innocence claims. Id. The correct standard is "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the Court's confidence in the judgment of guilt." The court explained "the new evidence need not be entirely dispositive to be likely to alter the result on retrial.... Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence"

Evidence is new when it is "discovered after trial & could not have been discovered earlier through the exercise of due diligence". petitioner believes the District Court

Should grant the **Writ** and order a new evidentiary hear-
-ing because the state court applied the wrong standard & The circuit court's ruling denying postconviction relief was premised on the application of case law that the Illinois Supreme Court overruled in People v. Robinson, 2020 IL 123849. At the beginning of its closing argument, the State Told the circuit court:

> What we're here to decide is whether the evidence presented to you in this hearing leads to total vindication and exoneration of the defendant in this murder.

(R. 299). And at the close of its argument, it reiter-
-ated:

> That testimony does not lead to a total vindic-
> -ation and exoneration that would be required in this case. I'd ask that you deny the petition.

(R. 310).

Petitioner presented "clear and convincing evidence", when the states most critical witness Raven Bender testified "the person she knew as "moe" who she witness kill Johnny Frazier was not in the court room" (See: Exhibit-A).

Also Co-defendant-Tony Benson, Testified during the evidentiary hearing that "he was responsible for the murder and the petitioner had no knowledge he was about to do the murder and didn't participate, and had counsel contacted him he would have testified for petitioner during his trial.

petitioner's habeas corpus petition establishes that petitioner is being held in custody unlawfully in violation of the Due process clause of the fourteenth Amendment of the United states Constitution.

Petitioner's habeas Corpus petition has demonstrated by 'clear and convincing evidence' that he is actually innocent of the crimes of which he has been convicted and fundamental fairness requires that the writ be granted to adjudicate his ineffective assistance counsel claim via an 'evidentiary hearing' which the circuit Court erroneously dismissed.

Mr. Crawford is the victim of a miscarriage of justice and the instant case is amongst the extreme & extraordinary where there was no in Court identification by the main eye witness, and the co-defendant Took responsibility and would have testified for

Petitioner had trial Counsel called him as a witness. In Convicting the petitioner, the jury necess--arily rejected the petitioner's proclamations of innoc--ence in the videotaped interrogation. If the jury had heard Benson Confess and Corroborate petitioners assertion that Benson was the Sole offender (among many other det--ails), there is at least a probability that they would not have credited the state's assertion that Crawford's claim of innocence actually "screams....' I did it' and the petition--er would have been acquitted. The petitioner clearly pro--duced "clear and convincing evidence" from Benson's test--imony, and in demonstrating said facts is by nature the kind of error that might have affected the accuracy of the outcome of the petitioners trial.

petitioner understands the high standard announced in Herrera v. Collins, 506 U.S. 390, 400 (1993) where the Rule is grounded in the principle that federal habeas Courts sit to ensure to ensure that individuals are not imprisoned in violat--ion of the Constitution. But petitioner's "clear and Convincing evidence" of actual innocence in a Colloquial Sense is the case where the state has Convicted the wrong person of the crime. Such claims are of Course regularly made on motions

for new trial after Convictions in both state and fed-eral Courts, especially when Codefendant has credibly confessed to the crime, and it is evident that the law has made a mistake. In the Context of non Capital case, the Concept of "actual innocence" is easy to grasp.

Petitioner has exhausted his actual innocence allegation, and the independent Constitutional claim of ineffective assistance of trial counsel was 'fairly presented' to the state courts as an "independant Const-itutional claim", Therefore, the actual innocence is no longer freestanding, and but for Trial Counsel's ineff-ectiveness to interview/investigate codefendant prior to trial the jury would have heard the truth during the petitioners trial. which Could Support habeas relief.

Petitioner's Claim:

Evidence of Crawford's Innocence Necessitates A New Trial, was raised and exhausted as an Actual Innocence claim in Violation under the sixth and Fourteenth Amendment which guarantee a person accused of a crime the right to a fair trial. A fair trial, In turn, requires effective counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984)

("The right to counsel is the right to the effective assistance of counsel")

The actual innocence necessitated a new trial and the petitioner was unable to secure relief in the state court in what was styled as a freestanding actual innocence claim which the trial court summarily dismissed the ineffective assistance of Trial and Appellate counsel claims without an evidentiary hearing. But the petitioner put forth a truly persuasive demonstration of actual innocence by testimony from the codefendant whom took full responsibility and providing exculpatory testimony of petitioner's innocence during the proceedings. petitioner's incarceration constituted a due process violation because his conviction rested solely on irredeemably unreliable evidence of Raven Bender who did not identify petitioner in court as the person she witnessed commit the murder of Johnny Frazier.

The Appellate Court's adjudication of this claim on the merits in the state court was a decision that was contrary to, and involved an unreasonable application of clearly established law and was based on an unreasonable determination of the facts. (See: opin. at slip-17-22).

The Appellate Court relied exclusively on the fact finding employed by the circuit court and citations thereto people v. Collier, 387 Ill. App.3d 630, 636 (2008); people v. Groebe, 2019 IL. App (1st) 180503, and rejected petitioner's Actual Innocence claim "The circuit court's conclusion that defendant failed to establish his actual innocence claim by a preponderance of the evidence was not manifestly erroneous." was a miscarriage of justice.

In the instant case the Appellate Court disre--garded the correct Rule of Law and agreed ent--irely on what the circuit court said. However, it's decision involved and unreasonable application of the law to the facts of the petitioners case.

Therefore, the Appellate court's opinion should not be presumed correct Sumner v. Mata, 499 u.s. 539, 101 S.ct. 764, where per paragraph (7) of Mata Id. petitioner was otherwise denied Due process of Law. where the Appellate Court factual determinations and fact finding on this claim was not fairly supported by the record, and clearly erroneous.

where the Appellate Court's opinion on this claim opinioned:

The circuit Court cited Collier, Id, a case specif-

-ifically resjected in the Robinson decision for appl-
-ying the incorrect standard, and in ruling against def-
-endant, The circuit Court Specifically Faulted him (pet-
-itioner) for failing to show that the new evidence "would change the outcome of the trial on retrial", rather than "probably" change the result. (opin. at slip-18).

Petitioner was tried before a Simultaneous Joint Jury trial with Co-defendant Benson, and the only witness the state was able to muster was Raven Bender who Test-
-ified that the person she witness shoot the victim was "moe", and that person she didn't see in the Courtroom. (See: exhibit-A, R-AA 117-139). co-defendant testified during the evidentiary hearing that the petition never had any knowledge about what was going on, and he Benson killed Johnny Frazier. How does this new, mater-
-ial, non cumulative evidence considered along with the no in court identification, not probably lead to a different result on retrial?

The Appellate court's opinion misconstruing the evidence and such was inaccurate and incomplete, ex rel Green v. Greer, 667 F.2d 585; Khines v. Godinez, 7 F.3d 674. The appellate courts' fact find and factual determin-

-ations was not fairly supported by the record, but clearly erroneous: not every factual finding/recit-ation in a state courts decision is a determinat-ion of a factual issue triggering the presumption of correctness. A reviewing courts' summary of the evidence at trial for example is merely that and does not always represent a finding of fact. State ex rel Smith v. Fairman 769 F. 2d 386 (7th cir. 1985).

Thus, where petitioner challenges the Illinois Appellate Court's fact finding & factual determinat-ions as inaccurate and incomplete and not fairly supported by the record, and petitioner has shown by 'clear and convincing' evidence that the petitioner is in custody in violation of the United States Const-itution. petitioner acknowledge that the District Court does not have the authority to grant the writ based on actual innocence, but i ask that your honor order a evidentiary hearing with regards to my ineffective assistance of counsel claim which i was denied a full, fair and complete opportunity to 'develop a record' even though i 'fairly presented' the claim and exhausted it in accordance with O'Sullivan v. Boerckel, 526 U.S. 838, 119 S.Ct. 1728 (1999).

In conclusion, petitioner asked the Dis-

-trict Court initially for appointment of Coun--sel to assist me in my reply to the respondents answer which your honor never ruled on, and petitioner was able to gather everything related to 2254 and studied/researched to enable me To reply to respondents answer.

petitioner pray this reply is sufficient enough to hopefully demonstrate my burden, and your honor if i'm ruled against please grant a certificate of appealability on petitioner's actual innocence claim and ineffective assistance of trial counsel claims. petitioner believes i have identified favorable facts and rebutted the appellate court's opinion with "clear and Conv--incing evidence/facts" suggesting that i am innocent and my trial counsel denied me the right to a fair trial by fail--ing to investigate and place the states case To any "meaning--ful test" which the sixth and fourteenth Amendments guar--antee. Raven Bender was the eye witness who testified at petitioners trial and she didn't identify crawford in Court. there was no physical or scientific evidence Tying crawford to the shooting. And the Co-defendant came foward and excepted sole responsibility, and yes crawford's presentation of the facts suggests that the codefendant may be reliable.

/S/ Tyrese Crawford
TYRESE CRAWFORD M20778
STATEVILLE CORRECTIONAL CENTER
P.O. BOX 112
JOLIET IL 60434

[signature] 3/22/23

OFFICIAL SEAL
JANIS R GARRISON-ELMORE
NOTARY PUBLIC, STATE OF ILLINOIS
COOK COUNTY
MY COMMISSION EXPIRES 11/04/2024

# AFFIDAVIT OF AFFIRMATION

I, TYRESE CRAWFORD, affiant, do hereby declare and affirm under the penalty of perjury as defined in 735 ILCS5/1-109, 28USC 1746 or 18 USC 1621 that everything contained herein is true and accurate to the best of my knowledge and belief. I further declare and affirm that the contents of the foregoing document(s) is/are known to me and is/are accurate to the best of my knowledge and belief. Finally, I do declare and affirm that the matter at hand is not taken either frivolously or maliciously and that I believe the foregoing matter is taken in good faith.

Signed on this 22 day of March, 2023.

Tyrese Crawford
TYRESE CRAWFORD M20778
Affiant
STATEVILLE CORRECTIONAL CENTER
P.O BOX 112
JOLIET IL 60434

3/22/23

OFFICIAL SEAL
JANIS R GARRISON-ELMORE
NOTARY PUBLIC, STATE OF ILLINOIS
COOK COUNTY
MY COMMISSION EXPIRES 11/04/2024

# EXHIBIT-A

JOSEPH IDENTIFICATION CALUMET STATES RAVEN

A. In the Calumet Park area.

Q. I'd ask you to take a look around the courtroom. Do you see Moe in this courtroom?

A. No.

Q. You don't see Moe in this courtroom?

A. No.

Q. All right. The person that you said was Moe, did you see him with Tony?

A. Yes.

MR. WIENER: Let the record reflect that there is no in-court identification.

MR. LAGERWALL: Your Honor, I would object to counsel speaking arguments.

THE COURT: Sustained. Let him do his Direct. The objection is sustained.

MR. LAGERWALL: All right.

Q. Raven, you saw a person named Moe, that you knew as Moe?

A. Yes.

Q. This person that you saw as Moe -- after the murder, you were asked to look at photo arrays, weren't you?

A. Yes.

MR. WIENER: Objection to foundation at this

000002

point, Judge. When was that?

THE COURT: Sustained. Sustained as to when this was.

BY MR. LAGERWALL:

Q. Let's go back. The murder happens November 4, 2007, correct?

A. Yes.

Q. Let's go to Wednesday after the murder. Do you remember that day?

A. Yes.

Q. Did you go to the police station that day?

A. Yes.

Q. And did you look at a photo array on that day?

A. Yes, I did.

Q. Did you look at that photo array on November 7, 2007?

MR. HEASTON: What was that date, counsel?

MR. LAGERWALL: November 7, 2007.

I'm showing counsel what's been previously marked as 13-A and 13-B.

MR. WIENER: Okay.

BY MR. LAGERWALL:

Q. Do you remember being at the police

Q. And who is No. 2?
A. The guy in the suit right there (indicating.)
Q. Well, back on November 7, 2007, you circled that. Why?
A. That's the guy who did it.
Q. That's the guy who did what?
A. Who killed Johnny.
Q. Who killed Johnny?
A. Yes.
Q. And what was this person's name? What did you know that person to be?
A. Moe.
Q. That's why you were circling this?
A. Yes.
MR. LAGERWALL: If I can have one moment.
THE COURT: Yes.
BY MR. LAGERWALL:
Q. All right. Now, the person that you identified as Moe here -- let's go back now. You are driving up and you see Tony?
A. Uh-huh, yes.
Q. And you see this person Moe?
A. Yes.
Q. That's the person that you identified in

array?

A. Yes.

Q. Did you put your name -- did you sign that photo array?

A. Yes.

Q. Where did you put your signature?

A. Right --

MR. WIENER: Objection. I believe it is an initial, am I correct or am I wrong?

MR. LAGERWALL: No.

BY THE WITNESS:

A. Yeah, it's No. 2.

BY MR. LAGERWALL:

Q. No. 2?

THE COURT: Objection is overruled.

MR. WIENER: All right.

BY MR. LAGERWALL:

Q. Was a circle placed around No. 2?

A. Yes.

Q. Now, this photo array, even though it is a copy, it is in the same or substantially the same condition as it was shown to you back on Wednesday November 7, correct?

A. Yes.

# EXHIBIT-B

1.

2-25-14

Dear ms: mingo

Im writeing you this letter wanting you to Know the truth about the murder of Johnny FRAZIER November 4th 2007 your SON didn't have anything to do with what happen In it's eating me up on the inside that he's Being punished FOR something that he didn't do I hate that it took me this long to really say what really happen But this is the truth your SON was only there TO Buy some weed he didn't Know anything about what was gonna GO down A Girlfriend of mine was in the car with Johnny which i had Been lookin for her All day ON November 4, 2007 She had Been caught Cheating on me Before By me But That night I Just was Fed up so i TOOK matters into my own hands it was me who shot Johnny FRAZIER ON November 4th 2007 in the Back of the head threw the head-Rest and my girl-friend was suppose to help me get off on murder charges and get lesser time for Robbery After her coming to See me in the county Div 9 that was our plan and Before she picked your SON out of A police line-up I told her if

EXHIBIT B

She Still love me She would Say he did it to help me Beat the murder your Son doesn't Know im writing you i got your information from A friend of his cause we dont communicate at all hopefully he have A lawyer that can come talk to me about what really happen the Night of November 4th 2007

Respectfully
Tony Benson
#M11444

# EXHIBIT C

STATE OF ILLINOIS )
) SS
COUNTY OF COOK )

AFFIDAVIT

I, Tony Benson being first duly sworn under oath depose and state that the foregoing is true and correct and made upon my personal knowledge and I am competent to testify thereto.

That on November 4th 2007 I had been looking For my girlfriend Raven Bender That whole evening I called Johnny cause i wanted To Buy some weed As he came to pick me up Raven Bender was in The van with him I got in The van Behind Johnny and Tyreese got in Behind Raven As we was headed To The city To Buy some weed Johnny got A call on his cell phone From A girl name Ashley So Johnny drove To 117th Loomis To Ashley house She came outside I was siting Behind Johnny and Tyreese was siting Behind Raven we went To wendys To Buy Ashley A salad which Johnny Bought and we headed Back To Ashley house on 117th Loomis once Johnny gave Ashley her Food we got on The Express way To Go Buy The weed In The City of Chicago once we got To 59th Johnny stoped By his cousin house and said his cousin probally wanna Buy some weed So we pulled over on 59th Johnny Exited The van went into A Apartment Building Then Came Back with his cousin we drove A few Blocks and pulled over To Buy The weed close By 57th

EXHIBIT [redacted] C
PENGAD 800-631-6989

We Arrived Back at Johnny Cousin House I was Siting Behind Johnny Johnny Cousin was Siting Behind Raven and Tyreese was All The way in The Back of The Van Tyreese Asked Johnny could he drop him Back off in Calumet park cause he Couldn't Stay in Smoke he Said OK he will Be right Back Me Raven Johnny and Johnny Cousin went into The Apartment Johnny got Some Crack From his Cousin and Johnny Told him let him Take tyreese home and he will Be Back As we made it Back to the VAN Raven got Back in The passenger Seat Tyreese was Siting Behind Raven I got In Back Behind the driver Seat Johnny got Back in The driver Seat As we got on The Expressway And made it Back To Calumet park Tyreese Asked Johnny could he drive him around to See if he Could Find his girlfriend So we drove Around looking For her Johnny stoped The VAN Cause He Seen Someone He Knew name Marcus He Asked Marcus did he Need A Ride I was Siting Behind Johnny with A Black hoodie on Tyreese was Siting Behind Raven with A

Tony Benson IV
AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 11 DAY April, 20 14

[signature]
NOTARY PUBLIC

JAMES A. LARIS
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
February 24, 2018

STATE OF ILLINOIS )
) SS
COUNTY OF COOK )

AFFIDAVIT

I, Tony Benson being first duly sworn under oath depose and state that the foregoing is true and correct and made upon my personal knowledge and I am competent to testify thereto.

Black and gray college wind Breaker on Marcus told Johnny he didn't Need A Ride So Johnny Continued to Drive we Ended up on A street Called Winchester Tyreese told Johnny to let him off here Johnny pulled over As Tyreese got out The VAN I pulled A 357 out my pants put it on The Back of The driver Seat headrest and pulled The trigger Shooting Johnny In The BACK of The head Raven got out The VAN in Started walking I yelled For her to come Back I looked up tyreese was long Gone I don't Know if He RAN or What It has Been Eating me up That I have A Innocent MAN locked up For Something He didnt participate in or had NO Knowledge of Tyreese only came to Buy Some weed It was me who shot And Killed Johnny ON November 4, 2007 Tyreese is Completly Innocent I wanna take Full Responsibility For my Actions Nobody Forced me To write this or Say this Nobody Threating me to do this i did This on my own Free will

JAMES A. EARIS
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
February 24, 2018

SUBSCRIBED And SWORN To BeFore Me
This 11th Day April 2014

[signature]
Notary Public

Tony Benson IV
AFFIANT

# EXHIBIT H

2013 IL App (1st) 111345-U

SIXTH DIVISION
September 20, 2013

No. 1-11-1345

**NOTICE**: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 5781 |
| | ) | |
| TYRESE CRAWFORD, | ) | Honorable |
| | ) | Michele M. Simmons, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1 *Held*: Defendant's first degree murder and armed robbery convictions were affirmed over his contentions that the trial court's comments during jury deliberations coerced the jury.

¶ 2 Following simultaneous but separate jury trials, defendant, Tyrese Crawford, and codefendant, Tony Benson[1], were convicted of first degree murder and armed robbery. Defendant was sentenced to consecutive terms of 40 years' imprisonment on his murder conviction, and 6 years' imprisonment on his armed robbery conviction. On appeal, defendant argues the trial court's comments during jury deliberations coerced the jury into rendering its guilty verdicts. We affirm.

¶ 3 The charges against defendant and codefendant stem from the November 4, 2007, shooting death of Johnny Frazier. At trial, Raven Bender, codefendant's girlfriend at the time of the incident,

[1] Tony Benson's appeal is pending before this court in appeal number 1-11-0974.

PENGAD 800-631-6989 EXHIBIT 1

testified that she, Mr. Frazier, defendant, and codefendant had been driving around in a minivan (hereinafter van) during the night of November 4, 2007. Mr. Frazier was the driver. At one point, while Mr. Frazier was not in the van, Ms. Bender heard defendant say to codefendant: "Don't leave no evidence behind. This *** dead." Ms. Raven saw a black and silver handgun on defendant's lap. After Mr. Frazier returned to the van, defendant asked Mr. Frazier to take him to a friend's home. Mr. Frazier was in the driver's seat, Ms. Bender was in the front passenger seat, defendant was in the backseat behind Mr. Frazier, and codefendant was in the backseat behind Ms. Bender. Defendant directed Mr. Frazier to park the van near 126th Street and Winchester Avenue in Calumet Park. Ms. Bender then left the van. As she walked away, she looked back to the van which had its interior lights on and observed defendant shoot Mr. Frazier in the back of the head. Defendant then ran away. After rummaging through Mr. Frazier's pockets, codefendant left the van and ran in the same direction as defendant.

¶ 4 Marcus Clemons, who knew Mr. Frazier for years, testified that he observed Mr. Frazier driving his van in Calumet Park between 10:00 and 10:30 p.m. on November 4, 2007. He confirmed that defendant, codefendant, and Ms. Benson were seated in the van as described by Ms. Benson.

¶ 5 Police officer Bryant Brooks discovered Mr. Frazier slumped over the wheel of the van at about 11:12 p.m. Medical personnel confirmed Mr. Frazier was dead. A police investigator photographed the scene and discovered Mr. Frazier's pants pockets had been turned inside out and a $100 bill was on the floor of the van near the driver's seat. The parties stipulated that a forensic pathologist found Mr. Frazier's death was caused by a gunshot wound.

¶ 6 During the police investigation, Detective Anthony Beattie took defendant's videotaped statement which was presented to the jury. Defendant stated that Mr. Frazier drove him, Ms. Bender, and codefendant around Calumet Park and Chicago on the date in question. As defendant was getting ready to leave the van, codefendant pulled up his shirt and showed defendant the handle of a gun. While defendant was opening the door of the van, he heard a shot and ran away.

¶ 7 Following evidence and closing arguments, the jury received instructions, including an instruction on accountability. The jury was given four verdict forms–a guilty and not guilty verdict as to each of the two charges against defendant–murder and armed robbery. The jury retired to deliberate at 4:43 p.m. on Friday, October 29, 2010. The jury deliberated for over six hours. During its deliberations, the jury forwarded several notes to the trial court.

¶ 8 At 5:34 p.m., the jury in its first note asked the court: "Are they, the defendants, equally guilty of first degree murder if it cannot be 100 percent certain which one pulled the trigger?" In discussing the note, defense counsel requested that the court tell the jury: "You have the instructions. Please continue to deliberate." The court agreed, and told the jury that it had the necessary instructions and to continue deliberating.

¶ 9 The jury, at 6:15 p.m., requested the transcript of Ms. Bender's testimony. The parties agreed to the jury receiving the transcript and the court ordered that it be prepared.

¶ 10 At about 8:15 p.m., the court received a note from the jury stating: "If we do not come to a decision tonight, can we continue on Monday?" At the suggestion of defense counsel and with the agreement of the State, the court responded: "No, you must remain a collective unit until you reach a unanimous verdict."

¶ 11 The jury asked for a smoke break at 8:55 p.m. The court, after consultation with counsel for both sides, allowed the jury to take a recess.

¶ 12 At 9:35 p.m., the jury sent another note to the court stating: "What if we have medication at home that we must take?" As the court was considering that note with the parties, the court was notified the jury reached a verdict on one of the charges. With the agreement of both sides, the court brought the jurors back into the courtroom and told them:

> "I sent you back with four forms of verdict. It is a "guilty" and "not guilty" with regard to each of the offenses for which the defendant has been tried.
>
> You will have to return a unanimous verdict with regard to both of those offenses.

I will keep this one verdict that you have sent out. I have not indicated to any of the parties what your verdict is on this one particular charge.

However, you will have to return a verdict with regard to the offense that you have not sent a verdict, unanimous verdict out. I will need a verdict on that one. So I am going to return you back to the jury room at this time."

With regard to the medication request—again with the parties' agreement—the court stated: "It is my understanding that a family member will have to bring it here for you prior to you being removed to a hotel for the night. If not, then you will have to go with the deputy sheriff home to get your medication, come back here and then you will go to the hotel for the night."

¶ 13 The jury continued to deliberate and, at 10:13 p.m., the jury forwarded its final note to the court asking: "Can we get a more direct clarification of the phrase, 'one for whose conduct he is legally responsible,' please?" The note also asked, "medication calls?" Over the defense counsel's objection that one instruction should not be highlighted over the other instructions, the court brought the jury back to the courtroom and said:

"Ladies and gentlemen, I did instruct you with regard to the law as it applies in this case. I have your complete set of instructions here to make sure that you have all of the instructions.

There is an instruction in this packet that you have concerning legal responsibility. I read it to you. I will read it to you again. It states: 'A person is legally responsible for the conduct of another person when, either before or during this commission of the offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agree to aid, or attempts to aid the other person in the planning or commission of the offense.'

The question that you have asked me, can I give you a more direct clarification, I am informing you that you have the law as it applies in this case. I just read to you the direction

that you have concerning as it states legal responsibility or when a person is legally responsible for another.

Ladies and gentlemen, I do believe that you do have the tools that you need to reach a verdict one way or another in this case, so I am going to allow you to go back to the jury room.

I hope that clarified things for you, if any, and go back to the jury room. And if you can reach a unanimous verdict for us, please let us know.

If you need to call and have medication brought, just let the deputy sheriff know, and we will let you call your family members and bring some medication for you. Okay.

Tendering to the - - the instructions back to the deputy sheriff. Ladies and gentlemen, let us know when you have a verdict."

At approximately 11:05 p.m., the jury returned verdicts finding defendant guilty of first degree murder and armed robbery.

¶ 14 Defense counsel filed a motion for a new trial. During the hearing on defendant's motion, defense counsel addressed an issue which was not included in defendant's written motion. Counsel noted that the jury's notes revealed it was having trouble reaching verdicts, and that the jury reached it's decision just "as the bus was pulling up to take them to the hotel." In denying the motion for new trial, the court stated in pertinent part:

"There was no indication that the jury was going to be sequestered. I had not Primmed them; I had not informed them that they were going to be sequester[ed]. What the court was doing at this time, which counsel may be commenting on, is I was talking to the Cook County Sheriff's Department here *** [and] was considering sequestering [the jury], and I was certainly speaking to the lieutenants that were on duty that night. However, I had not Primmed the jury; I and not brought them out and informed them of any type of sequestering for the night. At 11:00 p.m., counsel's

right, they did return a first degree murder verdict. However, it was certainly not after they were threatened with any type of sequestering, they were totally unaware of what I was doing. The attorneys were certainly, but the jury was not aware of what I was doing in preparing for sequestering."

¶ 15 On appeal, defendant argues the trial court's comments to the jury were coercive where the jurors' had concerns about being sequestered over the weekend without medication, and had difficulty applying the accountability instruction.

¶ 16 Defendant concedes that this issue was not properly preserved for appeal. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (both a trial objection and a written posttrial motion raising the issue are required for alleged errors that could have been raised at trial).

¶ 17 Furthermore, defense counsel either suggested or agreed to most of the comments of the trial court. Defendant also has forfeited any issue as to comments made by the court to which he had acquiesced at trial. See *People v. Woods*, 214 Ill. 2d 455, 475 (2005).

¶ 18 Defendant, however, seeks review of his claim of jury coercion as plain error. See *People v. Herron*, 215 Ill. 2d 167, 178 (2005). Plain error exists when " '(1) a clear or obvious error occurred and the evidence [was] so closely balanced that the error threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error [was] so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Borys*, 2013 IL App (1st) 111629, ¶ 21 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). A defendant has the burden of persuasion under both prongs of plain error. *Herron*, 215 Ill. 2d at 187. Our first step in a plain-error analysis is to determine whether a clear or obvious error occurred. *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009).

¶ 19 In determining whether a trial court's comments to a jury were improper, a reviewing court must consider whether, under the totality of the circumstances, the words actually interfered with the

jury's deliberations and coerced a guilty verdict. *People v. Wilcox*, 407 Ill. App. 3d 151, 163 (2010). We have held that informing a jury that it will be sequestered is not necessarily coercive. *People v. Defyn*, 222 Ill. App. 3d 504, 516 (1991). "Extremely brief deliberations after a reference to sequestration may, however, invite an inference that the reference to sequestration coerced the jury into rendering a verdict." *Id.*

¶ 20 After reviewing the trial court's comments in response to the jury's notes, under the totality of the circumstances, we find no evidence that the jury was coerced during it's deliberations to reach its guilty verdicts. The trial court carefully considered each note from the jury and responded to the jury only after consultation with the parties. None of the responses can be viewed as coercive in nature. The trial court instructed the jury to continue deliberating after it sent a note asking whether both defendant, and codefendant could be found "equally guilty" of murder if it could not determine who pulled the trigger. In response to the jury's inquiry if it could continue deliberating on Monday if a decision had not been reached, the court stated that it must remain a collective unit until unanimous verdicts were reached. After being sent notes by the jurors asking for medication, the court assured them–on two separate occasions–that they would be able to obtain their medication. In addition, the court told the jurors they would have to reach unanimous verdicts on both counts after the jurors returned with a verdict on one charge. Finally, after the inquired if it could get a clarification of the phrase "one for whose conduct he is legally responsible," the court reread the accountability instruction to the jury, told the jury it had the necessary tools to reach a verdict "one way or another," and requested the jury to let the court know if it reached a unanimous verdict. Throughout the process, the jury never indicated it was deadlocked, and never demonstrated they could not reach a verdict. The trial court was acting reasonably and cannot be seen to have coerced "minority jurors *** to defer to the conclusions of the majority for the purpose of reaching a verdict." *Wilcox*, 407 Ill. App. 3d at 163. The trial court's comments during jury deliberations did not amount to clear or obvious error. The plain-error doctrine does not apply in this case.

¶ 21 Nonetheless, defendant argues the court, by its comments, coerced a guilty verdict after being informed the jury had reached a verdict as to one charge by instructing the jury that the court needed a second unanimous verdict. Defendant maintains the court "could have accepted one of the verdicts and excused the jury for the weekend." On learning the jury had reached a verdict on one charge, the trial court instructed the jury to reach a unanimous verdict "one way or another" on the remaining charge, and to use one of the verdict forms–guilty or not guilty–which had been provided. The trial court did not coerce the jury to reach a guilty verdict on the remaining charge, and was not obligated to end the jury's deliberations. However, even if the jury had indicated it was conflicted and unable to reach a verdict on the remaining charge–which it never did–the trial court would not have been required to discharge the jury. See *People v. Cowan*, 105 Ill. 2d 324, 328 (1985) ("The trial court has discretion to have the jury continue its deliberation even though the jury has reported that it is deadlocked and will be unable to reach a verdict.").

¶ 22 Furthermore, we reject defendant's argument that the jurors' verdicts were coerced because they believed they would be sequestered. The trial court correctly stated during the posttrial hearing that the jurors were never specifically informed they would be sequestered. The trial court's reference to a "hotel" in discussing the juror's medication concerns could, at most, be viewed as notifying the jury as to the *possibility* of a sequester. The trial court's comments as to a "hotel" cannot be viewed, under the circumstances, as coercive. In fact, it is recognized that informing a jury as to preparations for sequestration tends to remove, rather than create pressure to reach a verdict. *People v. McCoy*, 405 Ill. App. 3d 269, 276 (2010) (citing *People v. Steidl*, 142 Ill. 2d 204, 231-32 (1991)); see also *People v. Fields*, 285 Ill. App. 3d 1020, 1029-30 (1996) and *People v. Nemecek*, 277 Ill. App. 3d 243, 249 (1995) (no coercion existed where the jurors returned guilty verdicts minutes after the jurors were informed that they would be sequestered for the night).

¶ 23 Defendant claims the jurors were pressured to return a verdict because they were having difficulty understanding the accountability instruction. Defendant argues before us that the trial court

should have done more to clarify the accountability instruction for the jury. However, each time the jury had a question regarding the definition of accountability, defense counsel below maintained that the trial court should simply inform the jury to continue deliberating, and that no further guidance was needed. After the first note requesting clarification regarding the meaning of accountability, the court agreed with defense counsel and instructed the jurors to continue deliberating. After the second note, the court reread the definition of accountability found in the instructions which had been given to the jury. The trial court then assured the jurors they had "the tools you need to reach a verdict one way or another," and asked them to continue their deliberations. The court was well within its discretion to instruct the jury as it did. The record does not indicate that the jury reached its verdicts without understanding the definition of accountability, or because of pressure.

¶ 24 We also find *People v. Ferro*, 195 Ill. App. 3d 282 (1980), which is cited by defendant, distinguishable from the case at bar. In *Ferro*, the defendant challenged responses by the trial court to jury questions after the jury reached a standstill in the deliberation process. *Id.* at 292-93. Here, however, there was no indication in the record that the jury was deadlocked. Moreover, unlike in *Ferro* (*id.* at 291-92), the trial court in this case never submitted to the jurors a deadline by which a verdict must be reached.

¶ 25 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 26 Affirmed.

## Certificate of Service

I, Tara Thompson, an attorney, hereby certify that on November 20, 2015, I caused to be served by hand-delivery a copy of Petitioner's Petition for Post-Conviction Relief upon counsel of record and/or counsel from the Office of the Cook County State's Attorney appearing in their stead.

Tara Thompson

STATE OF ILLINOIS
SUPREME COURT

At a Term of the Supreme Court, begun and held in Springfield, on Monday, the 9th day of May, 2022.

Present: Anne M. Burke, Chief Justice

| | |
|---|---|
| Justice Rita B. Garman | Justice Mary Jane Theis |
| Justice P. Scott Neville, Jr. | Justice Michael J. Burke |
| Justice David K. Overstreet | Justice Robert L. Carter |

---

On the 25th day of May, 2022, the Supreme Court entered the following judgment.

No. 128173

| | |
|---|---|
| People State of Illinois,<br><br>Respondent<br><br>v.<br><br>Tyreese Crawford,<br><br>Petitioner | Petition for Leave to Appeal from Appellate Court First District 1-20-1310 08CR5781 |

The Court having considered the Petition for leave to appeal and being fully advised of the premises, the Petition for leave to appeal is DENIED.

As Clerk of the Supreme Court of the State of Illinois and keeper of the records, files and Seal thereof, I certify that the foregoing is a true copy of the final order entered in this case.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the seal of said Court, this 29th day of June, 2022.

Cynthia A. Grant

Clerk,
Supreme Court of the State of Illinois

Exhibit P

# EXHIBIT E

TONY BENSON,

was called as a witness on behalf of the Petitioner-Defendant, having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. LEONARD:

Q. Good morning, sir.
A. Good morning.
Q. Please state your name and spell your name for the record.
A. Tony Benson, last name B-e-n-s-o-n.
Q. You're in IDOC custody; is that right?
A. Yes, sir.
Q. What are you incarcerated for?
A. First-degree murder and armed robbery.
Q. And who was the victim in that case?
A. Johnny Frazier.
Q. Did you have a codefendant?
A. Yes, sir.
Q. Who was your codefendant?
A. Tyrese Crawford.
Q. Is that the same Tyrese Crawford that's seated here at counsels' table?
A. Yes, sir.

THE COURT: Let the record reflect an in-court identification of the defendant.

MR. LEONARD: Thank you, your Honor.

BY MR. LEONARD:

Q. I would like to talk about the evening of November 7, 2004. Do you recall what happened that night?

A. Yes, sir.

Q. What happened?

A. It was a long day. I was strolling around the 127th area looking for my girlfriend.

Q. Let's start with the major event that happened that day. Was somebody murdered?

A. Yes. I shot and killed a guy by the name of Johnny Frazier.

Q. Did Tyrese Crawford shoot Johnny Frazier?

A. No, sir.

Q. Why did you kill Johnny Frazier?

A. For two reasons. One of the reasons is, he was having an affair with a girlfriend of mine. The second reason --

THE COURT: Having a what, I'm sorry?

THE WITNESS: Having an affair with a girlfriend of mine. The second reason, he set up a guy that was

like a father figure to me, got killed, so I wanted to seek revenge for his murder.

BY MR. LEONARD:

Q. I want to go through those in a little more detail in a little bit.

But first, just for names, the girlfriend that he was --

A. Raven Bender.

Q. And who was the father figure?

A. Vonnie Combs.

Q. I would like to show you what we will mark for identification as Petitioner's Exhibit No. 1.

MR. LEONARD: Your Honor, may I approach?

THE COURT: Yes.

BY MR. LEONARD:

Q. Before we talk about that, Mr. Benson, could you just tell the Court your current age?

A. Right now, I'm 29.

Q. Sir, I have put in front of you a document, Petitioner's Exhibit No. 1. Do you have that in front of you?

A. Yes, sir.

Q. At the top, it says in bold print, "Affidavit of Tony Benson"; right?

A. Yes, sir.

Q. Can you flip to the third page of that document?

Above the notary stamp there's a signature. Is that your signature?

A. Yes, sir.

Q. This appears to be dated the 5th of day of November 2014?

A. Yes, sir.

Q. If you turn the page again, there's something called Exhibit A attached to this. Do you see that?

A. Yes, sir.

Q. Whose handwriting is that?

A. Mine.

Q. On the second page of Exhibit A, whose signature is that?

A. Mine.

Q. So, prior to testifying today, have you had a chance to review this document, Petitioner's Exhibit No. 1?

A. Yes, sir.

Q. Is everything in these affidavits the truth?

A. Yes, sir.

Q. So I will take that back.

MR. LEONARD: Your Honor, may I approach?

THE COURT: Yes.

MR. LEONARD: Thank you.

BY MR. LEONARD:

Q. Let's go into a little bit more detail about what happened that day, November 7, 2004.

At some point in that day, did you encounter Tyrese Crawford?

A. Yes, sir.

Q. What was happening before you met up with Tyrese? How did you meet up with him?

A. I was looking for Raven, you know what I'm saying, through the area of 124th, 127th, and also, I was wanting to buy some weed. So, as I was looking for Raven, I ran into Tyrese Crawford, and he said he was trying to buy some weed as well. So I called Johnny up to buy some marijuana, and Raven was with me.

Q. Did you have any opinion about Raven spending time with Johnny?

A. Yes.

Q. What were your thoughts on that?

A. She was just, like, cheating on me, you know, behind my back with Johnny Frazier.

Q. And how did that make you feel?

A. Hurt, angry.

Q. After you called Johnny, because you were looking for some weed, what happened next?

A. He came and met me on, like, 125th, 126th and Page, and we got in the car, proceeded to 59th to buy some weed.

Q. Sir, was anybody with him in the car when he came to get you?

A. Yes.

Q. Who?

A. Raven.

Q. And you said, "We got in the car." Who all got in the car?

A. Me and Tyrese.

Q. So how many people were in the car when you -- after he picked you up?

A. Four -- it was two -- Johnny was driving, Raven was in the passenger's seat, and I got in. That makes four. Me and Tyrese got in, so four people.

Q. Where did you and Tyrese sit?

A. I sat behind Johnny and Tyrese sat behind Raven.

Q. What kind of car was this?

A. A Dodge Caravan.

Q. That's like a minivan?

A. Yes, sir.

Q. Okay. So he picked you up to go get some weed; is that right?

A. Yes, sir.

Q. Where did you go?

A. We went to 59th, like, by Shields somewhere, 59th and Shields.

Q. That's in Chicago?

A. Yes, sir.

Q. What town were you in when he picked you up?

A. Calumet Park.

Q. Did you stop anywhere along the way while you were getting weed?

A. Yes, sir.

Q. Where did you stop?

A. Johnny had got a call on his phone from a girl named Ashley. She wanted some food. So we stopped on 117th and Loomis to see what she wanted, see what type of food she wanted, and proceeded to, like, Wendy's and got her a salad, a salad and something.

Q. And after you picked up the salad --

A. We took it back to her, proceeded on the e-way

to go get the weed.

Q. So you took the food to Ashley's house?

A. Yes, sir.

Q. And how was Ashley related to --

A. It was one of his girlfriend's.

Q. Did you have any relationship with Ashley?

A. Yes, sir.

Q. What was that?

A. I was dealing with her for one point in time. Like, you know, we messed around, like, a year or two.

Q. Like a romantic relationship?

A. Yes, sir.

Q. Did Johnny give Ashley the food?

A. Yes, sir.

Q. Did Johnny have a conversation at all with Ashley?

A. Yes, sir.

Q. Did it appear that Ashley saw who was in the van?

A. Yes, sir.

Q. Did you notice any reaction?

A. Yeah. She was kind of disappointed, because the back windows was tinted. So, when she first approached the driver's side, when she seen Raven, she

was like who is this, why is she in the car, which he hit the light, the interior light, and told her like, Tony's in the backseat, she's with him, but she was kind of upset, though.

Q. Did anybody get out of the car at Ashley's house?

A. No, sir.

Q. So where did you guys go next?

A. We proceeded to 59th to get the weed.

Q. Did you pick anybody up on the way?

A. Yes, sir.

Q. Who was that?

A. A cousin, a cousin of Johnny's named Marcus Spreewell, or something.

Q. Spreewell?

A. Yes, sir.

Q. So where did you pick up this cousin of Johnny's?

A. Like, in the 56th, 55th area, an apartment complex.

Q. And so did he also get in the van?

A. Yes, sir.

Q. So now there's five people in the van. Where was everybody seated?

A. The same position. Johnny was driving, Raven was in the passenger's seat, I was behind Johnny, Tyrese was behind Raven, and his cousin got all the way in the back, he was all the way in the back.

Q. And where did you go next?

A. Proceeded to get the marijuana.

Q. And whereabouts was that again?

A. 59th and Shields.

Q. And when you got to 59th and Shields, what happened there?

A. We bought the weed, proceeded back to Johnny's cousin's apartment. We got out of the car. Me, Raven, Johnny and his cousin went into the apartment. We talked a little bit. Tyrese stayed in the van. So we talked, we discussed, you know, we traded, we transacted drugs. We left out of the apartment, went back into the car and proceeded back to Calumet Park.

Q. Okay. Where did you go when you got back to Calumet Park?

A. We drove around. Tyrese wanted to look for his girlfriend, so we drove around. He's, like, man, you know, just drop me off. So, as I proceeded -- as we proceeded around, we ran into a friend named Marcus. Johnny asked me if he needed a ride, and he said no.

So I told Johnny -- I proceeded to tell him, like, man, go through this alley, you know. I proceeded to tell him which way, which route to go. I took him to, like, a dead end block, like, by Winchester, like, 127th. Tyrese was like, man, let me out, let me get out of the car. When he got out of the car, Raven got out as well. I pulled out the gun and shot him in the head.

Q. Let's take that step by step. You said that Tyrese was looking for his girlfriend?

A. Yes.

Q. How did you know that?

A. He said it.

Q. So what did Tyrese say?

A. He said, "I need to look for my girl. I know she probably worried about me. I need to look for her."

Q. So you wanted Johnny to give him a ride --

A. Yes.

Q. -- to find his girlfriend?

A. Yes.

Q. You said you ran into Marcus --

A. Marcus Clemons.

Q. Who is Marcus Clemons?

A. A friend I used to deal with for years.
Q. What do you mean you dealt with him?
A. You know, hung around, beat people up. He was like my partner in crime.
Q. You and Marcus and Tyrese, were you guys part of the same gang?
A. Yes, sir.
Q. What gang was that?
A. Black P. Stones.
Q. So what happened when you saw Marcus that night?
A. That night, we ran into him. We was driving there on 125th, on 126th and Page, and Johnny asked him if he needed a ride, and he said no. So we proceeded on our way.
Q. Did you ever find Tyrese's girlfriend?
A. No.
Q. So you said that you instructed Johnny to drive somewhere; is that right?
A. Yes, sir.
Q. Where did you tell him?
A. Drive through an alley and proceeded to, like, a dead end block, like 127th and Winchester. It was, like, a little car lot, not that much traffic.

Q. Why did you want Johnny to drive to that location?

A. So I could kill him.

Q. Why there, though?

A. I felt like I had a better chance, you know, of getting away with it there, not too much traffic, dark, you know.

Q. And so what happened when Johnny stopped the van at this location you had picked out?

A. He stopped the van. Tyrese got out. He just got out. Raven got out as well. I pulled a gun out, and I shot him in the head. As Raven was running, I told her to come back.

Q. And so, when Johnny stopped the van, where were you sitting?

A. Behind, I was sitting behind him.

Q. And where was Tyrese?

A. Sitting behind Raven.

Q. At any point did you tell Tyrese that you planned to shoot Johnny?

A. No, sir.

Q. Did you tell or show Tyrese that you had a gun with you that day?

A. No, sir.

Q. Did you tell Tyrese that you planned to rob Johnny?
A. No, sir.
Q. Was there anybody that you had told of your intention to shoot Johnny?
A. I told Marcus.
Q. When did you tell Marcus?
A. Like, a month, a month prior to that.
Q. And that's the same Marcus Clemons?
A. Yes, sir.
Q. What happened after you shot Johnny?
A. After I shot him, I get out of the car. I told Raven to come back. I yell for her to come back. "Where you going? Come back." She came back. I made her go in his pockets, take the money, take the money out of his hand, took the money out of his pockets.
Q. "His hand" and "his pockets", that's Johnny's?
A. Yes, sir.
Q. Where was Tyrese?
A. He was gone. He was nowhere to be found. He was gone.
Q. What did you do after you and Raven took the money from Johnny?
A. I went to Marcus' girlfriend house on, like,

125th, 126th and Page, and Marcus was there. I gave him the gun and told him to get rid of it. I walked to the bus stop with Raven, put her on a bus and sent her to Harvey.

Q. How much money are we talking about that you guys took?

A. About $700, $800.

Q. You said you gave the gun to Marcus Clemons?

A. Yes, sir.

Q. What happened to the gun after that?

A. He got rid of it.

Q. How do you know?

A. I talked to him the next day. We had court together for a case we had caught. I talked to him. I told him, "You took care of that?" He was like, "Yeah, I got rid of it."

Q. You had court on a case --

A. -- that we had together. Not this. A case me and Marcus had together.

Q. That's separate from the case you have with Tyrese?

A. Yes, sir.

Q. While you were in Johnny's van that night, did Tyrese ever say something to you like don't leave no

evidence behind?

A. No, sir.

Q. Did he ever say something like this guy or this N word is dead?

A. No, sir.

Q. You testified that Tyrese had nothing do with the murder of Johnny Frazier; right?

A. Yes, sir.

Q. But when you shot Johnny, Tyrese and Raven were both nearby. They just left the van; right?

A. Yes, sir.

Q. So why did you do it at that moment? Why not wait until there's nobody around?

A. I just -- feelings was building up inside. I just -- I was outraged. I just couldn't take it. I just wanted to do it and get it over with.

Q. You said that you and Tyrese were part of the same gang, the P. Stones; right?

A. Yes, sir.

Q. Did you ever know him to go by the nickname moe?

A. Yes. You know, pretty much everybody goes by that. It's part of the Stones. It's like, what's up moe? It's something you call anybody, a Stone, you

know what I'm saying?

Q. So did you go by moe?

A. Yes.

Q. So --

A. Pretty much everybody that's part of that organization.

Q. Okay. So was moe the nickname of any specific person?

A. No.

Q. Did moe basically mean like dude or homey?

A. Pretty much.

Q. Now, earlier, you gave some reasons why you killed Johnny Frazier; right?

A. Yes, sir.

Q. I would like to talk a little bit more about those.

A. Yes, sir.

Q. One, you mentioned, was revenge for this murder of Vonnie Combs?

A. Yes, sir.

Q. Who was Vonnie Combs?

A. Like a father figure, you know, someone I could always go to when, you know, I had trouble, needed money, needed drugs, someone who, like, took me under

his wing, you know what I'm saying this?

Q. And what happened to Vonnie?

A. He was killed. He was shot in the head in front of his house.

Q. When did that happen?

A. 2006.

Q. Did you have any beliefs about who killed him?

MS. WALLS: Objection, relevance.

THE COURT: Overruled.

THE WITNESS: Yes, I did.

BY MR. LEONARD:

Q. What did you believe happened to him?

A. Johnny was in the car with him. There was two women in the backseat --

MS. WALLS: I'm going to object to him going into the facts of the case. He asked the question who did you believe shot Vonnie, and the facts of Vonnie Combs' case is not relevant.

THE COURT: Sustained.

BY MR. LEONARD:

Q. Who do you believe shot Vonnie Combs?

A. A guy that we was -- it was a setup, man. You know, it was a setup. The guy that we --

THE COURT: Mr. Benson, do you understand the

question?

THE WITNESS: Yes.

THE COURT: All right. Please answer the question, sir.

THE WITNESS: A guy by the name of Cedar.

THE COURT: Cedar?

THE WITNESS: Yes.

BY MR. LEONARD:

Q. And who do you believe set him up?

A. Johnny.

Q. Why do you believe that?

MS. WALLS: Objection, relevance.

THE WITNESS: Because --

THE COURT: One second. Let me rule on the objection.

I'm going to overrule the objection based on the testimony the defendant has given with regard to his reasons for shooting and killing Johnny Frazier.

Your objection is overruled.

You may answer the question.

THE WITNESS: What is the question again, sir?

BY MR. LEONARD:

Q. Why do you believe that Johnny Frazier set up the murder of Vonnie Combs?

A. Power struggle.
Q. What does that mean?
A. Basically, taking him out, he could be the next -- move up in the ranks or be, you know, the hottest person in the area, control the drugs, you know. It was a power struggle, man.
Q. You said that this murder of Vonnie Combs happened while Vonnie was in his car?
A. Yes.
Q. Is it a coincidence that you shot Johnny Frazier in Johnny Frazier's car?
A. Yeah, basically, just take him out, the same reason he had got my homey took out, the same reason.
Q. What do you mean?
A. Like, basically, just, like, leave a mark, leave something for somebody to talk about, do him the same way he had my homey did.
Q. Why did you want this to be something people would talk about?
A. Clout.
Q. What does that mean?
A. Just, like, fans, you know what I'm saying? Just somebody to talk about. It basically gives people something to talk about.

Q. Well, let's talk a little bit about what your role was in the Black P. Stones.

You were a member of the Black P. Stones?

A. Yes, sir.

Q. What was your function in this gang?

A. A hot head.

Q. I'm sorry, I didn't understand.

A. A hot head, a shooter.

Q. A hot head?

A. Yes.

Q. What does that mean?

A. Someone just, like, quick to take care of some business, you know what I'm saying? Put some holes in somebody.

Q. The murder of Johnny Frazier, is this the only time you've been violent toward anybody?

A. No.

Q. Did you use a gun on other occasions other than shooting Johnny Frazier?

A. Absolutely.

Q. You've been in IDOC since 2011; right?

A. Yes, sir.

Q. Or Cook County Jail, followed by IDOC?

A. Yes, sir.

Q. Were you involved in any violence since getting locked up?
A. Absolutely.
Q. Like what?
A. Stabbings, violent inmate assaults.
Q. Have you ever been caught with any weapons in the IDOC?
A. Absolutely.
Q. Were you caught with any weapons at Cook County Jail?
A. Absolutely.
Q. Did you ever engage in any acts of violence at Cook County Jail?
A. Yes, sir.
Q. Like what?
A. Stabbings. You know, I stabbed a guy 33 times.
Q. Do you have any cases pending against you right now?
A. Yes, sir.
Q. For what?
A. A violent inmate assault.
Q. Where is that case pending?
A. Lee County.
Q. And what are you accused of doing?

A. Stomping somebody half to death.

Q. Stomping someone?

A. Yes, sir.

Q. I want to go back to your motive that you talked about with Johnny Frazier. You said that there was some jealousy related to Raven Bender?

A. Yes, sir.

Q. Why were you jealous about Raven and Johnny?

A. I felt like she was mine, you know what I'm saying? You dealing with me, you don't deal with nobody else but me, unless I approve of it.

Q. You were interrogated by the police about this case at one point; right?

A. Yes.

Q. Did you tell them that you didn't mind that Raven and Johnny were together?

A. Yes, sir.

Q. Why did you tell them that?

A. Just to throw them off.

Q. What do you mean?

A. Confuse them, make them think that, you know, I had nothing do with it, this case.

Q. How did you first hear that the police were investigating Johnny's murder?

A. They went to my house, my grandmother's house, and asked, you know, was I there to question. She called me and told me.

Q. Did you ever talk with Raven about the police investigation?

A. Yes, sir.

Q. When was that?

A. The day after, she called me, told me the police had questioned her. I told her to keep her mouth closed, you know, don't say anything, it was going to be all right. She told me that they were looking for me.

Q. She called you the day after what?

A. The day after Johnny was killed.

Q. Why did you tell Raven to lie?

A. I felt like I could get away with it, you know what I'm saying? So keep her mouth closed, don't say nothing.

Q. Did you learn from Raven that she had spoken to the police?

A. Yes, sir.

Q. What did you learn from her?

MS. WALLS: Objection.

THE WITNESS: She told me --

THE COURT: One second. Let me rule on the objection.

What is your objection?

MS. WALLS: It's hearsay.

THE COURT: Counsel?

MR. LEONARD: Hearsay is a Rules of Evidence prohibition that doesn't exist in these proceedings, but it also goes to his motive, your Honor.

THE COURT: Sustained.

BY MR. LEONARD:

Q. At the time that you spoke to Raven about what she told the police, had you spoken to the police yet?

A. No, sir.

Q. At some point, were you arrested and interrogated?

A. Yes, sir.

Q. What did you tell the police about who shot Johnny?

A. I lied. I told them Tyrese Crawford shot Johnny Frazier on the day of the incident.

Q. Let me go back to my earlier question and ask it a different way. Did Raven tell you what she told the police?

A. No, sir.

Q. You did not learn from Raven what information she gave to the police before you talked to them?
A. No, sir.
Q. When you talked to the police, who did you tell them shot Johnny Frazier?
A. Tyrese Crawford.
Q. Why did you tell them that?
A. I felt like I could get away with it, you know.
Q. You mentioned Marcus Clemons a few times. Did he testify at your and Tyrese's trial?
A. Yes, sir.
Q. Prior to his testimony, but after this crime, had you spoken to Marcus Clemons?
A. Yeah, a few times.
Q. Did you talk with him about his testimony?
A. Yes, sir.
Q. What did you tell him?
A. I told him to lie about the seating arrangements in the van.
Q. Where did you tell him to position the people?
A. I told him to say I was sitting behind Johnny, Raven was in front of Tyrese, Raven was in the passenger's seat, Tyrese was behind Raven.
Q. Aside from being in the same gang, what was

your relationship like with Marcus Clemons?
A. I would say that was my homey.
Q. What does that mean?
A. Like, almost, like, my everyday -- like, a partner in crime. That was my guy, you know what I'm saying?
Q. Was he a good friend of yours?
A. Yeah.
Q. What about Tyrese, were you good friends with him back then?
A. No.
Q. What was your relationship like with Tyrese?
A. Seen him a few times, you know, what's up, you know, extend my greetings, keep it moving.
Q. Did you live close to each other?
A. About -- no, I stay on 124th. He stayed across -- about a 20-, 30-block radius.
Q. Did you go to school together?
A. No, sir.
Q. But you guys were in the same gang?
A. That doesn't mean anything.
Q. Why not?
A. Because, you know, where I'm from we go by blocks. Just because you a part of the same gang

doesn't mean that, you know -- it's different territory. You know, you not on my block, it's like forget you. He's across the bridge somewhere, you know what I'm saying?

Q. Are you friends with Tyrese today?

A. No, sir.

Q. When was last time you spoke with him?

A. 2007.

Q. Were you brought over here today in the same van?

A. No, sir.

Q. Were you held in the same bullpen?

A. No, sir.

Q. Are you trying to help Tyrese because you both were P. Stones?

A. No, sir.

Q. Are you afraid of Tyrese?

A. No, sir.

Q. Have you heard of a gang called the Black Disciples?

A. Yes, sir.

Q. What was their relationship with the Black P. Stones?

A. There wasn't any --

MS. WALLS: Objection.

THE COURT: How is this relevant?

MR. LEONARD: Santana McCree is a Black Disciple, your Honor.

THE COURT: Counsel for the State?

MS. WALLS: Unless he's going to now testify that he is a gang expert, it is still irrelevant.

THE WITNESS: Huh --

THE COURT: Mr. Benson, please, sir, wait for the question. Do you understand that?

THE WITNESS: Yes, ma'am.

THE COURT: The objection will be sustained, Counsel. You have to show relevance for this.

BY MR. LEONARD:

Q. Let's talk about your decision to come forward and tell this. Prior to your trial and throughout your trial, you claimed you were innocent?

A. Yes, sir.

Q. So why did you decide to change your story and tell the truth now?

A. It's been eating me up, you know what I'm saying, throughout the years, got an innocent man locked up for something he had no knowledge of, didn't participate in. I feel, like, coming forward I can

finally, you know, be at peace with myself, you know what I'm saying, do the right thing.

Q. After you decided you wanted to do the right thing, as you said, what did you do?

A. I contacted Ms. Mingo, wrote her a letter, explained to her I want to tell her what happened that night of November 4, 2007, tell her, her son was innocent, and if he had a lawyer, she could have the lawyer come talk to me so I could try to, you know, do the right thing.

MR. LEONARD: And just for the record, Mingo is M-i-n-g-o.

BY MR. LEONARD:

Q. Who is Ms. Mingo?

A. His mother.

Q. Whose mother?

A. Tyrese's.

Q. I would like to show you what we will mark as Petitioner's Exhibit No. 2 for identification.

MR. LEONARD: Your Honor, may I approach the witness?

THE COURT: Yes.

BY MR. LEONARD:

Q. Sir, you have Petitioner's Exhibit 2 in front

of you; right?

A. Yes, sir.

Q. Is that the letter -- is that a copy of the letter that you sent to Tyrese's mom?

A. Yes, sir.

Q. And it's dated February 25, 2014?

A. Yes, sir.

Q. And it says, "Dear, Ms. Mingo", the first line?

A. Yes, sir.

Q. Is this your handwriting?

A. Yes, sir.

Q. On the second page, it's signed. Whose signature?

A. Mine.

Q. And the number is M11444 next to the signature. What's that?

A. That's my I.D. number.

Q. Sir, could you just read this letter?

A. Yes, sir.

MS. WALLS: Objection.

THE COURT: Counsel, what is the purpose of this?

MR. LEONARD: I think that his letter to the -- I mean, if your Honor is fine with just the letter itself --

THE COURT: It's been in your petition. I have a copy of it. He has a copy of it. It is part of the file. The Court has read it. Objection sustained.

MR. LEONARD: Thank you.

BY MR. LEONARD:

Q. Is what you said in your letter to Ms. Mingo the truth?

A. Yes, sir.

Q. How did you get Ms. Mingo's contact information?

A. Through a friend I knew I seen, used to hang with Tyrese Crawford.

Q. Who's that friend?

A. Santana.

Q. Santana?

A. Yes, sir.

Q. Do you know his last name?

A. I think McCree.

Q. McCree?

A. Yes, sir.

Q. Where did you -- let me start over.

How did you know Santana McCree?

A. I saw him around. We wasn't in the same cell, but I seen him around a few times. And one day, we

had, like, a Christian service together. Like, we met up in, like, a Christian and Bible study class.

Q. All of this was at Stateville prison?

A. Yes, sir.

Q. Yes?

A. Yes, sir.

Q. So was that a Christian Bible study class?

A. Yes, sir.

Q. So why did you decide to approach Santana at the Bible study?

A. I just felt like it was the right thing to do when I seen him. You know, I knew he was at the same house as Mr. Tyrese Crawford, and I felt like he could provide me with her address so I could write her.

Q. Why did you think Santana would have the address for Tyrese's mom?

A. I seen them hang around the yard a lot, you know.

Q. Tyrese and Santana?

A. Yeah.

Q. Other than asking Santana for Ms. Mingo's mailing address, did you have conversations with Santana about Tyrese and your case?

A. No.

Q. Did you ever have a conversation with Santana about what you thought might happen if you testified here?

A. No, sir.

Q. The letter that you wrote to Ms. Mingo, did Tyrese ask you to send that?

A. No, sir.

Q. Did Tyrese ask you to sign the affidavits that we looked at earlier?

A. No, sir.

Q. Did Tyrese tell you what to put in any of those documents?

A. No, sir.

Q. So what involvement did Tyrese have in the affidavit or that letter?

A. None.

Q. Did anybody make any threats or promises to you --

A. No, sir.

Q. -- regarding these documents?

A. No, sir.

Q. And are you expecting to receive anything in exchange for testifying today?

A. No, sir.

A. Yes, sir.
Q. Do those medications affect your memory?
A. No, sir.
Q. Prior to your incarceration, did you ever receive treatment for these conditions?
A. Yes, sir.
Q. What kind of treatment?
A. Medication, and I was in three mental health facilities.
Q. And what sort of symptoms do you exhibit from these conditions?
A. What do you mean what type of symptoms?
Q. PTSD and bipolar disorder, what does that do to you?
A. I got anger. I'm just outraged. I get mad. I just, you know, hurt people, harm people, harm myself, things like that.
Q. All right. We can wrap it up. I have a couple more questions.
Who killed Johnny Frazier?
A. I did, sir.
Q. And what role did Tyrese Crawford play in that?
A. None at all.
MR. LEONARD: With the exception of any possible

Q. Do you anticipate benefitting in any way from confessing to murdering Johnny Frazier?
A. Yes, sir.
Q. How?
A. I could be at peace with God and finally ask for forgiveness, for Him to forgive me.
Q. Do you anticipate any other benefits that you will receive?
A. No, sir.
Q. Do you think you're giving anything up or you stand to lose anything by your testimony today?
A. No, sir.
Q. I do want to ask a couple of questions, sir, about your mental health issues, because I think they are relevant.
Have you been diagnosed with any mental health issues?
A. Yes, sir.
Q. What are those?
A. Explosive bipolar disorder, PTSD.
Q. Are you receiving any treatments for those conditions?
A. Yes, sir.
Q. Are you taking any medications?

A. Yes, sir.
Q. Can you flip to the third page of that document?
Above the notary stamp there's a signature. Is that your signature?
A. Yes, sir.
Q. This appears to be dated the 5th of day of November 2014?
A. Yes, sir.
Q. If you turn the page again, there's something called Exhibit A attached to this. Do you see that?
A. Yes, sir.
Q. Whose handwriting is that?
A. Mine.
Q. On the second page of Exhibit A, whose signature is that?
A. Mine.
Q. So, prior to testifying today, have you had a chance to review this document, Petitioner's Exhibit No. 1?
A. Yes, sir.
Q. Is everything in these affidavits the truth?
A. Yes, sir.
Q. So I will take that back.

A. Yes, sir.
Q. Can you flip to the third page of that document?
Above the notary stamp there's a signature. Is that your signature?
A. Yes, sir.
Q. This appears to be dated the 5th of day of November 2014?
A. Yes, sir.
Q. If you turn the page again, there's something called Exhibit A attached to this. Do you see that?
A. Yes, sir.
Q. Whose handwriting is that?
A. Mine.
Q. On the second page of Exhibit A, whose signature is that?
A. Mine.
Q. So, prior to testifying today, have you had a chance to review this document, Petitioner's Exhibit No. 1?
A. Yes, sir.
Q. Is everything in these affidavits the truth?
A. Yes, sir.
Q. So I will take that back.

# EXHIBIT-F

E-FILED
Transaction ID: 1-20-1310
File Date: 6/23/2021 10:34 PM
Thomas D. Palella
Clerk of the Appellate Court
APPELLATE COURT 1ST DISTRICT

**NO. 1-20-1310**

**IN THE**
**APPELLATE COURT OF ILLINOIS**
**FIRST JUDICIAL DISTRICT**

---

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Respondent-Appellee, | ) | |
| | ) | Cir. Ct. No. 08 CR 5781 |
| v. | ) | |
| | ) | |
| TYREESE CRAWFORD, | ) | The Honorable Michele M. Pitman, |
| | ) | Judge Presiding. |
| Petitioner-Appellant | ) | |

---

**BRIEF AND ARGUMENT OF PETITIONER-APPELLANT**

---

Karl Leonard
Lauren Myerscough-Mueller
Lindsay Hagy
THE EXONERATION PROJECT
at the University of Chicago Law School
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 789-4955
karl@exonerationproject.org
laurenm@exonerationproject.org
lindsay@exonerationproject.org

*Counsel for Petitioner-Appellant*

**ORAL ARGUMENT REQUESTED**

# POINTS AND AUTHORITIES


**Nature of the Case** .......... 1

**Issues Presented for Review** .......... 1

**Jurisdiction** .......... 2

Ill. Const. 1970, art. VI, § 6 .......... 2

Illinois Supreme Court Rule 651(a) .......... 2

**Introduction** .......... 3

**Statement of Facts** .......... 4

**I. The Murder of Johnny Frazier and the Police Investigation** .......... 4

**II. Trial and Direct Appeal** .......... 5

*People v. Crawford*, 2013 IL App (1st) 111345-U .......... 5

**A. Raven Bender's testimony** .......... 5

**B. Marcus Clemons' testimony** .......... 6

**C. Crawford's videotaped interrogation** .......... 7

**D. Closing arguments** .......... 8

*People v. Crawford*, 2013 IL App (1st) 111345-U .......... 8

**E. Jury deliberations and notes** .......... 8

*People v. Crawford*, 2013 IL App (1st) 111345-U .......... 9

**F. Direct appeal** .......... 10

*People v. Crawford*, 2013 IL App (1st) 111345-U .......... 10

*People v. Crawford*, 378 Ill.Dec. 232 .......... 10

**III. Post-Conviction Proceedings** .......... 10

**A. Tony Benson testifies, consistent with three prior written statements, that he alone was responsible for Frazier's murder** .......... 10

**B. The circuit court views Crawford's videotaped interrogation** ............... 13

**C. The State calls a jailhouse informant** ............... 14

725 ILCS § 5/115-21 ............... 14, 15

*Massiah v. United States*, 377 U.S. 201 (1964) ............... 15

Illinois Rule of Professional Conduct 4.2 ............... 16

*People v. Robinson*, 2020 IL 123849 ............... 16

**D. The circuit court denies post-conviction relief** ............... 16

**Argument** ............... 16

**I. Crawford's Ineffective Assistance of Trial Counsel and Jury Coercion Claims Required an Evidentiary Hearing** ............... 17

**A. Relevant law** ............... 17

*People v. Coleman*, 183 Ill. 2d 366 (1998) ............... 17, 18

*People v. Caballero*, 126 Ill. 2d 248 (1989) ............... 17

*People v. Whitfield*, 217 Ill.2d 177 (2005) ............... 17

*People v. Domagala*, 2013 IL 113688 ............... 18

**B. Crawford's ineffective assistance of trial counsel claim required an evidentiary hearing** ............... 18

U.S. Constitution, amend. VI & XIV ............... 18

Illinois Constitution 1970, art.I, § 8 ............... 18

*Strickland v. Washington*, 466 U.S. 668 (1984) ............... 18, 19, 20, 21

*People v. Enis*, 194 Ill.2d 361 (2000) ............... 19

*People v. Crawford*, 2013 IL App (1st) 111345-U ............... 19, 21

*People v. Harris*, 206 Ill. 2d 1 (2002) ............... 19

*People v. Price*, 375 Ill. App. 3d 684 (1st Dist. 2007) ............... 20

*People v. Herron*, 215 Ill. 2d 167 (2005)....................................................20

*People v. Ferro*, 195 Ill. App. 3d 282 (2d Dist. 1990)................................20

*People v. Ortega*, 209 Ill. 2d 354 (2004)....................................................21

*People v. Rodriguez*, 387 Ill. App. 3d 812 (1st Dist. 2008)........................21

*People v. Gregory*, 184 Ill. App. 3d 676 (2d Dist. 1989)............................21

*People v. Golub*, 333 Ill. 554 (1929)..........................................................21

*People v. Sweeny*, 57 Ill. App. 3d 879 (5th Dist. 1978)..............................22

*People v. Domagala*, 2013 IL 113688 (2013)..............................................22

C. **Crawford's jury coercion claim required an evidentiary hearing**.........22

*People v. Gregory*, 184 Ill. App. 3d 676 (2d Dist. 1989)...................22, 23

*Allen v. United States*, 164 U.S. 492 (1896)...............................................22

*Jenkins v. United States*, 380 U.S. 45 (1965)......................................22, 23

*People v. Ferro*, 195 Ill. App.3d 282 (2d Dist. 1980)................................23

*People v. Price*, 375 Ill. App. 3d 697 (1st Dist. 2007)...............................23

*People v. Domagala*, 2013 IL 113688.........................................................23

II. **Evidence of Crawford's Innocence Necessitates a New Trial**..........................23

A. **Relevant Law**..................................................................................24

*People v. Washington*, 171 Ill.2d 475 (1996)..............................................24

*People v. Bull*, 185 Ill.2d 179 (1998)..........................................................24

*People v. Coleman*, 2013 IL 113307...................................................24, 25

*People v. Robinson*, 2020 IL 123849..................................................24, 25

*People v. Burrows*, 172 Ill.2d 169 (1996)....................................................25

*People v. Smith*, 177 Ill.2d 53 (1997).........................................................25

*People v. Molstad*, 101 Ill.2d 128 (1984) ....................................................25

*People v. Ortiz*, 235 Ill.2d 319 (2009) ....................................................25

**B. Reversal for a new evidentiary hearing is required because the circuit court applied the wrong standard**....................................................25

*People v. Robinson*, 2020 IL 123849....................................................25, 26

*People v. Barnslater*, 373 Ill. App. 3d 512 (2007) ....................................25

*People v. Collier*, 387 Ill. App. 3d 630 (2008) ....................................25, 26

*People v. Robinson*, 2021 Il App 2021 IL App (1st) 171371 ....................26

**C. There has never been any dispute that Benson's testimony is new, material, and non-cumulative and the circuit court did not hold otherwise**....................................................26

*People v. Coleman*, 2013 IL 113307 ....................................................26, 27

*People v. Molstad*, 101 Ill.2d 135 (1984) ....................................................27

*People v. Smith*, 177 Ill.2d 53 (1997) ....................................................27

*People v. Warren*, 2016 IL App (1st) 090884-C ..........................................27

*People v. Sparks*, 393 Ill.App.3d 878 (2009)..............................................27

*People v. Ortiz*, 385 Ill. App. 3d 1 (1st Dist. 2008)......................................27

*People v. Ortiz*, 235 Ill. 2d 319 (2009) ....................................................28

**D. If the jury had heard Benson's confession, there is a probability it would have acquitted Crawford** ....................................................28

*People v. Coleman*, 2013 IL 113307 ....................................................28

*People v. Morgan*, 212 Ill.2d 148 (2004) ....................................................28

*People v. Ortiz*, 235 Ill. 2d 333 (2009) ....................................................28

**1. Benson's testimony corroborates Crawford's videotaped interrogation and creates a probability of a different outcome**.....28

*People v. Ortiz*, 235 Ill. 2d 333 (2009).....29, 30

*People v. English*, 2013 IL 112890.....30

*People v. Dugar*, 2021 IL App (1st) 182545-U.....30, 31

*People v. Molstad*, 101 Ill.2d 128(1984).....31

*People v. Harper*, 2013 IL App (1st) 102181.....31

*People v. Parker*, 2012 IL App (1st) 101809.....31

*People v. Leavitt*, 2014 IL App (1st) 121323.....32

*People v. Brooks*, 187 Ill. 2d 91 (1999).....32

*People v. Rodriguez*, 100 Ill.App.3d 244 (1981).....32

*People v. Macklin*, 2019 IL App (1st) 161165.....32

**a. The circuit court misconstrued the testimony regarding Benson's gun**.....32

*People v. Molstad*, 101 Ill.2d 128(1984).....33

*People v. Harper*, 2013 IL App (1st) 102181.....33

*People v. Parker*, 2012 IL App (1st) 101809.....33

*People v. Dugar*, 2021 IL App (1st) 182545-U.....33

**b. The circuit court misconstrued the testimony regarding when Crawford exited the van**.....34

*People v. Molstad*, 101 Ill.2d 128(1984).....35

*People v. Harper*, 2013 IL App (1st) 102181.....35

*People v. Parker*, 2012 IL App (1st) 101809.....35

*People v. Dugar*, 2021 IL App (1st) 182545-U.....35

**c. The circuit court misconstrued the testimony regarding Marcus Clemons** .......... 35

**2. The fact that the jury received an instruction on accountability does not render Benson's post-conviction confession irrelevant** .......... 37

720 ILCS 5/5–2(c) .......... 37, 38

*People v. Taylor*, 186 Ill. 2d 439 (1999) .......... 38

*People v. Johnson*, 2014 IL App (1st) 122459-B .......... 38

*People v. Dennis*, 181 Ill. 2d 87 (1998) .......... 38

*People v. Shaw*, 186 Ill. 2d 301 (1998) .......... 38, 39

*People v. Martinez*, 242 Ill.App.3d 915 (1992) .......... 38

*People v. Furby*, 138 Ill. 2d 434 (1990) .......... 38

**Conclusion** .......... 39

## NATURE OF THE CASE

Petitioner Tyreese Crawford appeals the circuit court's denial of his petition for post-conviction relief. At the evidentiary hearing in this matter, Crawford's co-defendant, Tony Benson, testified that he alone was responsible for the murder at issue and that Crawford had nothing to do with it. Because this evidence was new, material, non-cumulative, and sufficiently conclusive, Crawford should have been granted a new trial. Crawford asks this Court to reverse the denial of post-conviction relief and remand for a new trial. Crawford does not contest the charging instrument.

## ISSUES PRESENTED FOR REVIEW

1. Where Crawford presented evidence that he received ineffective assistance of counsel due to trial counsel's failure to preserve for appeal a claim of jury coercion, did the circuit court err in dismissing the claim without an evidentiary hearing?

2. Where Crawford presented evidence that his right to a fair trial was violated by comments the circuit court made during jury deliberations which coerced a verdict, did the circuit court err in dismissing the claim without an evidentiary hearing?

3. Where the circuit court applied the wrong standard in evaluating a post-conviction actual innocence claim, should the Court remand for a new evidentiary hearing?

4. Where Crawford's co-defendant testified at the evidentiary hearing that he committed the underlying murder and that Crawford was not involved, and where that testimony was consistent with what Crawford told police in the videotaped interrogation the State showed the jury at trial, does this evidence warrant post-conviction relief?

## JURISDICTION

Crawford appeals the third-stage denial of his post-conviction actual innocence claim, entered on October 2, 2020. (R. 338).[1] Notice of appeal was timely filed on October 29, 2020. (C. 524). Jurisdiction lies in this Court under article VI, section 6, of the Illinois Constitution and Supreme Court Rule 651(a).

[1] Citations to the record are as follows: "C." refers to the common law record; "CI." refers to the impounded common law record; "R." refers to the reports of proceedings on appeal; and "SUP2 R." and "SUP3 R." refer to the supplemental volumes of reports of proceedings.

## INTRODUCTION

TyReese Crawford and his co-defendant, Tony Benson, stand convicted of the 2008 murder of Johnny Frazier in Calumet Park, Illinois. Frazier was seated in the driver's seat of a van and was shot in the head by someone who fired through the headrest and from the backseat. At trial, the evidence primarily consisted of (1) the testimony of Raven Bender, who was co-defendant Benson's girlfriend who testified that Crawford was the shooter and that Benson stole from Frazier's pockets; (2) Marcus Clemons, an eyewitness who testified that he saw Crawford seated in the van behind Frazier shortly before the shooting; and (3) Crawford's videotaped interrogation in which he professed his innocence.

On post-conviction, co-defendant Benson testified—consistent with a letter he sent to Crawford's mother years after they were convicted and two sworn affidavits—that he alone was responsible for Frazier's murder and that Crawford had no knowledge or involvement. Benson further revealed that the State's two trial witnesses, Bender and Clemons, were actually involved in the crime. Benson explained that Clemons knew about the murder in advance, helped dispose of the murder weapon, and agreed to lie to the police and at trial in order to protect himself and his "partner in crime" Benson. Benson further testified that his girlfriend, Bender, helped steal from the deceased victim, that they divvied up the proceeds, and that he asked her to lie on his behalf.

The circuit court denied post-conviction relief because it determined that Benson's testimony was insufficiently conclusive to change the result on retrial. The circuit court did *not* rule that Benson's testimony was immaterial, cumulative, or not newly-discovered. Because Benson's testimony creates, at the bare minimum, a probability of a different result were a jury to hear it, the circuit court erred in denying post-conviction relief.

## STATEMENT OF FACTS

### I. THE MURDER OF JOHNNY FRAZIER AND THE POLICE INVESTIGATION

On November 4, 2007, the Calumet Park Police Department responded to a call reporting a person slumped over the wheel of a silver van parked in the 12000 block of South Winchester Ave. (SUP2 R. 1584-86). Emergency medical technicians soon confirmed that this person, later identified as Johnny Frazier, was dead. (SUP2 R. 1579-80, 1586). Frazier's front pants pocket was turned inside-out and a $100 bill was on the van's floor near the driver's seat. (SUP2 R. 509, 1620-22). A forensic pathologist found that Frazier was killed by a gunshot wound to the head. (SUP2 R. 1895). "Defects" in the driver's side headrest indicated that the shot was fired through the back of the headrest and into Frazier's head. (SUP2 R. 1625-26).

Investigators quickly learned that Frazier had been seen that day with Raven Bender. (SUP2 R. 1700-01, 1725). When the detectives located her, Bender acknowledged that she had been with Frazier, but said he had dropped her off at her home and she did not know what happened after that. (SUP2 R. 1764). She subsequently spoke to her boyfriend, Tony Benson, who told her to "keep quiet." (SUP2 R. 1751-52). The next day, at her mother's urging, Bender called the detectives and told them she had information about what happened. (SUP2 R. 1771-74).

Bender would subsequently sign a handwritten statement during an interview with a felony review Assistant State's Attorney in which she alleged that "Moe" shot Frazier and that her boyfriend, Benson, went through Frazier's pockets. (SUP2 R. 1761-62, 1767-69). She identified a photo of TyReese Crawford as "Moe." (SUP2 R. 1727-28). She told police that she believed Benson was the one who had arranged the murder. (SUP2 R. 827).

The police arrested and interrogated Crawford. The interrogation was videotaped.[2] Crawford told the detective that Frazier had driven him, Bender, and Benson to buy marijuana that day and that Crawford had sat behind Bender for part of the trip and in the third row of seats for another part of the trip. (State Trial Ex. 15A / Petitioner's Ex. 3, 18:15-19:25). Crawford explained that, as he was about to exit the van, he saw a part of the handle of a gun in Benson's hand—the rest of the gun was between Benson's leg and the van door. (*Id.* 30:35-31:15). Crawford had no idea what Benson planned to do and he tried to get out of the van as quickly as possible. (*Id.* 31:30-50, 32:55-33:03); *see also* R. 95 ("When [Crawford] got out of the car, Raven got out as well. I pulled out the gun and shot [Frazier] in the head.") (post-conviction testimony of Tony Benson).

## II. TRIAL AND DIRECT APPEAL

Crawford was tried simultaneously with co-defendant Benson before separate juries. *People v. Crawford*, 2013 IL App (1st) 111345-U, ¶¶ 2. Crawford never confessed to the murder, and there was no biological or physical evidence connecting him to the crime. The only evidence connecting Crawford to the crime was the trial testimony of 1) Raven Bender, Benson's girlfriend at the time of the incident, and 2) Marcus Clemons, a "lifelong friend" of Benson's. *Crawford*, 2013 IL App (1st) 111345-U, ¶¶ 3-4; SUP2 R. 1812.

### A. Raven Bender's testimony

Bender testified that she had spent the day in the passenger seat of Frazier's van

[2] The videotape was introduced at trial as People's Exhibit 15A and again at the post-conviction evidentiary hearing as Petitioner's Exhibit 3. The Clerk of the Circuit Court submitted the exhibits to this Court as part of the record on appeal on June 23, 2021. A motion for leave to supplement the record with the exhibits is currently pending before this Court.

and that Frazier eventually picked up Benson and a person she called "Moe." (SUP2 R. 1667). When the State asked Bender if she could identify "Moe" in the courtroom, Bender was unable to do so. (SUP2 R. 1661). Bender testified that when Frazier left the van at one point, she heard "Moe" say to Benson, "Don't leave no evidence behind. This n***** dead," and saw a handgun in "Moe's" lap. (SUP2 R. 1686). When Frazier returned to the van, they began to drive back to Calumet Park. (SUP2 R. 1689). Bender testified that at this point, she was in the passenger's seat, Frazier was driving, "Moe" was in the backseat behind Frazier, and Benson was in the backseat behind Bender. (SUP2 R. 1689-90).

Bender testified that when they reached Calumet Park, "Moe" asked Frazier to drop him off "at his baby's mama house." (SUP2 R. 1691). Along the way, Frazier stopped to talk with someone on the street named Marcus "for a couple seconds." (SUP2 R. 1692). After that conversation, Frazier continued to follow "Moe's" directions to his "baby mama's house." (SUP2 R. 1691, 1694). According to Bender's testimony, "Moe" directed Frazier to the area of 126th and Winchester, where they stopped. (SUP2 R. 1694-95). When they stopped, Bender got out of the van and began to walk toward a bus stop. (SUP2 R. 1695). At some point, she turned to look back at the van. (SUP2 R. 1696). She testified that the light in the van was on and that she saw "Moe" shoot Frazier and saw Benson go through Frazier's pockets. (SUP2 R. 1697-98).

**B. Marcus Clemons' testimony**

Marcus Clemons testified that he was in the custody of the Illinois Department of Corrections and was a convicted felon. (SUP2 R. 1784). He further testified that, on the evening of November 4, 2007, he was walking to a gas station in Calumet Park, when a van pulled up alongside him. (SUP2 R. 1784-85). The driver, Johnny Frazier, asked Clemons if he needed a ride, Clemons told him no, and Frazier drove away. (SUP2 R.

1786). He testified that the van contained four people: Frazier in the driver's seat, "Raven" (i.e., Bender) in the front passenger seat, Crawford behind the driver, and Benson behind the passenger seat. (SUP2 R. 1786-89).

### C. Crawford's videotaped interrogation

The jury also viewed a videotape of Crawford's interrogation. In the recording, Crawford explained that, on November 4, 2007, he saw Frazier and Bender driving in Calumet Park, flagged them down, and asked Frazier to take him to buy some marijuana. (State Trial Ex. 15A / Petitioner's Ex. 3 at 7:00-8:10). Frazier agreed, took Crawford to a location to purchase the marijuana, and then drove Crawford back. (*Id.* 8:05-8:25). Shortly thereafter, Benson and Clemons approached Crawford. (*Id.* 8:40-8:55). Benson asked Crawford if he knew where Bender was. (*Id.* 8:40-8:55). Crawford told him he had seen her with Frazier. (*Id.*) Benson and Clemons walked away. (*Id.*) Benson approached Crawford again later and then called Frazier or Bender and asked them to come pick him up. (*Id.* 9:30-10:50). Frazier and Bender picked up Benson and Crawford and they drove to Chicago to buy more marijuana. (*Id.* 10:50-11:10, 12:30-13:55, 18:10-19:25). Later that evening, Crawford became worried that his girlfriend, back in Calumet Park, would think he had been gone for too long, and Frazier agreed to take him back. (*Id.* 19:40-20:20, 23:30-50).

Contrary to Bender's testimony, Crawford stated that he had been seated behind Bender, that Benson sat behind Frazier, and that they maintained these positions when they returned to Calumet Park. (*Id.* 21:30-45; 25:20-26:10). When they got back to Calumet Park and did not find Crawford's girlfriend at the location where Crawford had expected to find her, Crawford asked Frazier to drop him off on Lincoln Street. (*Id.* 22:00-22:25, 26:40-27:50). Benson then interjected and asked Frazier to stop on Winchester Avenue

instead. (*Id.* 28:35-29:10). When Frazier stopped, and as Crawford was getting ready to exit the van, Benson gave Crawford a "look" and Crawford saw just a "little bit" of the handle of a gun in Benson's hand, while the rest of the gun appeared to be between Benson's leg and the door of the van. (*Id.* 30:35-31:35). Crawford had no idea what Benson planned to do and he tried to get out of the van as quickly as possible. (*Id.* 31:30-45). As Crawford opened the door, he heard a shot and ran without looking back. (*Id.* 31:50-32:00, 32:50-33:03).

**D. Closing arguments**

The State argued to the jury that Crawford was guilty under three theories: intentional murder, knowing murder, and felony murder. (SUP2 R. 843-59). The State specifically argued that Crawford was the shooter, but contended that Crawford and Benson "acted together" in robbing and killing Frazier, and maintained that, under the "law of accountability," they were equally guilty. (SUP2 R. 842, 876, 898). The jury received an instruction on accountability. *Crawford*, 2013 IL App (1st) 111345-U, ¶ 7.

**E. Jury deliberations and notes**

At 4:43 p.m., the jury started what would be six and half hours of deliberation. *Crawford*, 2013 IL App (1st) 111345-U, ¶ 7. The jury sent six notes to the judge over the course of its deliberations. (SUP2 R. 924, 930, 932, SUP3 R. 4-10). The first note, sent shortly before 6 p.m., asked, "Are they, the defendant, equally guilty of first degree murder if it cannot be 100 percent certain which one pulled the trigger?" (SUP2 R. 924). The court advised the jury that it had all the instructions it needed. (SUP2 R. 924-26). About fifteen minutes later, the jury asked for "Raven B. transcripts" which the Court provided over the State's objection. (SUP2 R. 930).

At about 8:15 p.m., the jury sent a note asking, "If we do not come to a decision

tonight, can we continue on Monday?" (SUP3 R. 4). Defense counsel and the State agreed that the jury should be told that they needed to remain a collective unit until they reached a verdict, and the Court gave an instruction to the jury along those lines. (SUP3 R. 4-5). At about 9 p.m., the jury asked for and was given a smoke break. (SUP3 R. 5). About 45 minutes later, at 9:43 p.m., the Court received a note labeled 9:35 p.m. which read, "What if we have medication at home that we must take?" (SUP2 R. 932). At the same time, at 9:43 p.m., the jury turned in a verdict form as to one of the charged offenses. The court instructed the jury to continue to deliberate on the other charge and told jurors that medication could either be brought to them prior to the jurors being removed to a hotel for the night or a sheriff's deputy could take them to pick it up. (SUP3 R. 6-8).

At 10:13 p.m., about thirty minutes later, the jury sent another note stating, "Can we get a more direct clarification of the phrase, quote, one for whose conduct he is legally responsible, end quote, please." (SUP3 R. 8). The jury again asked about medication, and the court asked a deputy sheriff to find out who needed medication. (*Id.*) The court told the jurors that they could call their family members to bring medication to the courthouse. (SUP3 R. 8, SUP2 R. 933). As to the accountability issue, the court re-read the instruction it had already given regarding accountability. (SUP2 R. 939).

At 11:05 p.m., the jury reached a verdict finding Crawford guilty of armed robbery and first-degree murder. (SUP2 R. 941-42).

Crawford filed a motion for a new trial. During argument on that motion—but not in the written motion itself—defense counsel argued that the jury had been coerced by the possibility of being sequestered. *Crawford*, 2013 IL App (1st) 111345-U, ¶¶ 14-15. The motion was denied.

On April 26, 2011, Crawford was sentenced to consecutive terms of 40 years for first-degree murder and 6 years for armed robbery. (C. 131).

**F. Direct appeal**

On appeal, Crawford raised one issue: that the circuit court's statements during jury deliberations coerced a guilty verdict. *Crawford*, 2013 IL App (1st) 111345-U, ¶ 2. This Court found that Crawford's defense counsel failed to properly preserve the jury coercion issue for appeal by not objecting to the court's comments and not raising the issue in a posttrial motion. *Crawford*, 2013 IL App (1st) 111345-U, ¶¶ 16-17. Still, this Court evaluated whether the statements to the jury amounted to plain error and found, under the plain error standard, that there was "no evidence that the jury was coerced during it's [sic] deliberations to reach its guilty verdict." *Id.* ¶¶ 18-20. The Supreme Court denied leave to appeal. 378 Ill.Dec. 232.

**III. POST-CONVICTION PROCEEDINGS**

Crawford filed a petition for post-conviction relief on October 28, 2014, which was later amended by counsel. (C. 224). In his petition, Crawford claimed actual innocence, ineffective assistance of trial and appellate counsel, jury coercion, and cumulative error. (*Id.*)

The State moved to dismiss all of Crawford's claims besides the actual innocence claim, which it agreed should proceed to an evidentiary hearing. (R. 3-4, 10). After argument, the circuit court dismissed all claims besides actual innocence. (R. 40-44). The actual innocence claim proceeded to a third-stage evidentiary hearing.

**A. Tony Benson testifies, consistent with three prior written statements, that he alone was responsible for Frazier's murder**

As noted above, Crawford was convicted on October 29, 2010. (SUP2 R. 941). On

February 25, 2014, Benson sent a letter to Crawford's mom, Ms. Mingo:

> Dear ms. Mingo
> Im writeing you this letter wanting
> you to Know the truth about the murder
> of Johnny FRAZIER November 4th 2007 your
> son didn't have anything to do with what
> happen In it's eating me up on the inside
> that he's Being punished FOR something that
> he didn't do I hate that it took me this
> long to really say what really happen But
> This is the truth your Son was only
> There to Buy some weed he didn't Know
> anything about what was gonna GO down

(C. 199).

Benson's letter goes on to explain that he was jealous of Frazier spending time with his girlfriend, Bender. (*Id.*) He further explained that Bender visited him in the County Jail after his arrest in this matter and that they agreed Bender would identify Crawford as the shooter so that Benson would hopefully "get lesser time for robbery." (*Id.*) In fact, Benson told Bender: "if she still love[s] me she would say he [Crawford] did it to help me beat the murder[.]" (C. 200).

On April 11, 2014, Benson signed an affidavit confessing his guilt and exculpating Crawford. (C. 195). He averred: "It was me who shot and killed Johnny on November 4, 2007. Tyreese is completely Innocent." (C. 196). Benson explained in the affidavit that, "as Tyreese got out the van I pulled a 357 out my pants put it in the back of the driver seat headrest and pulled the trigger shooting Johnny in the back of the head." (*Id.*) Benson went on to say that Crawford "didn't participate in" the murder and "had no knowledge of"

Benson's intention to kill Frazier. (*Id.*) In reality, Crawford "only came to buy some weed." (*Id.*)

After Crawford retained post-conviction counsel, Benson signed another affidavit. (C. 265). In that affidavit, Benson reiterates that he killed Frazier and that "TyReese Crawford had nothing to do with me killing Johnny Frazier." (*Id.*) He also provided additional information about his motive for killing Frazier:

> I killed him for two reasons. The main reason was that he was implicated in a murder for a guy I was close with, a guy named Vonnie Combs. I think Johnny was questioned and released. Vonnie Combs was my friend. The thing that put me over the edge, though, was that I think he was having a relationship with Raven Bender, who was my girlfriend at the time of Johnny's death. I had been with Raven since 2005. I did not have a car. Johnny did. Sometimes I would see Johnny and Raven together. I was worried they were hanging out.

(*Id.*)

Benson also averred that he had informed Marcus Clemons of his intention to kill Frazier "a few weeks" before it happened. (C. 266). He further explained that, after the shooting, he gave the murder weapon to Clemons and that Clemons got rid of the gun at his request. (*Id.*) Benson and Clemons also communicated prior to Clemons' testimony at trial and Clemons agreed "to lie about the seating in the van, and to say that TyReese was seated behind Johnny." (C. 267).

At Crawford's evidentiary hearing, Benson testified to his sole responsibility for the murder of Johnny Frazier, his motive, and Crawford's complete lack of involvement. (R. 85-147). Benson testified that he directed Frazier to the dead-end block where he shot him. (R. 95). He explained that he told Frazier to drive to that location because there would be less traffic. (R. 97). Benson testified that when the van stopped, Crawford got out and Benson shot Frazier. (R. 97). He had not told Crawford that he planned to shoot Frazier.

(R. 97-98). Benson called to Bender, who had started to run away, and asked her to take money from Frazier's hands and pockets. (R. 98). Benson also confirmed that he and Bender split the proceeds from the robbery. (R. 138).

Benson testified that he killed Frazier as revenge for Frazier arranging the murder of Vonnie Combs, who Benson viewed as a father figure, and because Frazier was having an affair with Bender. (R. 86-88). Like Crawford in his video statement, Benson testified that he was sitting behind the driver's seat and Crawford was sitting behind the passenger's seat. (R. 87).

Benson testified that the only person who knew that he planned to kill Frazier was Clemons, whom he had told about a month before the murder. (R. 98). He further testified that Clemons helped him get rid of the gun. (R. 99). Benson testified that he asked Bender and Clemons to lie for him. (R. 108, 110).

He also testified that at the time of the murder, he and Crawford were both part of the P. Stone gang, and that in the P. Stones, all members went by the nickname "Moe" which essentially meant "dude or homey." (R. 101).

**A. The circuit court views Crawford's videotaped interrogation**

During the post-conviction hearing, the circuit court watched the video of Crawford's interrogation by police. (R. 150). Crawford's videotaped account of what happened the evening of Frazier's murder is consistent with Benson's testimony in a number of important ways:

- both explain that Crawford was in the van only because he wanted to buy marijuana (R. 89; State Trial Ex. 15A / Petitioner's Ex. 3 at 12:00);
- both state that it was Benson who called Frazier to come pick them up (R. 90; State Trial Ex. 15A / Petitioner's Ex. 3 at 9:00);

- both state that Benson was seated behind Frazier, not Crawford (R. 90, 97; State Trial Ex. 15A / Petitioner's Ex. 3 at 21:30-45; 25:20-26:10);

- both explain that, after they purchased the marijuana, Crawford asked Frazier to drive him back to Calumet Park so he could find his girlfriend (R. 94; State Trial Ex. 15A / Petitioner's Ex. 3 at 19:30);

- both explain that Crawford asked to get out of the van when they could not find his girlfriend (R. 94-96; State Trial Ex. 15A / Petitioner's Ex. 3 at 26:30);

- both explain that it was Benson who directed Frazier to the isolated location where the shooting occurred (R. 94-96; State Trial Ex. 15A / Petitioner's Ex. 3 at 28:35-29:10);

- both state that Crawford had no knowledge of Benson's intentions (R. 97-98; State Trial Ex. 15A / Petitioner's Ex. 3 at 31:30-45); and

- both explain that Benson was the shooter and that Crawford was not involved in any way (R. 97-98, 120; State Trial Ex. 15A / Petitioner's Ex. 3 at 31:30-33:10).

After the court viewed the tape of Crawford's interrogation, Crawford rested.

**B. The State calls a jailhouse informant**

For its part, the State called purported jailhouse informant Santana McCree. (R. 155). Crawford moved for a hearing to determine McCree's reliability pursuant to 725 ILCS § 5/115-21. The circuit court held that the statute "does not apply to a post-conviction hearing" and allowed McCree to testify. (R. 58). McCree claimed that he, Benson, and Crawford had a plot to "com[e] together to get [Crawford's] conviction overturned so we can get the wrongful conviction money." (R. 163). That allegation was allegedly supported

by certain intra-prison letters ("kites") McCree alleged that he had received from Crawford.

McCree further testified that he self-identifies as a "hustler" (R. 218-19) and that he had lied to another Cook County judge when it suited his interests. (R. 224). Specifically, McCree admitted that he lied in his own post-conviction proceedings because "this is what you have to do if you want to get [a petition] in late." (R. 223). Similarly, he testified that he filed documents in court "hoping that … [he] could speak something into existence" in order to get out of prison. (R. 211-12). McCree also initially denied remembering whether he had approached the State Attorney's Office about making a deal related to what he supposedly knew regarding an unrelated case in Joliet, but, when confronted with a letter he wrote to the State stating, "I have all the information I need to help solve a murder that took place in Joliet in 2014 and I can get the confession on tape," admitted that he was presently cooperating with the authorities in Joliet. (R. 213-15).

On the stand, McCree twice denied that he had been offered anything by the State in exchange for his testimony. (R. 156). Ultimately, he admitted that he indeed had a cooperation agreement providing that the State's Attorney would recommend up to a seven-year reduction of his forty-five-year sentence for an unrelated murder. (R. 156, 158-59). The State later made good on that promise, and McCree's sentence was reduced by seven years. (R. 258).

After McCree's testimony, it was revealed that he had cooperated with the Cook County State's Attorney as an informant in another case as well. (C. 509). In light of that revelation, Crawford moved to strike McCree's testimony because it was unreliable and should not have been allowed in the first place (1) under 725 ILCS 5/115-21(d); (2) because it was contrary to *Massiah v. United States*, 377 U.S. 201 (1964), where the State used

McCree to continue to gather information against Crawford after McCree agreed to work for them; and (3) pursuant to Illinois Rule of Professional Conduct 4.2 where the State used McCree to communicate with Crawford when the latter was represented by counsel. (R. 261-62). The circuit court denied Crawford's motion, but indicated that it would "look at the credibility of Mr. McCree[.] (R. 276-77).

In the end, the circuit court found McCree to be noncredible. (A28-29). ("I don't find Mr. McCree was credible much"). As for the "kites" McCree claimed to have received from Crawford, the court stated that its "ruling is based clearly on the testimony that I heard and not on these kites." (A27).[3]

### C. The circuit court denies post-conviction relief

On October 10, 2020, the circuit court denied Crawford post-conviction relief. Although the court recognized that Benson testified at the hearing that he killed Frazier alone and that Crawford did not know Benson intended to kill Frazier, it concluded that Benson "did not have credibility before this Court[.]" (R. 333-34, 337). Ultimately, the court found that Crawford failed to show that Benson's testimony "would change the outcome of the trial on retrial." (R. 338).

## ARGUMENT

Crawford's post-conviction petition raised five claims: (1) actual innocence, (2)

[3] It was error for the circuit court to refuse to conduct the reliability hearing called for in 725 ILCS 5/115-21 and allow McCree to testify. It was also error to deny Crawford's motion to strike the testimony. However, because the circuit court did not credit McCree's testimony or the kites, there is no need for this Court to address the issues in this appeal. However, to the extent the State seeks to argue in its brief that McCree's testimony or the "kites" support the circuit court's denial of post-conviction relief—contrary to the circuit court's explicit statements to the contrary—then the Court will be called upon to address the issue and reverse the circuit court on that basis. Because this is a question of law, *de novo* review would apply. *See, e.g.*, *People v. Robinson*, 2020 IL 123849, ¶ 39.

ineffective assistance of trial counsel, (3) jury coercion, (4) ineffective assistance of appellate counsel, and (5) cumulative error. As noted above, claims 2–5 were dismissed at the second stage of post-conviction proceedings. Claim 1, raising actual innocence, was denied at the third stage following an evidentiary hearing.

## I. CRAWFORD'S INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AND JURY COERCION CLAIMS REQUIRED AN EVIDENTIARY HEARING

The circuit court erred when it dismissed Crawford's post-conviction claims of ineffective assistance of counsel and jury coercion. This Court should reverse and remand for that hearing.

### A. Relevant law

At the second stage of post-conviction proceedings, "the circuit court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity which would necessitate relief under the Act." *People v. Coleman*, 183 Ill. 2d 366, 380 (1998). A third-stage evidentiary hearing "is required whenever the petitioner makes a substantial showing of a violation of constitutional rights." *Id.* at 381.

At the second stage, the circuit court is "foreclosed ... from engaging in any fact-finding ... because all well pleaded facts are to be taken as true." *Id.* at 380-81 (citing *People v. Caballero*, 126 Ill. 2d 248, 259 (1989)). Moreover, "[w]hen the petitioner's claims are based on matters outside the record, it is not the intent of the Act that such claims be adjudicated on the pleadings." *People v. Whitfield*, 217 Ill.2d 177, 207 (2005). "[T]he dismissal of a post-conviction petition is warranted ***only*** when the petition's allegations of fact—liberally construed in favor of the petitioner and in light of the original trial record—fail to make a substantial showing of imprisonment in violation of the state or federal constitution." *Coleman*, 183 Ill.2d at 382 (emphasis added). The "substantial showing"

standard is met when well-pleaded allegations "***if proven*** at an evidentiary hearing, would entitle petitioner to relief." *People v. Domagala*, 2013 IL 113688, ¶ 35 (emphasis in original).

The second-stage dismissal of a post-conviction claim is reviewed *de novo*. *Coleman*, 183 Ill. 2d at 388 ("[T]he ultimate question regarding the sufficiency of the allegations contained in a post-conviction petition merits treatment as a legal inquiry requiring plenary appellate review.").

**B. Crawford's ineffective assistance of trial counsel claim required an evidentiary hearing**

In his post-conviction petition, Crawford raised two claims of ineffective assistance of counsel. He claimed that he received ineffective assistance of appellate counsel, only to the extent the circuit court determined that any of his other claims were waived for failure to present them on direct appeal. (C. 246). Because the circuit court made no such holding, that claim is not at issue in this appeal. Crawford's other claim of ineffective assistance was predicated on his trial counsel's failure to properly preserve his jury coercion claim for appeal. (C. 243). The circuit court erred in dismissing this claim without holding an evidentiary hearing.

The U.S. and Illinois constitutions guarantee a person accused of a crime the right to a fair trial. U.S. Const. amend. VI & XIV; Ill. Const. 1970, art.I, § 8. A fair trial, in turn, requires effective counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("the right to counsel is the right to the *effective* assistance of counsel") (emphasis added). Where counsel is ineffective, it cannot be said that the trial was fair or its result reliable. *Id.* at 694. To show ineffective assistance of counsel, a petitioner must show that "counsel's errors ... deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Specifically, the petitioner must show that counsel's performance fell below an objective standard of reasonableness and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687, 694. The Illinois Supreme Court has defined "reasonable probability" as a probability "sufficient to undermine confidence in the outcome" of the original trial. *People v. Enis*, 194 Ill.2d 361, 376-77 (2000).

The circuit court dismissed Crawford's ineffective assistance claim, finding that it "agree[d] with the Appellate Court," that "the issue was reviewed for [plain error,]" that "the Appellate Court found there was no error with the Court's responses to the jury," and therefore the issue was barred by *res judicata*. (R. 42-43).

The court's holding applying *res judicata* was simply wrong. This Court did ***not*** consider whether trial counsel was ineffective for failing to properly preserve Crawford's jury coercion argument for appeal. *See generally Crawford*, 2013 IL App (1st) 111345-U. The effectiveness of trial counsel was ***not*** at issue on direct appeal. Rather, the sole issue before this Court was whether jury coercion occurred under the plain error standard. *See id.* ¶¶ 15-18. Thus, *res judicata* cannot apply and the claim should not have been dismissed on that ground. *See People v. Harris*, 206 Ill. 2d 1, 42 (2002) ("Because of this distinction between these contentions, we conclude that defendant's argument in the case at bar was not 'actually decided' in *Harris II*, and *res judicata* does not apply.").

The circuit court's ruling as to the substance of the ineffective assistance claim was also error. Although the court did not explicitly apply the two *Strickland* factors in dismissing this claim, it appears that the court found a lack of prejudice and did not reach the reasonableness prong. (*See* R. 42-43). The court's finding that Crawford did not

demonstrate prejudice was legally incorrect and premature.

On direct review, this Court concluded that no jury coercion occurred under the extremely deferential ***plain error standard of review***—a standard the Court applied only because of counsel's ineffectiveness in failing to preserve the issue for appeal. In relying on this Court's conclusion that there was no jury coercion (under the plain error standard) as proof that Crawford was not prejudiced, the circuit court engaged in circular reasoning. The court relied on the prejudicial outcome of trial counsel's ineffectiveness as evidence that there was no ineffectiveness. That is inconsistent with *Strickland*.

"[T]he plain error doctrine is not coextensive with an abuse of discretion standard of review[.]" *People v. Price*, 375 Ill. App. 3d 684, 697 (1st Dist. 2007). "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. ... In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

But for trial counsel's unreasonable failure to preserve the jury coercion issue for appeal, the abuse of discretion standard would have applied. *See People v. Ferro*, 195 Ill. App. 3d 282, 292 (2d Dist. 1990). "[A] court abuses its discretion when its decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree

with it." *People v. Ortega*, 209 Ill. 2d 354, 359 (2004).

To be sure, both standards are deferential to the trial court's conclusions. However, counsel's ineffectiveness here resulted in the replacement of a deferential standard with an ***even more*** deferential standard. This Court was therefore forced to "apply this plain-error review to an issue that already carries an abuse-of-discretion standard of review." *People v. Rodriguez*, 387 Ill. App. 3d 812, 821 (1st Dist. 2008) (regarding jury instruction issue). Had that not been the case, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687-88. Indeed, in circumstances similar to those present in this case, this Court has found the existence of jury coercion. As a general rule, "[a] verdict hastened by the action of the judge, however worthy the motive, cannot be the result of that deliberation which the law guarantees." *People v. Gregory*, 184 Ill. App. 3d 676, 681 (2d Dist. 1989) (quoting *People v. Golub*, 333 Ill. 554, 561 (1929)). "A court's instruction to a jury to continue deliberating should be simple, neutral, and not coercive." *Id.* at 681. "The possibility of a hung jury is an inevitable by-product of a unanimous-verdict requirement, and the jury cannot be compelled to reach a verdict in all instances." *Id.* at 681.

Illinois law is clear that jury coercion exists in circumstances where a court advises a jury that it "must" return a verdict or uses other language that conveys the message that "[y]ou can't be deadlocked." *See id.* at 684. The trial court in this case did just that. It told the jury that it "***must*** remain a collective unit ***until*** you reach a unanimous verdict," that the jury "will ***have to*** return a unanimous verdict," and that "I will ***need*** a verdict[.]" *Crawford*, 2013 IL App (1st) 111345-U, ¶¶ 10, 12 (emphasis added). The court notified the jury that it would be sequestered for the night if it did not return a verdict and instructed

the jury to "let us know ***when*** you have a verdict." *Id.* ¶ 13 (emphasis added). These are coercive comments and the failure of counsel to properly object was unreasonable and prejudicial.

Not only did trial counsel's failure to properly raise this issue compel this Court to apply only the plain error review standard, counsel's failure also deprived the circuit court of the opportunity to meaningfully assess whether jury coercion had occurred. Among the purposes of the rule requiring post-trial briefing regarding issues to which a defendant objects is ensuring that "the trial court is informed of possible errors so that the court has an opportunity to correct those errors[.]" *People v. Sweeny*, 57 Ill. App. 3d 879, 885 (5th Dist. 1978). Neither this Court nor the trial court were given that opportunity as a result of trial counsel's failure to brief the issue.

Crawford made a substantial showing of a constitutional violation. *Domagala*, 2013 IL 113688, ¶ 35 ("substantial showing" standard met when well-pleaded "allegations of a constitutional violation, [...] *if proven* at an evidentiary hearing, would entitle petitioner to relief") (emphasis in original). The circuit court erred in dismissing this claim without an evidentiary hearing.

**C. Crawford's jury coercion claim required an evidentiary hearing**

In his post-conviction petition, Crawford claimed that his rights to due process and a trial by jury were violated by the circuit court's comments to the jury during deliberations. (C. 245). The integrity of a jury's verdict must be protected from coercion, duress, and influence. *People v. Gregory*, 184 Ill. App.3d 676, 680 (2d Dist. 1989); *Allen v. United States*, 164 U.S. 492, 499 (1896); *Jenkins v. United States*, 380 U.S. 45, 446 (1965). Here, in view of the totality of the circumstances surrounding the jury's deliberations, its verdict was coerced. The circuit court's instruction to the jury that they "needed" to return a second

unanimous verdict, in light of their long deliberations and concerns about personal health problems, was coercive. *Jenkins*, 380 U.S. at 446; *People v. Ferro*, 195 Ill. App.3d 282 (2d Dist. 1980). As noted above. "[a] verdict hastened by the action of the judge, however worthy the motive, cannot be the result of that deliberation which the law guarantees" and "[t]he possibility of a hung jury is an inevitable by-product of a unanimous-verdict requirement, and the jury cannot be compelled to reach a verdict in all instances." *Gregory*, 184 Ill. App. 3d at 681.

For the same reasons set forth above in the context of ineffective assistance of counsel, this claim is not barred by *res judicata* because it was decided on direct appeal under the plain error standard. As noted above, "the plain error doctrine is not coextensive with an abuse of discretion standard of review[.]" *Price*, 375 Ill. App. 3d at 697. This Court never determined whether error existed under the abuse of discretion standard, which would have applied but for trial counsel's ineffectiveness.

The circuit court dismissed the jury coercion claim, but provided no reasoning whatsoever. (*See* R. 44, 45). For the reasons outlined above (*supra* 21-22), the trial court's comments to the jury were coercive and this Court would have determined as much had it not been confined to the plain error standard of review. Because Mr. Crawford has made a substantial showing of a constitutional violation, the State's motion to dismiss this claim should have been denied and an evidentiary hearing should have been ordered. *See Domagala*, 2013 IL 113688, ¶ 35.

## II. EVIDENCE OF CRAWFORD'S INNOCENCE NECESSITATES A NEW TRIAL

The circuit court erred when it denied Crawford's post-conviction claim of actual innocence following an evidentiary hearing. This Court should reverse, vacate Crawford's

conviction, and remand for a new trial. At minimum, the Court should reverse and remand for a new evidentiary hearing where the correct legal standard may be applied to Crawford's claim.

**A. Relevant law**

"[N]o person convicted of a crime should be deprived of life or liberty given compelling evidence of actual innocence." *People v. Washington*, 171 Ill.2d 475, 489 (1996); *see also People v. Bull*, 185 Ill.2d 179, 212 (1998) ("An important goal of the criminal justice process is the protection of the innocent accused against an erroneous conviction").

To support a claim of actual innocence, a petitioner must present "new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *Washington*, 171 Ill.2d at 489). In *People v. Robinson*, the Illinois Supreme Court recently confirmed the standard in *Coleman* and rejected any "total exoneration" or "total vindication" standard for actual innocence. 2020 IL 123849, ¶ 55. The Court held that "total vindication or exoneration" was the "incorrect standard" for evaluating actual innocence claims. *Id.* The correct standard is "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 47 (citing *Coleman*, 2013 IL 113307, ¶ 97). The Court explained "new evidence need not be entirely dispositive to be likely to alter the result on retrial.... Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." (citations omitted). *Id.* ¶ 47.

Evidence is new when it is "discovered after trial and could not have been

discovered earlier through the exercise of due diligence." *Id.* ¶ 96 (citing *People v. Burrows*, 172 Ill.2d 169, 180 (1996)). "Material means the evidence is relevant and probative of the petitioner's innocence." *Id.* ¶ 96 (citing *People v. Smith*, 177 Ill.2d 53, 82-83 (1997)). Evidence is noncumulative when it adds to what the jury heard. *Id.* ¶ 96 (citing *People v. Molstad*, 101 Ill.2d 128, 135 (1984)). Finally, conclusive evidence means that, when it is considered along with the trial evidence, it would probably lead to a different result. *Id.* ¶ 96 (citing *People v. Ortiz*, 235 Ill.2d 319, 336-37 (2009)). In weighing the final factor, whether the evidence is conclusive, courts should consider all of the new evidence together and assess its cumulative impact against the trial evidence. *See Coleman*, 2013 IL 113307, ¶¶ 102-116.

**B. Reversal for a new evidentiary hearing is required because the circuit court applied the wrong standard**

The circuit court's ruling denying post-conviction relief was premised on the application of case law that the Illinois Supreme Court overruled in *People v. Robinson*, 2020 IL 123849. At the beginning of its closing argument, the State told the circuit court:

> What we're here to decide is whether the evidence that was presented to you in this hearing leads to total vindication and exoneration of the defendant in this murder.

(R. 299). And at the close of its argument, it reiterated:

> That testimony does not lead to a total vindication and exoneration that would be required in this case. I'd ask that you deny the petition.

(R. 310).

In *Robinson*, decided after closing arguments in this matter, the Supreme Court rejected the "total exoneration" or "total vindication" standard that the appellate courts had adopted in *People v. Barnslater*, 373 Ill. App. 3d 512 (2007), and *People v. Collier*, 387 Ill. App. 3d 630 (2008). 2020 IL 123849, ¶ 55. Nevertheless, the circuit court employed

the "total exoneration" standard that the State had urged it to apply. Indeed, the circuit court explained that, "[w]hen looking at a claim of actual innocence, the Court receives guidance from case law, in particular People versus Collier...." (A21). The court then recounted the requirement that an actual innocence claim be supported by evidence that is newly-discovered, material and non-cumulative, and likely to change the result on retrial. (*Id.*)

Although the circuit court did not explicitly invoke the "total vindication" standard, its decision to cite *Collier* as the lodestar for how a court assesses an actual innocence claim—rather than *Robinson* which overruled *Collier's* standard, *Washington* which originally set for the elements of an innocence claim, or *Coleman* which the *Robinson* court cited as setting forth the correct standard—suggests that it applied the incorrect legal standard. This Court has held that "[w]here a circuit court has judged evidence under an improper standard of proof, the appropriate remedy is to order a new hearing to be conducted under the proper standard." *People v. Robinson*, 2021 Il App 2021 IL App (1st) 171371, ¶ 58. Accordingly, where a circuit court applies the "total vindication" standard, this Court reverses and remands for a new evidentiary hearing. *Id.* That is what should occur here.

### C. There has never been any dispute that Benson's testimony is new, material, and non-cumulative and the circuit court did not hold otherwise

As noted above, post-conviction relief is required where a petitioner presents "new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial." *Coleman*, 2013 IL 113307, ¶ 96. There has never been any dispute that Benson's testimony was new, material, and non-cumulative. Indeed, at the evidentiary hearing, the State told the judge that the only issue to be decided was conclusiveness (under the incorrect standard). R. 299 ("What we're here to decide is whether the evidence that was

presented to you in this hearing leads to total vindication and exoneration of the defendant .... what this comes down to is what you heard at the hearing is it enough to undermine your confidence in the other jury."). In denying post-conviction relief, the circuit court held that the evidence was insufficiently conclusive. It did not find that the evidence was not new, material, or noncumulative. Rather, the court's ruling was based entirely on a finding that Crawford "has failed to show that the co-defendant's additional testimony stating that Mr. Crawford had nothing to do with this murder would change the outcome of the trial on retrial." (A29).

As to the newly-discovered nature of the evidence, the circuit court expressly stated that it had "rule[d] with regards to it being new evidence." (A27). That is consistent with the case law related to confessions by co-defendants. *Molstad*, 101 Ill.2d at 135 (1984) ("no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination"). Likewise, the circuit court did not find that Benson's testimony was immaterial or cumulative. (*See generally* A22-28). That is also consistent with the case law. *Coleman*, 2013 IL 113307, ¶ 96 ("Material means the evidence is relevant and probative of the petitioner's innocence. Noncumulative means the evidence adds to what the jury heard.") (*citing Smith*, 177 Ill.2d at 82-83; *Molstad*, 101 Ill.2d at 135); *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 81 ("[E]vidence that Madlock and Bledsoe later *confessed* to these facts would add something to the evidence the jury heard. This evidence certainly would have corroborated Jones's account of the shooting and defendant's alibi evidence, but that does not mean it would have added nothing to defendant's trial. Corroborative evidence is not the same as cumulative evidence.") (citing *Molstad*, 101 Ill.2d at 135; *People v. Sparks*, 393 Ill.App.3d 878, 886

(2009)); *People v. Ortiz*, 385 Ill. App. 3d 1, 11 (1st Dist. 2008), *aff'd*, 235 Ill. 2d 319 (2009) (evidence is material and noncumulative where it addresses the ultimate issue in the case: the identity of the offender).

### D. If the jury had heard Benson's confession, there is a probability it would have acquitted Crawford

If this Court were to determine that the circuit court did not apply the incorrect standard of proof, then the inquiry becomes whether the circuit court committed manifest error in denying Crawford's actual innocence claim. *Coleman*, 2013 IL 113307, at ¶ 98 (citing *People v. Morgan*, 212 Ill.2d 148, 155 (2004)); *Ortiz*, 235 Ill.2d at 333. "'Manifest error' is defined as 'error which is 'clearly evident, plain, and indisputable.'" *Ortiz*, 235 Ill.2d at 333 (citations omitted). Because the circuit court's findings were manifestly erroneous, this Court should reverse and remand for a new trial.

#### 1. Benson's testimony corroborates Crawford's videotaped interrogation and creates a probability of a different outcome

In closing arguments at trial, the State told the jury that Crawford's videotaped interrogation, in which he denies any involvement in the crime and points to Benson's culpability, "screams out to you 'I did it. I did it. I am a liar and I did it.'" (SUP2 R. 890-91). In convicting Crawford, the jury necessarily rejected Crawford's proclamations of innocence in the videotaped interrogation. If the jury had heard Benson confess and corroborate Crawford's assertion that Benson was the sole offender (among many other details), there is at least a probability that they would not have credited the State's assertion that Crawford's claim of innocence actually "screams … 'I did it'" and Crawford would have been acquitted.

As described above, Benson's testimony at the evidentiary hearing is consistent with Crawford's videotaped interrogation across a multitude of highly probative subjects.

Most importantly, Benson confessed to sole responsibility for the murder and robbery, just as Crawford explained in his interrogation. (R. 97-98, 120). Further, Benson confirmed Crawford's statement that Crawford had no knowledge of Benson's intentions. (R. 97-98). Benson also testified to a host of details regarding what happened prior to Benson killing Frazier that confirm much of what Crawford explained to police: the only reason Crawford was there was that he wanted to buy marijuana (R. 89); Crawford asked Frazier to take him back to Calumet Park because his girlfriend was waiting on him (R. 94); they briefly encountered Marcus Clemons on the way (R. 94-96); it was Benson and not Crawford who directed Frazier to the isolated location where the shooting occurred (R. 94-96); and Crawford had either exited the van or was in the process of exiting the van when Benson shot Frazier (R. 97).

The circuit court's denial of post-conviction relief was based on its conclusion that Benson's testimony that he alone was responsible for the murder lacked credibility and therefore would not change the result on retrial. The court concluded that Benson "would be significantly impeached. He … did not have credibility before this Court." (A28). As a result, the court found that Crawford had "failed to show that the co-defendant's additional testimony stating that Mr. Crawford had nothing to do with this murder would change the outcome of the trial on retrial." (A29). In reaching this conclusion, the circuit court overlooked the overwhelming similarities between Benson's 2019 testimony and Crawford's 2008 videotaped interrogation. Instead, the court identified three minor inconsistencies between the versions (inconsistencies that are belied by the record) and determined that Benson's testimony lacked credibility on the basis of those three inconsistencies alone.

It is the role of the trial court to make credibility determinations. *See Ortiz*, 235 Ill. 2d at 333. Those credibility determinations are reviewed for manifest error. *People v. English*, 2013 IL 112890, ¶ 23. Because the circuit court's determination that Benson lacked credibility—a holding explicitly grounded in three findings—was based on errors that were clearly evident, plain, and indisputable, this Court should reverse. *See Ortiz*, 235 Ill.2d at 333.

It was manifestly erroneous to ignore the probability of a different outcome were a jury to hear the evidence. *People v. Dugar*, 2021 IL App (1st) 182545-U[4] is on point. There, an alternate offender confessed at a third-stage post-conviction hearing. This Court concluded that denial of post-conviction relief "was manifestly erroneous not necessarily because we believe Karl [the alternate offender], but because it is indisputably evident that the confession could probably change the outcome; however, that is left for the trier of fact to decide." 2021 IL App (1st) 182545-U, ¶ 80. This was so even though there were minor inconsistencies between the alternate offender's testimony and the testimony of other witnesses:

> Most disturbing is the fact that the trial court's only analysis of the trial evidence was to say that Karl's "explanation and description of the shooting is contradicted by the evidence at trial and also by [Ms.] Sanchez who was an independent witness." The court never acknowledged that Karl's testimony aligned significantly with the testimony of the trial witnesses: he wore all-black clothing, he rode in a black Lexus, the crime was committed near Argyle and Sheridan, he shot Taylor and then Bolden, he shot a .380 pistol, the pistol jammed, and the victims drove a maroon SUV. He also had a braided beard, which was the key characteristic that Bolden relied on to identify the shooter.
>
> Not surprisingly, there were some inconsistencies. Karl did testify that he ran north after the shooting, while Ms. Sanchez and Bolden testified that he ran south. Karl also testified that he used two guns

[4] Consistent with Rule 23(e)(1), a copy of this Order is included in the Appendix at A36.

> while Bolden testified as to only one gun. However, a confession never needs to perfectly align with other testimony to result in a conviction. See People v. Edwards, 301 Ill. App. 3d 966, 984 (1998) ("Every detail of the confession need not correspond to the independent evidence in every particular."). And more relevant, at the third stage of a postconviction proceeding new evidence need not be dispositive on an issue to make it likely that the jury would reach a different conclusion on retrial. Robinson, 2020 IL 123849, ¶ 48.

*Id.* ¶¶ 87-88.

This Court's holding in *Dugar* is consistent with many other cases involving the confession of an alternate suspect or testimony pointing to the culpability of an alternate suspect. *E.g.*, *Molstad*, 101 Ill. 2d at 134 ("A better determination of Molstad's guilt could be made if Albritton's testimony could be balanced against the testimony of Molstad's codefendants .... We therefore conclude that Albritton's testimony did establish Molstad's guilt beyond a reasonable doubt, but this testimony should now be balanced against the subsequently acquired testimony of other individuals who were at the scene of the crime."); *Ortiz*, 235 Ill. 2d at 337 ("at retrial, the evidence of defendant's innocence would be stronger when weighed against the recanted statements of the State's eyewitnesses. The fact finder will be charged with determining the credibility of the witnesses in light of the newly discovered evidence and with balancing the conflicting eyewitness accounts."); *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49 ("where newly discovered evidence is both exonerating and contradicts the State's evidence at trial, it is capable of producing a different outcome at trial"); *People v. Parker*, 2012 IL App (1st) 101809, ¶ 85 (codefendant's affidavit stating that "If I was to call to give my account of the murder of Niquita Johnson[,] I would say that Dennis Parker never attended this murder and he play no part [*sic*] of this murder" was "completely exculpatory").

Furthermore, it is no wonder that Benson's 2019 testimony and Crawford's 2008

statement differ in certain ways. For one, it is well-established that memory deteriorates with the passage of time. *People v. Leavitt*, 2014 IL App (1st) 121323, ¶ 91 ("Few, if any, cases do not have witnesses whose memories are not impaired by the passing of time to some degree."). Moreover, the Illinois Supreme Court has held that minor variations in testimony are "to be expected anytime several persons witness the same event under traumatic circumstances." *People v. Brooks*, 187 Ill. 2d 91, 133 (1999) (where witness "statements were generally consistent in regard to how the event unfolded, the taxicab being involved, defendant being on the passenger side of the cab, and the gunfire coming from the passenger side," but "[t]here were discrepancies as to how many cars were involved, whether defendant was in the front or the rear passenger seat, whether the cab's sign was lit, and whether anyone was leaning out of the cab"); *see also People v. Rodriguez*, 100 Ill.App.3d 244, 248 (1981) (conflicts in testimony were not dispositive and it was unrealistic for witnesses to a sudden, violent event to describe the event with perfect accuracy). In fact, this Court has noted that "[w]e should be particularly suspicious of descriptions that improve with time, as memory rarely works that way." *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 74.

Similarly, any inconsistencies in Benson's and Crawford's statements of facts are readily explained by the passage of time between two truthful statements. Moreover, each of the three inconsistencies identified by the circuit court to discredit Benson's testimony is based on a manifestly erroneous interpretation of the facts.

**a. The circuit court misconstrued the testimony regarding Benson's gun**

The circuit court concluded that Benson lacked credibility because his testimony that Benson "says he didn't show a weapon" was "contrary to what Mr. Crawford stated to

the police." (A24, 25).

The circuit court's conclusion on this score is contradicted by the record. Benson testified that he did not "tell or show Tyrese that [he] had a gun with [him] that day." (R. 97). Crawford told police that, when Frazier stopped the van, Crawford saw a "little piece" of the handle of a gun in Benson's hand between his leg and the driver's side rear door of the van. (State Trial Ex. 15A / Petitioner's Ex. 3 at 30:30; 32:30). There is no inconsistency between those statements.

Even if there were any tension between those statements, it is of no significance. As explained above, minor discrepancies in witness testimony, especially years later, do not eliminate the probability that the evidence would change the result on retrial. (*Supra* 30-32). To the extent there is any discrepancy between Benson's and Crawford's version of events, it would be whether Crawford knew Benson had a gun seconds before the shooting, or seconds later at the time of the shooting. Either way, that is dramatically different than what the jury heard at trial. At trial, the only testimony about when the gun was first displayed came from Raven Bender, who testified that Crawford "had a gun in his lap" much earlier while Frazier had gone inside a residence to purchase the marijuana. (SUP2 R. 567). Had the jury heard Benson corroborate Crawford's statement to police that it was *Benson* who had the gun and that Crawford only learned of it within seconds of the murder, there is at least a probability that they would not have convicted Crawford.

Moreover, the only possible relevance of when Crawford learned that Benson had a gun (immediately prior to the shooting or seconds later) is that earlier knowledge might suggest that Crawford was aware of Benson's plans. But both Benson's testimony and Crawford's statement to police are clear that Crawford had no knowledge of Benson's

plans. (State Trial Ex. 15A / Petitioner's Ex. 3 at 31:30; R. 97-98). The discrepancy identified by the circuit court—to the extent it even exists—is insignificant and does not render it improbable that a jury would acquit Crawford. Ultimately, the question of how to assess this issue should be left to a jury at a new trial. *See Molstad*, 101 Ill. 2d at 134; *Harper*, 2013 IL App (1st) 102181, ¶ 49; *Parker*, 2012 IL App (1st) 101809, ¶ 85; *Dugar*, 2021 IL App (1st) 182545-U, ¶¶ 87-88.

**b. The circuit court misconstrued the testimony regarding when Crawford exited the van**

The second reason the circuit court found that Benson's testimony lacked credibility was because of an alleged contradiction between Benson's and Crawford's versions of when exactly Crawford exited the van. The circuit court concluded that Benson testified that "Crawford got out of the vehicle when it first stopped" and "was gone at the time he [Benson] shot Johnny Frazier" whereas Crawford "stated that he saw a gun, he got out of the car and then he heard a shot." (A24-25). Those statements are not contradictory at all—they are identical.

To the extent there was any discrepancy, and just as with the above alleged inconsistency, the difference involved is, at most, a couple of seconds. At the post-conviction hearing, Benson testified that, when Frazier stopped the van, "Tyrese was like, man, let me out, let me get out of the car. Raven got out as well. I pulled a gun out, and I shot [Frazier] in the head." (R. 95). In his videotaped interrogation, Crawford remembered it slightly differently. Crawford stated that, as soon as he saw Benson's gun, "I looked at him and I grabbed that door handle, that's the first thing I did 'cause I don't know what he on, I don't know if he gonna kill me, kill him, kill her .... all I hear is 'POW,' I opened the door instantly, took off, I ran...." (State Trial Ex. 15A / Petitioner's Ex. 3 at 31:30).

Just as with the circuit court's reliance on supposed discrepancies related to when Crawford first knew Benson had a gun, even if there were any tension between the statements about the precise moment Crawford exited the van, it is insubstantial. Minor differences in witness testimony do not eliminate a probability that evidence would change the result on retrial. (*Supra* 30-32). To the extent there is any discrepancy between Benson's and Crawford's version of the exact second Crawford exited the van, either version is dramatically at odds with the testimony the jury heard at trial, which was that Crawford was in the van the entire time and shot Frazier in the back of the head. Had the jury heard Benson corroborate Crawford's statement to police that it was *Benson* who shot Frazier and that Crawford was either out of the van or on his way out of the van at the time, there is at least a probability that they would not have convicted Crawford.

The discrepancy identified by the circuit court—to the extent it exists—is insignificant and does not render it improbable that a jury would acquit Crawford. Ultimately, the question of how to assess this issue should be left to a jury at a new trial. *See Molstad*, 101 Ill. 2d at 134; *Harper*, 2013 IL App (1st) 102181, ¶ 49; *Parker*, 2012 IL App (1st) 101809, ¶ 85; *Dugar*, 2021 IL App (1st) 182545-U, ¶¶ 87-88.

**c. The circuit court misconstrued the testimony regarding Marcus Clemons**

The final reason that the circuit court found Benson to lack credibility was because of a conclusion that his testimony differed from the trial testimony of Marcus Clemons. (A26). The circuit court found it "interesting" that Benson testified at the evidentiary hearing that he was seated behind Frazier in the van, but that Clemons testified at trial that it was Crawford seated behind Frazier. (A24).

The circuit court is correct that Benson's and Clemons' testimony are contradictory.

But that fact ***supports*** Crawford's innocence and is one of the many reasons Benson's testimony creates a probability of a different outcome. It was manifestly erroneous for the circuit court to conclude otherwise.

At trial, the jury heard Clemons testify that, on the evening of the murder, he was walking to a gas station in Calumet Park, when Frazier, who was driving a minivan, stopped and offered him a ride. (SUP2 R. 662-64). Frazier testified that "Raven" was seated in the front passenger seat, Crawford was seated behind the driver, and Benson was seated behind Raven. (SUP2 R. 665-67). Benson testified that this encounter lasted a maximum of 15 seconds. (SUP2 R. 669)

Benson, Crawford, and Clemons all agreed to one fact: Frazier pulled the van over and had a brief encounter with Clemons on the way back to Calumet Park. (State Trial Ex. 15A / Petitioner's Ex. 3 at 43:30; R. 95-96; SUP2 R. 662-64). The only relevant fact that Clemons testified to was the seating arrangement in the van, placing Crawford in the seat from which the fatal shot was fired. (SUP2 R. 667). The jury would not have credited Clemons' description if it had heard the testimony Benson provided at the post-conviction evidentiary hearing.

Had the jury heard from Benson, it would have known that Clemons was lying and it would have known why he was lying. The jury would have heard from Benson that Clemons was someone he considered his "partner in crime." (R. 96). The two of them "hung around, beat people up." (*Id.*) The jury would have heard that Benson had confided in Clemons—and only Clemons—his intention to murder Frazier. (R. 98). The jury would further have heard that Clemons was actually involved in the crime himself. Benson asked Clemons to dispose of the murder weapon and Clemons did so. (R. 99). Moreover, the jury

would have heard that Benson asked Clemons to lie in trial testimony in order to implicate Crawford and, hopefully, exculpate Benson. (R. 110). Where it is clearly evident, plain, and indisputable that Benson's testimony would have explained to a jury that Clemons lied—and why he lied—the circuit court manifestly erred in interpreting the tension between Benson's post-conviction testimony and Clemons's trial testimony as a reason to discredit Benson.

**2. The fact that the jury received an instruction on accountability does not render Benson's post-conviction confession irrelevant**

The Court noted in its ruling that Crawford was convicted under a theory of accountability such that he could have been found guilty if "Mr. Benson could have or was the actual shooter[.]" (A22). This does not alter the fact that there is a probability that Benson's testimony would change the result on retrial.

To the extent the State argues in this appeal that—even though it's theory at trial was that Crawford was the shooter—the accountability jury instruction obviates any need for a new trial, that argument must fail.

As an initial matter, the evidence presented at trial was that Crawford was the shooter and that Benson stole money from Frazier's pockets. If the State now attempts to change its theory to contend that Benson was the shooter but that he and Crawford were both involved in the robbery, a jury should assess that theory, not this Court in the first instance.

Moreover, in order for Crawford to be found guilty for Benson's actions under a theory of accountability, the State would have to prove prior knowledge of and involvement in the crime by Crawford, which they did not and have not. A person is accountable for the conduct of another if "[e]ither before or during the commission of an

offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5–2(c). The State must prove "that the defendant, either before or during the commission of the offense, intentionally aided or abetted an offender in conduct that constitutes an element of the offense." *People v. Taylor*, 186 Ill. 2d 439, 447 (1999).

Illinois courts are clear that the "mere presence of a defendant at the scene of the crime is [] insufficient to make a defendant accountable, even if it is coupled with defendant's flight from the scene or defendant's knowledge that a crime has been committed." *People v. Johnson*, 2014 IL App (1st) 122459-B; *People v. Dennis*, 181 Ill. 2d 87, 108 (1998) ("Not even presence at the scene, coupled with flight or knowledge that a crime is being committed, is sufficient, without more, for accountability purposes."); *People v. Shaw*, 186 Ill. 2d 301, 323 (1998), *opinion modified on denial of reh'g* (June 1, 1999) ("Presence at the commission of the crime, even when joined with flight from the crime or knowledge of its commission, is not sufficient to establish accountability," and noting that the defendant's testimony that he knew nothing about the robbery until after it was committed was uncontradicted by the State); *People v. Martinez*, 242 Ill.App.3d 915, 923 (1992) (mere presence of a defendant at the scene of a crime does not render him accountable); *People v. Furby*, 138 Ill. 2d 434, 456 (1990) ("mere presence at the scene of an offense is not by itself sufficient to sustain a conviction on an accountability theory," but defendant was guilty under theory of accountability when he, in addition to being present, knew in advance of the planned theft and shared equally in the proceeds); *People v. Banks*, 28 Ill. App 3d, 786 (1975) ("Presence plus knowledge that a crime was being committed, without more, are insufficient to establish accountability.").

Here. Benson testified in no uncertain terms that Crawford had no prior knowledge of or involvement in the shooting of Frazier. In other words, Crawford did not "solicit[], aid[], abet[], agree[] or attempt[] to aid" Benson "in the planning or commission of the offense." 720 ILCS 5/5-2(c). Rather, Crawford was merely present when Benson committed this crime. Crawford's flight from the scene and knowledge that a crime was committed has no bearing on his mere presence at the scene. (*See supra* 38).

As discussed above, Benson's testimony that he—not Crawford—committed this crime and that Crawford had no idea what Benson planned creates a probability of a different outcome. The State's entire theory of the case would have been contradicted by the actual perpetrator admitting to the crime and exculpating Crawford. Even if, for the sake of argument, the State had proceeded on a theory that Crawford was accountable for Benson's homicide—which it did not—there is still a probability that the result would have been different as Benson is clear that Crawford had no knowledge of or involvement in the crime. Mere presence is not a crime. The State presented no evidence—at trial or at the evidentiary hearing—that Crawford "intentionally aided or abetted" Benson, as required for accountability. As in *Shaw*, Crawford's statement that he had no knowledge about the robbery or murder stands uncontradicted by the State. *See* 186 Ill. 2d at 323. Instead, new evidence from the actual perpetrator now Crawford's prior statement.

The fact that the jury received an instruction accountability—an instruction it sent repeated notes to the judge expressing confusion about—does not weigh against the new evidence that Benson committed this crime without the knowledge or assistance of Crawford.

## CONCLUSION

If Crawford's case were tried today, the State would present to the jury testimony

## CERTIFICATE OF COMPLIANCE

Appellant's attorney hereby certifies that this brief conforms to the requirements of Supreme Court Rule 341(a) and (b). The length of this brief, excluding the pages or words contained in the Rule 341(d) cover, the Rule 341(h)(1) statement of points and authorities, the Rule 341(c) certificate of compliance, the certificate of service, and those matters to be appended to the brief under Rule 342(a), is 40 pages.

/s/ Karl Leonard
Karl Leonard

from Raven Bender that Tyreese Crawford was the shooter in this case and from Marcus Clemons that he briefly saw Crawford seated in the location from which the shot was later fired. The jury would then hear from Tony Benson, who would confess that he alone was responsible for the murder, that Bender and Clemons were both involved in the crime themselves, and that he had instructed both Benson and Clemons to lie. Benson's testimony places the trial evidence in a different light, undermines confidence in the judgment of guilt, and creates a probability of a different result on retrial. Crawford respectfully requests that this Court grant him a new trial.

Respectfully Submitted,

TYREESE CRAWFORD

By: /s/ Karl Leonard
One of his attorneys

Karl Leonard
Lauren Myerscough-Mueller
Lindsay Hagy
THE EXONERATION PROJECT
at the University of Chicago Law School
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 789-4955
karl@exonerationproject.org
laurenm@exonerationproject.org
lindsay@exonerationproject.org

*Counsel for Petitioner-Appellant*

NO. 1-20-1310

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | Appeal from the Circuit Court of Cook County, Illinois, County Department, Criminal Division |
| Respondent-Appellee, | |
| v. | Cir. Ct. No. 08 CR 5781 |
| TYREESE CRAWFORD, | Honorable Michele M. Pitman, Judge Presiding. |
| Petitioner-Appellant. | |

**APPENDIX**

Karl Leonard
Lauren Myerscough-Mueller
Lindsay Hagy
THE EXONERATION PROJECT
at the University Chicago Law School
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
312-789-4955
karl@exonerationproject.org
laurenm@exonerationproject.org
lindsay@exonerationproject.org

*Attorneys for Appellant Tyreese Crawford*

# TABLE OF CONTENTS TO APPENDIX


Report of Proceedings, *People v. Crawford*, 08 CR 5781 (March 24, 2017) ..............A1

Report of Proceedings, *People v. Crawford*, 08 CR 5781 (October 2, 2020) ............A14

Notice of Appeal (October 30, 2020)............................................................................A33

*People v. Dugar*, 2021 IL App (1st) 182545-U..............................................................A36

Index to Record on Appeal..............................................................................................A70

# EXHIBIT-F1

2021 IL App (1st) 201310-U
Order filed: December 23, 2021

FIRST DISTRICT
FOURTH DIVISION

No. 1-20-1310

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 5781 |
| | ) | |
| TYREESE CRAWFORD, | ) | Honorable |
| | ) | Michele M. Pitman, |
| Defendant-Appellant. | ) | Judge, presiding. |

---

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

## ORDER

¶ 1 *Held*: The second-stage dismissal of several issues raised in defendant's postconviction petition is affirmed, where those arguments were barred by the doctrine of collateral estoppel; denial of defendant's actual innocence claim following an evidentiary hearing is also affirmed, where the circuit court did not manifestly err in concluding that defendant's new evidence would not probably have changed the result on retrial.

¶ 2 Defendant-appellant, Tyreese Crawford, appeals from the circuit court's order dismissing the majority of his postconviction arguments at the second stage, as well as the order denying his actual innocence claim following an evidentiary hearing. For the following reasons, we affirm.[1]

---

[1] Portions of this order are taken from our prior disposition of defendant's direct appeal. See *People v. Crawford*, 2013 IL App (1st) 111345-U.

¶ 3 Defendant and his codefendant, Tony Benson, were charged with first degree murder and armed robbery, and were tried in simultaneous but separate jury trials.

¶ 4 The charges against defendant and codefendant stem from the November 4, 2007, shooting death of Johnny Frazier. At trial, Raven Bender, Benson's girlfriend at the time of the incident, testified that she and Frazier had been driving around in a minivan on November 4, 2007, during which time Frazier sold drugs on several occasions. Frazier was the driver. Thereafter, they were joined by defendant and Benson, who wanted to buy some marijuana in Chicago, Illinois. At one point, while Frazier was not in the van, Bender heard defendant say to codefendant: "Don't leave no evidence behind. This * * * dead." Bender saw a black and silver handgun on defendant's lap. After Frazier returned to the van, defendant asked Frazier to take him to Calumet Park, Illinois. Frazier was in the driver's seat, Bender was in the front passenger seat, defendant was in the backseat behind Frazier, and Benson was in the backseat behind Bender. Defendant then directed Frazier to park the van near 126th Street and Winchester Avenue in Calumet Park. Bender then left the van. As she walked away, she looked back to the van which had its interior lights on and observed defendant shoot Frazier in the back of the head. Defendant then ran away. After rummaging through Frazier's pockets, Benson left the van and ran in the same direction as defendant.

¶ 5 Marcus Clemons, who had known Frazier for years, testified that he observed Frazier driving his van in Calumet Park between 10:00 and 10:30 p.m. on November 4, 2007. He confirmed that defendant, codefendant, and Bender were seated in the van as described by Bender.

¶ 6 Police officer Bryant Brooks discovered Frazier slumped over the wheel of the van at about 11:12 p.m., and medical personnel later confirmed Frazier was dead. A police investigator photographed the scene and discovered Frazier's pants pockets had been turned inside out and a

$100 bill was on the floor of the van near the driver's seat. The parties stipulated that a forensic pathologist found Frazier's death was caused by a gunshot wound.

¶ 7 During the police investigation, Detective Anthony Beattie took defendant's videotaped statement which was later presented to the jury at trial. Defendant stated that Frazier drove him, Bender, and Benson from Calumet Park to Chicago on the date in question to purchase some marijuana. Defendant sat behind Bender and Benson sat behind Frazier. After they returned to Calumet Park and as defendant was getting ready to leave the van, Benson pulled up his shirt and defendant saw the handle of a gun. While defendant was opening the door of the van to run away in fear, and while he was still in the van, he heard a shot and then ran away. Defendant never stated that Bender was still in the van prior to the shooting in the video, but physically gestured to her position in the front seat in explaining that he ran when he saw the gun because he did not know if Benson was going to shoot him, Frazier or Bender. Defendant claimed to have no prior knowledge of Benson's intention to shoot Frazier.

¶ 8 Following the presentation of the evidence and closing arguments, the jury received instructions, including an instruction on accountability. The jury retired to deliberate at 4:43 p.m. on Friday, October 29, 2010, and deliberated for over six hours.

¶ 9 During its deliberations, the jury forwarded several notes to the trial court. These included questions regarding: (1) the law as to accountability, (2) a request for a transcript of Bender's testimony, (3) the possibility of the need to return to deliberate on Monday if a verdict could not be reached that day, (4) a request for a "smoke break," and (5) when and how the jurors could obtain needed medication from home. The trial court responded to each question, often by agreement of the parties. After the jury indicated that it had reached a verdict on one of the charges, and once again by agreement of the parties, the trial court advised the jury of the need to continue

to deliberate on the remaining charge. At approximately 11:05 p.m., the jury returned verdicts finding defendant guilty of first degree murder and armed robbery. Benson was also found guilty of the same charges.

¶ 10 Defense counsel filed a motion for a new trial. During the hearing on the motion, defense counsel raised an issue which was not included in defendant's written motion. Specifically, defense counsel noted that the jury's notes and questions revealed it was having trouble reaching unanimous verdicts, and that the jury reached its decision only after being coerced by the trial court's responses to their questions and just "as the bus was pulling up to take them to the hotel" to be sequestered. Defendant's motion was denied, and he was subsequently sentenced to consecutive terms of 40 years' imprisonment on the murder conviction and 6 years' imprisonment on the armed robbery conviction.

¶ 11 On direct appeal, defendant argued that the trial court's comments during jury deliberations coerced the jury into rendering its guilty verdicts. Defendant conceded that this issue had not been properly preserved for appeal with contemporaneous objections at trial and by inclusion in his written posttrial motion, and therefore asked for the issue to be reviewed for plain error. *People v. Crawford*, 2013 IL App (1st) 111345-U, ¶¶ 16-18. After noting that the first step in that analysis is to determine if any error had occurred (*id.*), this court rejected defendant's arguments and concluded: "After reviewing the trial court's comments in response to the jury's notes, under the totality of the circumstances, we find no evidence that the jury was coerced during [its] deliberations to reach its guilty verdicts." *Id.* ¶ 20. We further concluded: "The court was well within its discretion to instruct the jury as it did." *Id.* ¶ 23.

¶ 12 Defendant filed an initial postconviction petition, pursuant to the Post-Conviction Hearing Act (Act) (720 ILCS 5/122-1 *et seq.* (West 2014)), in October 2014, and the operative amended

petition was filed on November 20, 2015. Therein, defendant initially made a claim of actual innocence based on new evidence purportedly showing that it was Benson that killed Frazier. In support of this claim, defendant attached to the petition a letter and affidavits from both Benson and a newly identified witness, Geroise Walker.[2]

¶ 13 In a letter to defendant's mother and in his two affidavits, Benson generally averred that he—and not defendant—shot and killed Frazier because: (1) he was jealous that Frazier had been having a sexual relationship with Benson's girlfriend, Bender, and (2) Frazier had been implicated in the murder of one of Benson's friends. Defendant did not know anything about the plan, was only present because he wanted to buy marijuana, and had left the van by the time Benson shot Frazier. After the murder, Benson and Bender took money from Frazier's pockets and left the scene. Benson later split the money with Bender and had Clemons dispose of the murder weapon. Benson further averred that he had spoken to both Bender and Clemons prior to trial and instructed both to testify that it was defendant who was sitting behind Frazier in the van on the night of the shooting and additionally—in the case of Bender—that it was defendant who shot Frazier. Benson indicated that he had not discussed this matter with defendant, but was finally coming forward to tell the truth because it was "eating me up on the inside" that defendant was being punished for something he did not do.

¶ 14 Defendant's petition also asserted that the jury was coerced to reach a verdict by the trial court's comments and responses to the jury's questions during deliberations, ineffective assistance of trial and appellate counsel to the extent that any of these arguments were waived for not having been properly preserved or previously raised, and cumulative error.

---

[2] Walker's affidavit was not further relied upon by defendant or the circuit court below, and defendant does not rely upon it on appeal. Therefore, we need not address its content on appeal.

¶ 15 The State conceded that defendant's actual innocence claim should proceed to an evidentiary hearing. However, the State moved to dismiss all the other claims on the basis that they fundamentally amounted to a claim that the jury was improperly coerced, a claim that was rejected on direct appeal and was thus barred by the doctrine of *res judicata*. The circuit court agreed, dismissed all but the actual innocence claim, and advanced that claim to an evidentiary hearing.

¶ 16 Prior to the hearing, defendant filed a motion regarding the testimony of one of the State's potential witnesses, Santana McCree. According to the motion, McCree was a convicted murderer incarcerated in the same facility as defendant and intended to testify as an informant at the evidentiary hearing that defendant had communicated to McCree information that undermined defendant's actual innocence claim. Because McCree would purportedly testify pursuant to a "cooperation" agreement whereby the State would "not oppose" a 7-year reduction in McCree's 45-year sentence, defendant's motion asked—pursuant to section 115-21 of the Code of Criminal Procedure of 1963 (Code) (West (2018))—that: (1) he be provided certain disclosures regarding McCree, (2) a reliability hearing be held regarding McCree's testimony, and (3) McCree's proposed testimony be barred due to its unreliability. In the alternative, defendant moved *in limine* to exclude McCree's testimony from the hearing for its purported unreliability.

¶ 17 The State objected, contending that Section 115-21 of the Code did not apply to postconviction proceedings and that any conclusion regarding McCree's reliability and credibility should be determined by the trial court acting as the trier of fact at the evidentiary hearing. The trial court agreed and denied defendant's motion in its entirety.

¶ 18 At the hearing, defendant submitted his videotaped statement to the police into evidence. Defendant also presented Benson as a witness, and he generally testified consistently with the

letters and affidavits attached to defendant's amended petition. He stressed that defendant knew nothing about the planned robbery and murder, and that he and not defendant shot and killed Frazier.

¶ 19 However, he did concede that he had previously lied to the police about the incident and reiterated that he arranged for Bender and Clemons to wrongfully implicate defendant at trial. In addition, there were some inconsistencies between Benson's letter and affidavits and his testimony, and between his testimony and defendant's statements in the videotaped statement. For example, contrary to defendant's videotaped statement that defendant was still in the van when Benson pulled out his gun and when Frazier was shot, in one of his affidavits Benson averred that defendant was outside and eight feet away when Benson shot Frazier. At the hearing, Benson testified that both Bender and defendant were outside the van when he pulled out his gun and shot Frazier.

¶ 20 The State presented McCree's testimony at the hearing, in which he asserted that he was incarcerated in the same facility as defendant and Benson. McCree, who admitted to previously lying to a court and who self-described himself as a "hustler," further claimed that defendant's petition and Benson's confession was nothing more than a plot to have defendant's conviction overturned in order to obtain and split an award for defendant's wrongful conviction. McCree contended that this plot was documented in several "kites," or letters written by defendant and passed along among other prisoners at the facility. Over defendant's objection, these kites were entered into evidence at the hearing.

¶ 21 After initially denying any such agreement, McCree ultimately admitted to having a cooperation agreement with the State with respect to his assistance with this matter. After McCree confirmed that he had cooperated with the State as an informant in several other cases as well,

defendant moved to strike both McCree's testimony and the kites from evidence. The circuit court denied that motion but indicated that it would address the credibility of McCree's testimony and the kites in ruling on the ultimate merits of defendant's claim of actual innocence.

¶ 22 In an oral ruling entered on October 10, 2020, the circuit court rejected defendant's claim of actual innocence and denied his postconviction petition. In so ruling, the circuit court specifically indicated that it did not find McCree very credible and was not relying upon the kites at all in making its decision. Rather, the circuit court framed the issue before it as a question of whether, taking Benson's letter, affidavits, and testimony at the hearing as newly discovered evidence, would that evidence likely change the outcome on retrial. The circuit court concluded that it would not, after noting several inconsistencies between the new evidence and the evidence presented at trial. The circuit court also noted that while the evidence at trial indicated that defendant was the shooter, the jury was also instructed on the law of accountability, that theory was argued by the State, and a jury could believe that Benson was the shooter but also that defendant and Benson acted together. Defendant filed a timely appeal.

¶ 23 On appeal, defendant does not challenge the dismissal of his claims of ineffective assistance of appellate counsel and cumulative error. Instead, defendant first contends that the circuit court erred in dismissing his jury coercion and ineffective assistance of trial counsel claims at the second stage. He then contends that the circuit court improperly denied his actual innocence claim following the evidentiary hearing.

¶ 24 "The Post–Conviction Hearing Act *** provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. [Citations.] A postconviction action is not an appeal from the judgment of conviction, but is a collateral attack

on the trial court proceedings." *People v. Tate*, 2012 IL 112214, ¶ 8. The petition may be dismissed at the first stage if it is frivolous or patently without merit, otherwise it advances to the second stage. 725 ILCS 5/122-5 (West 2018). At the second stage, the defendant must make a substantial showing of a deprivation of constitutional rights or the petition is dismissed. *People v. Dupree*, 2018 IL 122307, ¶ 28. If such a showing is made, the postconviction petition advances to the third stage where the court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2018).

¶ 25 We first address defendant's contention that the circuit court erred in dismissing his jury coercion and ineffective assistance of trial counsel claims pursuant to the doctrine of *res judicata*, where: (1) the issue of jury coercion was decided on direct appeal under a plain error standard, rather than the less deferential abuse of discretion standard, and (2) the issue of ineffective assistance of trial counsel was not raised or decided on direct appeal at all. The State disagrees, contending that because this court explicitly concluded on direct appeal that no jury coercion occurred, neither of these two claims have any merit because they are barred under the doctrines of *res judicata* or law of the case.

¶ 26 At the second stage, " '[t]he inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the [postconviction] court to engage in any fact-finding or credibility determinations.' " *Dupree*, 2018 IL 122307, ¶ 29 (quoting *People v. Coleman*, 183 Ill. 2d 366, 385 (1998)). Rather, at the second stage of proceedings the postconviction court takes "all well-pleaded facts that are not positively rebutted by the trial record" as true. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Thus, the substantial showing of a constitutional violation that must be made at the second stage is " 'a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at

an evidentiary hearing, would entitle [defendant] to relief.' " (Emphasis omitted.) *Coleman*, 183 Ill. 2d at 385 (quoting *People v. Domagala*, 2013 IL 113688, ¶ 35).

¶ 27 "At the second stage of postconviction proceedings, the State may file a motion to dismiss the petition." *People v. Graham*, 2012 IL App (1st) 102351, ¶ 31. A petition may be dismissed at the second stage only when the allegations in the petition, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation. *People v. Hall*, 217 Ill. 2d 324, 334 (2005). However, the "purpose of a postconviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal." *People v. English*, 2013 IL 112890, ¶ 22. Therefore, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised, but were not, are forfeited. *People v. Ligon*, 239 Ill. 2d 94, 103 (2010). It is appropriate to dismiss a postconviction petition based on *res judicata* or forfeiture at either the first or second stage. *People v. Blair*, 215 Ill. 2d 427, 450-51 (2005).

¶ 28 A second-stage dismissal of a postconviction petition is reviewed *de novo*. *Coleman*, 183 Ill. 2d 366, 389 (1998). We may affirm a second-stage dismissal "on any basis supported by the record." *People v. Stoecker*, 384 Ill. App. 3d 289, 292 (2008).

¶ 29 As an initial matter, we reject the State's assertion that the law of the case doctrine should apply here. The State is certainly correct that it can rely on this argument for the first time on appeal, as we may affirm the dismissal of defendant's petition on any basis that has support in the record. *People v. Wright*, 2013 IL App (4th) 110822, ¶ 32. However, "the doctrine of the law of the case is inapplicable because that doctrine bars relitigation of an issue already decided in the same case, whereas a postconviction proceeding is a case different from the direct appeal." *Id.* ¶ 29. See also *People v. Tenner*, 206 Ill. 2d 381, 395-96 (2002) (law of the case doctrine found to be

inapplicable where "defendant's second post-conviction petition is not the same case as either that involving his first post-conviction petition or that involving his federal *habeas corpus* petition"). Because this postconviction proceeding is separate and distinct from defendant's direct appeal, law of the case is not the proper doctrine to apply here.

¶ 30 However, we agree with the circuit court and the State that defendant's claims of jury coercion and ineffective assistance of trial counsel claims are barred pursuant to the doctrine of *res judicata*. More specifically, we find them barred by the doctrine of collateral estoppel. *Richter v. Village of Oak Brook*, 2011 IL App (2d) 100114, ¶ 17 ("Collateral estoppel is a branch of *res judicata* that prohibits the relitigation of an issue actually decided in an earlier proceeding between the same parties."). This doctrine applies when a party participates in two separate and consecutive cases arising on *different* causes of action, but some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former case. *Tenner*, 206 Ill. 2d 381, 396. "The collateral estoppel doctrine has three requirements: (1) the court rendered a final judgment in the prior case; (2) the party against whom estoppel is asserted was a party or in privity with a party in the prior case; and (3) the issue decided in the prior case is identical with the one presented in the instant case." *Id.*

¶ 31 Obviously, because we entered a final judgment in defendant's direct appeal and he was a party in that case the first two elements are satisfied here. Thus, application of collateral estoppel here hinges on whether a controlling issue we decided on direct appeal is identical with one presented here. We find that it is.

¶ 32 We begin by addressing defendant's postconviction claim of jury coercion. As noted above, the issue we addressed on direct appeal was whether the jury at defendant's trial was coerced into reaching a verdict by the trial court's comments during their deliberations. *Crawford*,

2013 IL App (1st) 111345-U, ¶ 15. We found that no coercion occurred. *Id.* ¶¶ 19-23. Defendant now raises the exact same argument again in his postconviction jury coercion claim, asking us to reach a different conclusion and thus conclude that there was a substantial denial of his constitutional rights. Pursuant to the doctrine of collateral estoppel, the circuit court properly found that defendant is barred from relitigating this issue. As our supreme court has recognized, a defendant "cannot obtain post-conviction relief merely by rephrasing a claim which was previously addressed on direct appeal." *People v. Enis*, 194 Ill. 2d 361, 379 (2000).

¶ 33 Defendant nevertheless complains that his claim of jury coercion should not be barred because that issue was decided on direct appeal under a plain error standard, rather than the less deferential abuse of discretion standard that should apply in this postconviction proceeding.[3] We disagree.

¶ 34 First, collateral estoppel has been applied to issues raised in postconviction petitions that were previously decided in the context of a plain error analysis. *Enis*, 194 Ill. 2d 361, 379 (2000); *Wright*, 2013 IL App (4th) 110822, ¶ 28-31. Moreover, and as we noted on direct appeal, the "first step in a plain-error analysis is to determine whether a clear or obvious error occurred." *Crawford*, 2013 IL App (1st) 111345-U, ¶ 18, citing *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009). In finding that no such error occurred on direct appeal and that therefore the "plain-error doctrine

---

[3] The plain error doctrine "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error." *People v. Herron*, 215 Ill. 2d 167, 186 (2005). The plain-error doctrine is applied where "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In either circumstance, the burden of persuasion remains with the defendant. *Herron*, 215 Ill. 2d at 182. The first step is to determine whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). In contrast, a trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Santos*, 211 Ill. 2d 395, 401 (2004).

[did] not apply in this case" (*id.* ¶ 20), this court determined that the trial court's comments to the jury were not improper only after considering "whether, under the totality of the circumstances, the words actually interfered with the jury's deliberations and coerced a guilty verdict" (*id.* ¶ 19, citing *People v. Wilcox*, 407 Ill. App. 3d 151, 163 (2010)). This is the exact standard that would apply regardless of whether the issue had been properly preserved for direct appeal, and the same standard that would apply in these postconviction proceedings.

¶ 35 Lastly, even if we agreed that *in general* there is a meaningful distinction between the search for clear or obvious error where an issue has not been preserved and the search for an abuse of discretion where the issue has been properly preserved, any such distinction is irrelevant here considering our actual analysis on direct appeal. In finding that no jury coercion occurred, we *twice* referenced the trial court's discretion in how to respond to the jury's questions, and repeatedly concluded that "we find *no evidence* that the jury was coerced during [its] deliberations to reach its guilty verdicts" and that "*[n]one* of the responses can be viewed as coercive in nature." (Emphasis added.) *Id.* ¶¶ 20-23. We therefore did not simply find that no clear or obvious error occurred, we found no evidence of any error *at all* in how the trial court exercised its discretion in responding to the jury's questions during deliberations. Application of collateral estoppel to bar relitigating this issue via defendant's postconviction claim of jury coercion was therefore thoroughly appropriate.

¶ 36 Importantly, this conclusion also bars defendant's claim of ineffective assistance of trial counsel. It is axiomatic that such a claim requires defendant to show that his trial counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced his defense (*Strickland v. Washington*, 466 U.S. 668, 678 (1984)), and defendant has the burden of establishing both prongs of the *Strickland* test (*People v. Burks*, 343

Ill. App. 3d 775 (2003)). Here, defendant contends that he was prejudiced by his trial counsel's failure to preserve the jury coercion issue for appeal and ensure that an abuse of discretion standard would apply rather than review for plain error.

¶ 37 As we have already discussed above, however, on direct appeal we found no evidence of any error at all in how the trial court exercised its discretion in responding to the jury's questions during deliberations. Because we have already concluded that defendant suffered no prejudice due to the trial court's comments, "defendant is collaterally estopped from claiming prejudice from trial counsel's failure to preserve the error for review." *Wright*, 2013 IL App (4th) 110822, ¶ 31; *People v. Evans*, 186 Ill. 2d 83, 103 (1999) ("Defendant cannot now argue that trial counsel was ineffective for failing to object to what this court has previously concluded to be nonprejudicial."). Because defendant therefore cannot establish the prejudice prong of the *Strickland* test, his claim of ineffective assistance was also properly dismissed at the second stage.

¶ 38 We next address defendant's argument that his actual innocence claim was improperly denied because the circuit court: (1) erred by allowing McCree's testimony and the kites into evidence at the hearing, (2) applied the wrong legal standard, (3) misconstrued certain evidence, and (4) manifestly erred in concluding that defendant's new evidence would not likely have changed the result on retrial.

¶ 39 At a third-stage evidentiary hearing, the defendant must show, by a preponderance of the evidence, a substantial violation of a constitutional right. *People v. Coleman*, 2013 IL 113307, ¶ 92. The circuit court, serving as the finder of fact at the third stage, must determine witness credibility, weigh the testimony and evidence, and resolve any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34, "Following a third-stage evidentiary hearing where fact-finding and credibility determinations are made, the circuit court's decision will not be reversed unless it is

manifestly erroneous." *People v. Logan*, 2011 IL App (1st) 093582, ¶ 30. "Manifest error is error that is 'clearly evident, plain and indisputable.' " *People v. Beaman*, 229 Ill. 2d 56, 73 (2008) (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)). This deferential standard of review reflects the understanding that the circuit court is in the best position to observe and weigh the credibility of the witnesses. *Coleman*, 183 Ill. 2d 366, 384–85 (1998).

¶ 40 Our supreme court recently summarized the standards applicable to a claim of actual innocence as follows:

> "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. [Citations.] Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. [Citation.] Evidence is material if it is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative evidence adds to the information that the fact finder heard at trial. [Citation.] Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. [Citation.] The conclusive character of the new evidence is the most important element of an actual innocence claim. [Citation.]
>
> Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *People v. Robinson*, 2020 IL 123849, ¶¶ 47-

48.

¶ 41 Before turning to a discussion of the ultimate merits of defendant's actual innocence claim, we must first address two preliminary issues. First, defendant contends on appeal that the circuit court erred by refusing to hold a reliability hearing regarding McCree's testimony, by allowing him to testify at the hearing, and by denying defendant's motion to strike that testimony and the kites from the evidence at the hearing. However, asserting that the circuit court did not credit either McCree's testimony or the kites below, defendant contends that we need not address these errors unless the State and/or this court seek to rely on that evidence to affirm the circuit court's ultimate decision to deny his actual innocence claim.

¶ 42 The State does indeed seek to rely on that evidence in its brief, noting that while the circuit court did explicitly state it was not relying on the kites, it only found that McCree was not "credible much before this Court" and indicated that as such it would give his testimony the "proper weight." As such, the State contends that McCree's testimony "while not given great weight by the circuit court, was still granted some credence" and may therefore be relied upon to affirm the circuit court's rejection of defendant's claim of actual innocence.

¶ 43 We need not further address defendant's objections to McCree's testimony and the introduction of the kites into evidence, nor the possible significance of that evidence on appeal, because the issue is moot. "A moot question is one that existed but because of the happening of certain events has ceased to exist and no longer presents an actual controversy over the interest or rights of the party." *In re Nancy A.*, 344 Ill. App. 3d 540, 548 (2003). Courts of review will not decide moot or abstract questions, will not review cases merely to establish precedent, and will not render advisory opinions. *Peach v. McGovern*, 2019 IL 123156, ¶ 64. Nor do courts in Illinois consider issues where the result will not be affected regardless of how those issues are decided.

*Id.*; *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009).

¶ 44 Here, it is undisputed that the circuit court gave absolutely no weight to the kites in rejecting defendant's actual innocence claim, and clearly gave little to no weight to McCree's testimony. Moreover, other than its comments as to credibility, neither McCree's testimony nor the kites factored into the circuit court's substantive analysis of the actual innocence claim. We note again that the circuit court framed the issue before it as a question of whether, taking Benson's letter, affidavits, and testimony at the hearing as newly discovered evidence, would that evidence likely change the outcome on retrial. It is therefore apparent from the record that neither McCree's testimony nor the kites played any role in the circuit court's rejection of defendant's actual innocence claim. Furthermore, as discussed more fully below we need not rely on any of this evidence to affirm the circuit court's decision, and thus the ultimate result of this appeal would not be affected regardless of how these issues were decided below. As such, any possible error with respect to the introduction of this evidence at the evidentiary hearing is moot.

¶ 45 As to the second preliminary issue, defendant contends that this matter must be remanded for a new evidentiary hearing because the circuit court applied the wrong standard as to the conclusive character element of his actual innocence claim. Defendant specifically notes that the correct standard was set forth in *Robinson*, 2020 IL 123849, ¶¶ 47-48, 55, in which our supreme court rejected a "standard that requires evidence of total vindication or exoneration to support a claim of actual innocence" and instead concluded that the "new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence."

¶ 46 As evidence that the wrong standard was utilized here, defendant notes: (1) the State argued

below that defendant had to show "total vindication and exoneration," (2) the circuit court cited *People v. Collier*, 387 Ill. App. 3d 630, 636 (2008), a case specifically rejected in the *Robinson* decision for applying the incorrect standard, and (3) in ruling against defendant, the circuit court specifically faulted him for failing to show that the new evidence "would change the outcome of the trial on retrial" rather than "probably" change the result. While defendant acknowledges that the circuit court did not "explicitly invoke the 'total vindication' standard," he contends that the above facts "suggest[] that it applied the incorrect legal standard." We disagree.

¶ 47 First, while the State may have asked for an improper standard to be applied, the record also shows that defense counsel cited the correct standard to the circuit court during argument below. Second, while the circuit court did cite to the *Collier* decision in discussing the appropriate standard to apply, in the very same paragraph discussing that standard the circuit court properly recognized that defendant's new evidence "must be so conclusive that it would *likely or probably* change the result on the trial." (Emphasis added.) Finally, while the circuit court did at one point fault defendant for failing to show that the new evidence "would change the outcome of the trial on retrial," we find from the record as a whole that this was simply a slight misstatement of the correct standard the circuit court itself had already identified.

¶ 48 Indeed, defendant himself acknowledges that he is relying upon a purported suggestion that the incorrect legal standard was applied. However, a trial court is presumed to know the law and follow it properly, and that presumption is only overcome by a "strong affirmative showing to the contrary in the record." *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 62. Here, we find no such affirmative showing in the record before us.

¶ 49 Having addressed these two preliminary issues, we may now turn to the substantive merits of the circuit court's denial of defendant's claim of actual innocence. Even assuming defendant

presented new, material, noncumulative evidence, we find that the circuit court did not manifestly err in concluding that the evidence was not sufficient, when considered along with the trial evidence, to probably or likely lead to a different result on retrial.

¶ 50 In so ruling, we reject several specific arguments raised by defendant on appeal. We begin by addressing defendant's challenge to the circuit court's reliance on two specific inconsistencies between defendant's videotaped statement and Benson's testimony in finding that Benson's testimony was not credible, did not corroborate defendant's statement, and therefore did not support his claim of actual innocence. Defendant contends these two instances were either the result of the circuit court misconstruing the evidence or amounted to no more than immaterial, minor inconsistencies that did not significantly impeach Benson's testimony. We disagree.

¶ 51 Defendant notes that the circuit court found Benson incredible, in part, because: (1) while Benson testified that he never showed defendant his gun or told defendant he had a gun and intended to shoot Frazier, in his statement defendant stated he saw Benson's gun before exiting the van, and (2) while defendant stated that he was still in the van at the time of the shooting, and indicated that Bender was as well, Benson testified that defendant and Bender got out of the van before he pulled out the gun and shot Frazier. While defendant first contends that this recitation misconstrues the evidence, a review of the record reveals that it does not.

¶ 52 Indeed, Benson specifically testified that he *never* told defendant he had a gun and intended to shoot Frazier or showed defendant a gun on the day of the shooting. In contrast, defendant specifically told the police that he saw Benson's gun, and that is the reason he got out of the van and ran away. Furthermore, defendant specifically stated that he was in the van at the time of the shooting and indicated that Bender was as well. In contrast, Benson twice testified that defendant and Bender exited the van *before* he pulled out the gun and shot Frazier. First, Benson testified:

"Tyrese was like, man, let me out, let me get out of the car. When he got out of the car, Bender got out as well. I pulled out the gun and shot him in the head." He thereafter described the course of events again, stating: "[Frazier] stopped the van. Tyrese got out. He just got out. Raven got out as well. I pulled a gun out, and I shot him in the head." The circuit court did not misconstrue this evidence.

¶ 53 Nor were these merely minor inconsistencies. Defendant essentially stated that he knew nothing of Benson's plan, saw the gun, and then exited the van and ran out of fear. In contrast, Benson testified that defendant and Bender got out of the van for no apparent reason after they had all driven around for hours and just before Benson shot Frazier. As such, the circuit court correctly recognized that Benson's testimony did not corroborate defendant's rendition of events on this key issue.

¶ 54 The circuit court also correctly noted that defendant was tried on the alternative theory of accountability, and that would also be the case upon retrial. The circuit court essentially concluded that Benson's rendition of events—where defendant exited the vehicle *before* Benson pulled out the gun and shot Frazier—could suggest that defendant knew exactly what was about to happen and thus both impeach Benson's own testimony to the contrary and provide significant support for a conviction of defendant on a theory of accountability upon retrial. We agree.

¶ 55 Furthermore, we also reject defendant's contention that the circuit court erred in finding that Benson's testimony was discredited by the tension between Clemon's trial testimony that defendant was seated behind Frazier just before the shooting and Benson's testimony that defendant was seated behind Bender. Defendant contends that Clemons only testified as he did because Clemons was involved in disposing of the murder weapon and complied with Benson's instruction that he lie to the jury about defendant's location in the van. Defendant then asserts that

if a jury heard Benson's testimony it would not credit Clemon's testimony because "it would have known that Clemons was lying and would have known why he was lying."

¶ 56 Obviously, this argument presupposes the credibility of Benson's testimony. However, the circuit court clearly and specifically found Benson to be wholly lacking in credibility, and contrary to defendant's contentions to the contrary on appeal this finding was based upon more than the inconsistencies discussed above. Indeed, the circuit court also specifically noted that Benson himself admitted to lying to the police prior to trial and Benson himself testified that he successfully managed to arrange for both Clemons and Bender to provide false testimony at trial. On this record, the circuit court's conclusion that Benson lacked any credibility cannot be viewed as an error so clearly evident, plain and indisputable that we should reverse that finding for manifest error. *Morgan*, 212 Ill. 2d at 155.

¶ 57 Lastly, we reiterate that in rejecting defendant's actual innocence claim the circuit court stressed that in addition to being tried on a theory that defendant was the shooter, the State had also proceeded on the alternative theory of accountability and that it was entirely possible that the jury believed that Benson was the shooter but that he and defendant had in fact been operating together in the robbery and murder. The same theory would be presented to the jury on retrial. As discussed above, the circuit court correctly concluded that the portion of Benson's testimony regarding defendant and Bender leaving the van just before Benson shot Frazier—suggesting they knew exactly what was about to happen—could provide significant additional support for that alternative theory on retrial. While defendant contends that Benson's testimony "that he—not Crawford—committed this crime and that Crawford had no idea what Benson planned creates a probability of a different outcome" even under a theory of accountability, this argument once again presupposes credibility that the circuit court specifically found Benson did not have.

¶ 58 Moreover, defendant's overall argument rests on Benson's testimony that he shot Frazier *and* that defendant knew nothing of Benson's plan, contending that this evidence was so conclusive that it was likely to alter the result on retrial. However, it is settled that a trier of fact may believe as much, or as little, of any witness's testimony as it sees fit. *People v. Tabb*, 374 Ill. App. 3d 680, 692 (2007). The circuit court properly recognized that the jury could have believed that Benson shot Frazier at trial, while also finding that he and defendant acted together. The same would be true on retrial, and defendant's arguments on appeal fail to adequately account for the impact this has on the circuit court's conclusion that he failed to show a likelihood of a different outcome on retrial resulting from his newly presented evidence. The circuit court's conclusion that defendant failed to establish his actual innocence claim by a preponderance of the evidence was not manifestly erroneous.

¶ 59 For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 60 Affirmed.

# EXHIBIT G

FILED
JAN 22 2021
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

STATE OF ILLINOIS)
) SS:
COUNTY OF COOK )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT-SIXTH MUNICIPAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 2008CR0578101 |
| TYREESE CRAWFORD, | ) | |
| Defendant. | ) | |

REPORT OF PROCEEDINGS had at the hearing of the above-entitled cause, before the HONORABLE MICHELE PITMAN, Judge of said Court, on the 24th day of March 2017, in Markham, Illinois.

PRESENT:

HON. ANITA M. ALVAREZ,
State's Attorney of Cook County, by
MS. LINDA WALLS,
Assistant State's Attorney,
On behalf of the People;

MR. KARL LEONARD,
On behalf of the Defendant.

Elizabeth LaFollette Karner, CSR
Official Court Reporter
Circuit Court of Cook County
Municipal Department-Sixth Municipal District
License No. 084-003783

(Whereupon, the following proceedings were held in open court.)

THE CLERK: Tyreese Crawford.

THE COURT: This is a matter of Tyreese Crawford.

Counsels, may I have your names for the record?

MR. LEONARD: Your Honor, good morning.

Karl Leonard -- K-a-r-l, L-e-o-n-a-r-d -- from The Exoneration Project for Mr. Crawford.

He is in IDOC and not present this morning.

THE COURT: Counsel for the State, good morning.

MS. WALLS: Good morning, your Honor.

Linda Walls -- W-a-l-l-s -- on behalf of the State.

THE COURT: Counsels, if you can be seated.

The Court is prepared to issue a ruling with regards to the State's motion to dismiss the defendant's petition for post-conviction relief.

The latest petition filed by the defendant was November 20th of 2015.

Correct, Counsel?

MR. LEONARD: Yes, your Honor.

THE COURT: The State filed a motion to dismiss June 10th of 2016.

And the petitioner filed a response to the respondent/State's motion to dismiss July 29th of 2016.

The Court has thoroughly read all of the pleadings in this matter. I have heard argument in support of both parties' position. The Court heard argument October 28th of 2016.

I have certainly had time to consider this.

This is a different type of argument. The State is conceding some. They are not conceding others.

One of the claims of the defendant the State is actually conceding, and that is Claim 1, the actual innocent claim.

What the State is doing is asking this Court to consider whether or not the defendant's other claims should move forward to a third-stage proceeding with regards to the other claims, that being Claim 2 which is that the defendant was denied his constitutional right to effective assistance of counsel.

I will state, Counsels, that the pleadings have been drafted very well in this matter. The Court has read all of them.

The arguments were very good as well. Both sides presented their positions in a very professional and clear manner.

The Court did enjoy your arguments which I thoroughly went through and read. I am clearly -- both of you understand the issues in this matter and understand the laws that pertain to post-conviction matters.

With regards to the defendant's second claim pertaining to ineffective assistance of counsel, there are a few reasons.

He indicates that his counsel -- his trial counsel was ineffective. The first is that defendant states that his trial counsel was ineffective for failing to preserve for appeal the argument that the jury was coerced in this matter.

Also, the defendant is alleging ineffective assistance of trial counsel for failing to call as a witness the codefendant in this matter, Mr. Benson, who would have supported his claim that he was not the shooter in this matter which supports his claim of actual innocence actually.

The Court finds the defense fails with regards to that. I do not find that trial counsel was ineffective for failing to call and to investigate the codefendant.

Counsels for Mr. Crawford are indicating to

this Court that this is newly discovered evidence, that it could not have been discovered. I will -- you cite the *Mousted* (verbatim) case that it could not have been discovered through due diligence.

The Court finds that your argument fails that trial counsel was ineffective for not calling and investigating whether or not the codefendant who had a Fifth Amendment right certainly not to testify at these proceedings to testify on behalf of Mr. Crawford to support his claim that he, in fact, did not commit this offense.

The Court finds the defendant fails to show any actual prejudice.

And defendant fails under the *Strickland* standard. Defendant must show this Court that counsel's performance was deficient.

The Court finds based on what the defendant is arguing counsel's performance was not deficient. Certainly there was no prejudice to the defendant.

For the reasons the Court has stated, the defendant -- certainly there's nothing showing this Court that counsel could have investigated or found that the codefendant could have testified on behalf of Mr. Crawford in this matter.

The defendant fails to show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that the result certainly would have been different absent any of these errors that the defense is indicating were committed.

The Court finds there is nothing ineffective about counsel's performance for not calling codefendant Benson.

There's nothing to support defendant's claim that counsel had the ability to learn or ascertain that the codefendant would have supported Mr. Crawford's claim and that he certainly would have testified on his behalf.

There's nothing to support this. Therefore, the Court finds that that claim fails before this Court.

The other claim of ineffective assistance also fails before the Court for jury coercion.

The Court would agree with the Appellate Court. And this issue came up in a motion for new trial when the Court ruled on a motion for new trial prior to sentencing Crawford.

It also came up before the Appellate Court. And the Appellate Court did review this.

Counsel for the defense in the post-conviction proceeding now comments on the standard of review that was used by the Appellate Court.

Regardless, the issue was reviewed for *Trainor*. And the Appellate Court found there was no error with this Court's responses to the jury.

The Court doesn't find that trial counsel was deficient in his performance for not objecting. He did bring this to the attention of this Court. It was brought to my attention in the motion for new trial. And it was brought up on appeal.

I disagree with you, Counsel, that it is not barred by res judicata. I find it -- the Appellate Court has ruled on this. They found there was no jury coercion.

The responses were not coercive by this Court. Therefore, that certainly will not proceed to a third-stage hearing either.

That has already been decided.

With regards to appellate counsel, the Court also finds the defendant fails to meet the *Strickland* standard or fails to show, rather, that appellate counsel was ineffective for failing to present basically the very issues that the defendant is arguing in this

post-conviction petition.

The defendant has failed to show that any failure to raise these issues was objectively unreasonable and has failed to show this Court there was a reasonable probability but for this failure the defendant's sentence and conviction would have been reversed.

The Court finds that claim fails as well.

With regards to cumulative error, the Court doesn't find there has been any error -- there's no cumulative error.

The Court would agree with Claim 1. That certainly should proceed to a third-stage hearing. The claim of actual innocence with the supporting affidavits absolutely should proceed to a third-stage hearing.

The other claims of ineffective assistance of counsel, jury coercion, cumulative error -- am I forgetting anything, Counsels?

MS. WALLS: One issue on ineffective assistance of counsel, your Honor, for failing to investigate letters written by Raven Bender and failing to investigate Genoise -- G-e-n-o-i-s-e -- Walker.

THE COURT: Same ruling.

The Court finds that the defense has claimed

this is newly discovered. The Court doesn't find that trial counsel failed in his performance to investigate this.

That came about at some point to speculate that counsel could have investigated this and obtained this information. The Court finds it is certainly speculative.

There's nothing to support any claim of ineffective assistance of trial counsel for that claim as well.

Again, Claim 1, actual innocence actually and with what has been submitted to this Court will proceed to a third-stage hearing.

The Court will order discovery to be tendered, and that will proceed under the Post-Conviction Act to a third-stage hearing.

The other claims, however, the State's motion to dismiss, respectfully, Mr. Leonard, are going to be -- the State's motion will be granted. Those claims will be dismissed.

The first claim will proceed.

MR. LEONARD: Thank you.

THE COURT: Counsel, where are you on discovery?

MS. WALLS: With that, I do have a general denial

answer to file with the Court.

We are moving forward in discovery. I do have quite a bit of discovery to tender.

Our investigators have been moving forward. They are looking and hoping to talk to one witness who is out of state. They are hoping next week. They have been trying to get the schedules.

Maybe we can go to the beginning of May if that's good for counsel. And I can get the discovery copied. And hopefully that interview will be done.

Once that interview is done, I will tender everything on the next court date. And our investigation will be completed.

THE COURT: Mr. Leonard?

MR. LEONARD: That makes sense to me.

I need to look at what we have and what we get from Ms. Walls to see if there's anything we will seek leave to subpoena from anybody.

Obviously we can do that after we review what we get from the State.

THE COURT: I assume with regards to the Court's ruling today, with regards to the matter proceeding to a third-stage hearing, you are going to ask your client be brought up once we proceed to the hearing.

MR. LEONARD: Absolutely, your Honor.

MS. WALLS: At this stage of discovery, your Honor, I assume you are in touch with him and letting him know what's going on with the matter.

It will be brought up later on in the proceedings.

MR. LEONARD: I understand.

THE COURT: What date would you like, Counsels, for status on discovery?

State, are you filing your answer today?

MS. WALLS: We are filing a general denial answer.

And I will file a more specific answer with witnesses once all discovery is tendered and counsel and I have spoken.

THE COURT: Leave is granted to the State to file their original answer to discovery.

State's Answer to Petitioner's Post-Conviction claim it's titled.

MS. WALLS: May 12th, Judge?

THE COURT: Is that good for you, Counsel?

MR. LEONARD: Yes, your Honor.

THE COURT: Is that by agreement?

MS. WALLS: By agreement.

THE COURT: By agreement, Friday, 5-12-2017,

9:00 a.m.

Is that for State to tender discovery on this day?

MS. WALLS: I will get all the discovery that we have right now.

And assuming I have all the investigative reports from my investigators, I will complete everything at that time.

THE COURT: If it's not complete, it will be for you to initially tender discovery to defense counsel.

MS. WALLS: Yes.

THE COURT: By agreement of the parties, 5-12-2017.

Thank you, Counsels.

(Whereupon, which were all the proceedings had in said cause this date and time.)

STATE OF ILLINOIS)
)
COUNTY OF COOK )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT-SIXTH MUNICIPAL DISTRICT

I, Elizabeth LaFollette Karner, CSR, an Official Court Reporter for the Circuit Court of Cook County, Municipal Department, Sixth Municipal District, do hereby certify that I reported in shorthand the proceedings had at the hearing in the above-entitled cause; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the proceedings had before the Honorable Michele Pitman, Judge of said court.

Elizabeth LaFollette Karner

ELIZABETH LAFOLLETTE KARNER, CSR
Official Court Reporter
License No. 084-003783

Dated this 8th day of December 2020.

FILED
JAN 22 2021
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

STATE OF ILLINOIS)
) SS
COUNTY OF COOK )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
Plaintiff )
)
vs ) Number 2008 CR 5781
)
TYRESE CRAWFORD )
Defendant )

REPORT OF PROCEEDINGS, taken in the above-entitled cause, taken on Zoom Video Conference, before the HONORABLE MICHELE PITMAN, Judge of said Court, taken on Friday, October 2nd, 2020.

APPEARANCES:

HONORABLE KIMBERLY M. FOXX
Cook County State's Attorney
BY: MS. LINDA WALLS
Assistant State's Attorney
Appeared on behalf of the People

MR. CARL LEONARD
MS. LOREN MYSERSCOUGH-MUELLER
MS. LINDSAY HAGY
Attorneys At Law
Appeared on behalf of the Defendant
Tyrese Crawford

VERNITA HALSELL-POWELL, CSR
Official Court Reporter
16501 South Kedzie Parkway
Markham, IL 60428

THE COURT: Calling the matter of Tyrese Crawford, 08 CR 5781-02. The defendant is before the Court, he is in the custody of the Illinois Department of Corrections. He is before this Court by way of Zoom video feed. Mr. Crawford, good morning, sir. State your name for us.

THE DEFENDANT: Okay.

THE COURT: State your name, for me, Mr. Crawford.

THE DEFENDANT: Tyrese Crawford, good morning.

THE COURT: Good morning, Mr. Crawford. Mr. Crawford as has been indicated is before the Court by way of Zoom feed from the Illinois Department of Corrections. His attorneys are also before this Court by way of Zoom feed. May I have your names, for the record?

MR. LEONARD: The three of us, I'm Carl Leonard, L E O N A R D.

MS. MYERSCOUGH-MUELLER: Good morning, your Honor, I'm Loren Myerscough-Mueller, M Y E R S C O U G H - M U E L L E R, on behalf of Mr. Crawford.

MS. HAGY: Good morning, your Honor, Lindsay Hagy, Lindsay with an A, Hagy, H A G Y.

THE COURT: Thank you, counsel.

State, good morning. Your name as well.

MS. WALLS: Good morning, your Honor, Linda Walls, W A L L S on behalf of the State.

THE COURT: Counsels you're here today for a ruling with regards to the defendant's post conviction petition. Have you spoken to your client about waiving his right to be heard in person?

MR. LEONARD: Yes, your Honor, he waives.

THE COURT: All right. Mr. Crawford?

THE DEFENDANT: Yes, ma'am.

THE COURT: You do understand, sir, that we are going to conduct this ruling today by way of the video conferencing Zoom feed that you're before today? However, there is a pandemic, sir, that is going around and due to that, we're limiting in person contact in court and travel back and forth to court. However, you do still have rights certainly Mr. Crawford, so you can waive your right to be in person or you can certainly -- I can order that you be brought to court if you wish, sir. Do you understand?

THE DEFENDANT: Yes.

THE COURT: Do you understand, sir, that you have a right to be addressed in open court and present in open court Mr. Crawford, do you understand that?

THE DEFENDANT: Yes, yes.

THE COURT: All right. Let me ask you, sir, do you wish to waive or give up that right by appearing before this court on this closed circuit television feed today?

THE DEFENDANT: Yes.

THE COURT: All right. Mr. Crawford you are waiving or giving up your right to appear in person in court. Are you doing so, sir, freely and voluntarily without any pressure or force?

THE DEFENDANT: Yes.

THE COURT: You have discussed this with your attorneys, is that correct?

THE DEFENDANT: Yes.

THE COURT: For the record this Court finds that the defendant knowingly, freely and understandingly waives the right to appear in person in open court. He would like to proceed by way of closed circuit television before this Court today. Is that correct, Mr. Crawford?

THE DEFENDANT: Yes.

THE COURT: All right. Mr. Crawford let me tell you this. If at any time during these proceedings you have difficulty seeing or hearing anything or if you need to speak with any of your attorneys, please let

me know that, sir. I'll stop the proceedings if you need to. Certainly let me know if you can't hear me -- I'm pretty much going to be the only one talking -- if you can't hear me or if you can't see us or if you need to speak to your attorneys. Do you understand that?

THE DEFENDANT: Yes. I want to let you know that this microphone, I mean the headphones is kind of in and out. I can hear you, but you go low, you go high, but I can still hear you, but I'll let you know.

THE COURT: Okay. Let me know. Counsel do you still wish to proceed? I speak pretty loud. I'll speak even louder.

MR. LEONARD: Yes, your Honor. I think there's a little bit of background noise that we're getting from IDOC. So if you could mute yourself?

THE COURT: I'm going to mute you because we're getting background noise. You can certainly wave if you need to interrupt. We'll be looking at the screen, but there's background noise behind you, so I'm going to mute you and you can let us know however wave or let us know if you can't hear.

THE DEFENDANT: All right.

THE COURT: Counsel, do you still wish to

continue?

MR. LEONARD: Yes. Thank you, your Honor.

THE COURT: All right. This matter comes upon the Court's call today for the court to rule with regard to the Petitioner's post conviction petition, the amended petition for post conviction relief that was filed November 20th of 2015. That is the petition that is before the Court at this time. Other issues have been ruled upon. It is this petition filed November 20 of 2015. Mr. Leonard, is that correct?

MR. LEONARD: Yes, your Honor. I just pulled out my file, that's correct.

THE COURT: All right. The Court has heard testimony on this matter. The Court has also conducted and heard arguments on this matter. The Court heard testimony September 6th of 2019. The Court heard testimony from two witnesses. The Court also heard arguments on March 13th of 2020 from the attorneys on this matter.

All right. The defendant's sole claim on the final issue in this post conviction petition that the State agreed to continue for a third stage hearing pertains to the defendant's claim for relief under the Post Conviction Act based on actual innocence. The

defendant has appeared before this Court for all of these proceedings. It looks like I arraigned the defendant back in April of 2008 with regards to the offense of first degree murder and the other charges that are listed in this indictment. This matter proceeded to a jury trial before this very Court. We began jury selection October 25th of 2010. The State rested and all parties rested, proceeded to closing arguments and it was a verdict on October 29th of 2010. The defendant -- and that was for first degree murder as well as armed robbery. The defendant was sentenced by this Court April 26th of 2011. This Court sentenced the defendant on Count 10, the murder charge, to 40 years of incarceration in the Illinois Department of Corrections. I merged Counts 11 and 12 with Count 10. He was also sentenced by this Court separately for Count 13, which is armed robbery. He received a consecutive sentence of six years of incarceration in the Illinois Department of Corrections. This has gone through the appellate process and there is also as indicated a post conviction petition that has been filed. The Court has ruled on the other issues that were alleged in the Defendant's post conviction petition. The sole issue

before this Court today pertains to defendant's claim for relief based on actual innocence of the charges of which he was convicted of.

When looking at a claim of actual innocence, the Court receives guidance from case law, in particular People versus Collier, C O L L I E R. That is 387 Ill App 3rd 630 which is a post conviction matter. However, Collier lays out the things that this Court must consider when considering these types of post conviction petitions claiming actual innocence. First, the Court must decide if what was presented to this Court is considered newly discovered evidence that was presented by the defendant. The evidence must be material, it must be not cumulative and it must be so conclusive that it would likely or probably change the result on the trial.

First, evidence is not newly discovered if it presents facts already known to the defendant at or prior to trial, though the source of the facts may have been unknown, unavailable or uncooperative.

Defendant was convicted of armed robbery and murder, the Court noted and I will note, under a theory of accountability. Counsels were able to provide this Court with the entire appellate record.

The Court has the entire appellate record for Mr. Benson, Mr. Crawford's co-defendant who testified in his post conviction hearing, as well as Mr. Crawford. In addition, I have my own notes in that I was the trial Judge and I recall a lot of this. But I have the entire appellate record and this Court has taken quite a bit of time to go through this appellate record. I thought I recalled that the defendant was convicted under a theory of accountability. This Court certainly instructed both juries, Mr. Crawford's and Mr. Benson's, with the language that states "or for one whose conduct he is legally responsible for". So the Court brings that about because Mr. Crawford was convicted of these offenses with the theory of accountability that Mr. Benson could have or was the actual shooter in this matter. There was a statement presented to Mr. Crawford's jury that Mr. Benson was, in fact, the person who subsequently shot Johnny Frazier. The Court even reviewed the closing arguments by the State pertaining to, well accountability, they certainly argued that. And the State goes further -- this is under record 907 of the appellate record -- the State argues "the law -- this is in the Crawford trial -- "The law recognizes what

one person might talk about, two people will actually do. So when you read that language with respect to one for whose conduct he is legally responsible, substitute in the name Tony Benson. It is like Tony Benson's hand is on the handgun with Mr. Crawford and Mr. Crawford's hand is going through the pockets of Johnny Frazier with Tony Benson." This was the State's theory. This is what was argued. This is not evidence, but this is what was argued and certainly presented to the juries that certainly Tony Benson could have been the actual shooter, but that they acted together. However, the evidence presented at trial from Raven Bender was certainly that Mr. Crawford was the shooter. The evidence presented at trial was that Mr. Crawford was seated in the position in the vehicle to conduct this shooting. Marcus Clemmons testified briefly, but he basically provided the seating in the vehicle for the jury. So, the Court goes through that because the jury heard that Mr. Benson -- that, first of all, that Mr. Crawford was convicted under a theory of accountability with Mr. Benson and that Mr. Crawford stated when he was arrested by the police in his statement that was shown to the jury, he indicates that he's out of the car and

he hears a shot. Certainly giving the inference that the only person in the car left is Tony Benson, and Mr. Benson therefore kills Johnny Frazier. Tony Benson testifies in this hearing on September 6 of 2019. The Court thoroughly went through his testimony. Mr. Benson's affidavit states that he and he alone killed Johnny Frazier and that Mr. Crawford had nothing to do with the killing of Johnny Frazier. Mr. Benson testified to this Court that he shot and killed Johnny Frazier himself. He says he sat behind Johnny and the defendant was behind Raven Bender. He indicates he saw Marcus Clemmons, which was something the Court found interesting because Clemmons testified that he saw both defendants however in different seats than what Mr. Benson testifies to. Mr. Benson states that he did not tell Tyrese Crawford that he was going to kill Johnny Frazier. And he states Mr. Crawford did not know he had a gun, which is contrary to what Mr. Crawford stated to the police. He states -- Mr. Benson states that he and he alone shot Johnny Frazier and he told Raven to come back and made her go through Frazier's pockets and remove money from his hands and from his pockets. He, being Mr. Benson, says the defendant was gone and nowhere to be found. He was

gone at the time he shot Johnny Frazier. That is very important to this Court. He states Mr. Crawford was out of the vehicle and he looked up and he says he was gone. He states that Tyrese Crawford got out of the vehicle when it first stopped. Both he and Raven Bender he stated got out of the vehicle. Now that is not what Tyrese Crawford stated to the police back when he was interviewed by the police. He did not state that he got out of the car when it first occurred. He stated that he saw a gun, he got out of the car and then he heard a shot. Mr. Crawford, Defendant Crawford said to the police back when he was interviewed that the gun was shown to him by defendant Benson. He got out of the van, not car, van. He didn't look back and he heard the shot and he took off running. This Court finds that particularly interesting and this is why. Mr. Benson's credibility is certainly being judged by this Court. He basically states that everyone gets out of the car for no reason when the car stops. He says he doesn't show a weapon. He doesn't say what's about to occur, but he states that everyone just happens to be out of the vehicle, not explaining why everyone just got out of the vehicle. Johnny Frazier's clearly in the vehicle. It

didn't state they were dropping someone off, so everyone else is out of the vehicle he states for some reason when he shoots Johnny Frazier.

Tony Benson also testified that he lied to the police at first and he said Crawford shot Johnny Frazier. He was asked that. He was asked that I believe on cross-examination and he says that he did lie. He also talked about telling people to lie. He says he told Marcus Clemmons to lie about the seating arrangements in the vehicle. He spoke also about manipulating the actual occurrence of the shooting in that he told Johnny Frazier where to drive, he indicated when he testified, so he could kill him at a place that was a little more desolate, a little more out of the way of any witnesses.

Santana McCree also testified before this Court. He spoke about a plot between him, the defendant and Tony Benson to get this conviction overturned so that they could split, as he put it, the wrongful conviction money. He states that he wrote an affidavit and defendant gave him directions as to that affidavit being better. The State then presented what are called kites, K I T E S, kites that purportedly were sent back and forth between Mr. McCree and the

defendant, Mr. Crawford. The State argued the kites and what was spoken about in those kites. The Court admitted the kites; however, the Court will certainly give those the proper weight and it is not much weight. Counsel for defense did certainly object to the kites and the Court is not making it's ruling based upon these kites that were put into evidence. The Court's making it's ruling based upon the testimony and the law that the Court must abide by when making these type of findings. Certainly not based upon these kites that the state presented in Mr. McCree's testimony, which at best the State's theory is that it gives a motive for this post conviction petition. However, I will say again, the Court's ruling is based clearly on the testimony that I heard and not on these kites.

So, even if this Court accepts Mr. Benson's testimony as new evidence, if it is considered new evidence, the Court will rule with regards to it being new evidence. And again the jury heard that Tony Benson was the shooter from Mr. Crawford's statement, that was played to the jury back then, was the shooter by way of inference the Court will state. He didn't, Mr. Crawford didn't say -- Defendant Crawford didn't

say that he saw Tony Benson shoot, but clearly he inferred that it was Mr. Benson who was the shooter. Defendant's actual innocence claim then must be evaluated with regards to whether or not the co-defendant's additional testimony, which would be considered new evidence, would it change the outcome of this trial?

This Court finds the co-defendant, Mr. Benson, would be significantly impeached. He would not -- he did not have credibility before this Court. The testimony at trial was that the defendant was, in fact, the person who shot Johnny Frazier. The testimony at trial was that Defendant Crawford was behind Mr. Frazier in a position to commit this offense. The case law is clear that impeachment of a prosecution witness is not a sufficient basis for granting a new trial. So I guess the theory is that the State's witness or witnesses would be impeached and that is Ortiz, People versus Ortiz, 235 Ill 2d at 335. So Mr. Benson would testify he's stating to one thing that he, in fact, committed this offense without Mr. Crawford having any knowledge of it. And the Court finds again Mr. Benson was not credible before this Court. I don't find Mr. McCree was credible much

before this Court as well. I will say that I'm giving his testimony and the kites the proper weight also.

Based upon that, the Court finds that the defendant's actual innocence claim fails. That defendant has failed to show that the co-defendant's additional testimony stating that Mr. Crawford had nothing to do with this murder would change the outcome of the trial on retrial. Based upon what this Court has heard, the petition is therefore going to be denied at this time. And therefore counsel, if you certainly wish to appeal, you can file your notice of appeal. But if there is anything further the Court needs to rule upon certainly let me know. If you have a Motion to Reconsider I can give you a date for that. But right now certainly the petition is going to be denied based upon the Court's ruling.

MR. LEONARD: Understood. Thank you, your Honor. Could we set a date for either an appeal check or a Motion to Reconsider or whatever we determine?

THE COURT: Yes, we can. Ms. Walls, is that going to be a by agreement date?

MS. WALLS: It doesn't matter, by agreement, motion defendant. It doesn't matter.

THE COURT: What day would you like? You need

Fridays counsel?

MS. WALLS: I would prefer a Friday.

THE COURT: You need a date within 30 days, Mr. Leonard?

MR. LEONARD: Yes, we do.

THE COURT: Friday, October 30th is open.

MR. LEONARD: Yes, your Honor.

THE COURT: I can give you a longer date if you wish to get something on file within 30 days. It's up to you.

MR. LEONARD: 10-30 works on our end, your Honor.

THE COURT: Ms. Walls?

MS. WALLS: That's fine, Judge.

THE COURT: By agreement, 10-30-2020, 9:00 a.m. for status and any further filings.

Counsel, do you wish an additional a breakout room with your client?

MR. LEONARD: That will be great. We'll waive his appearance for the next court date.

THE COURT: You waive his appearance for the next court date?

MR. LEONARD: Yes, your Honor.

THE COURT: Mr. Crawford, I'm going to put you back in a breakout room with your attorneys, sir.

THE DEFENDANT: Okay.

(Whereupon, was all the proceedings had in the above-entitled cause.)

STATE OF ILLINOIS)
) SS
COUNTY OF COOK )

I, VERNITA HALSELL-POWELL, Official Shorthand Reporter of the Circuit Court of Cook County, County Department - Criminal Division, do hereby certify that I reported in shorthand the evidence had in the above-entitled cause and that the foregoing is a true and correct transcript of all the evidence heard.

Official Shorthand Reporter
Circuit Court of Cook County
County Department - Criminal Division

DATE: October 28, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of October, I caused a copy of the foregoing to be served upon counsel of record by electronic mail.

/s/ Karl Leonard
Attorney for Petitioner

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
CRIMINAL DIVISION

| | | |
|---|---|---|
| TYREESE CRAWFORD | ) | |
| | ) | |
| *Petitioner-Defendant* | ) | Case No. 08 CR 5781 |
| | ) | |
| v. | ) | |
| | ) | |
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Honorable Michele Pitman, |
| | ) | Judge Presiding |
| *Respondent-Plaintiff* | ) | |

**NOTICE OF APPEAL**

(1) Court to which appeal is taken: Illinois Appellate Court, First Judicial District

(2) Name of appellant and address to which notices shall be sent:

Mr. TyReese Crawford
The Exoneration Project
at the University of Chicago Law School
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607

(3) Name and address of appellant's attorneys on appeal:

Karl Leonard
Lauren Myerscough-Mueller
Lindsay Hagy
THE EXONERATION PROJECT
at the University of Chicago Law School
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607
(312) 789-4955
karl@exonerationproject.org

FILED
OCT 3 0 2020
DOROTHY BROWN
CLERK OF CIRCUIT COURT

(4) Dates of judgment or order: October 2, 2020

(5) Offenses of which convicted: First degree murder, armed robbery

(6) Sentence: 40 years for murder, 6 years for armed robbery. Concurrent

**IN THE**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

TYRESE CRAWFORD, M20778 )

**Plaintiff** )

**v.** ) **Case No.** 22 C 4748

CHARLES TRUITT, WARDEN
STATEVILLE Correctional Center )

**Defendant**

**PROOF/CERTIFICATE OF SERVICE**

**TO:** Prisoner Correspondence
U.S District Court
northern district
219 south Dearborn street
Chicago Illinois 60604

**TO:** KWAME RAOUL
100 W. RANDOLPH St.
CHICAGO Illinois 60601

**TO:** ____________________

**TO:** ____________________

**PLEASE TAKE NOTICE that on** March 22nd **, 20**23 **, I have placed the documents listed below in the institutional mail at** Stateville **Correctional Center, properly addressed to the parties listed above for mailing though the United States Postal Service:** PETITIONERS' Reply TO RESPONDENTS ANSWER TO FEDERAL HABEAS CORPUS PETITION WITH EXHIBITS

**Pursuant to 28 USC 1746, 18 USC 1621 or 735ilcs 5/1-109, I declare, under the penalty of perjury, that I am a named party in the above action, that I have read the above documents, and that the information contained therein is true and correct to the best of my knowledge.**

**DATE:** March 22, 2023

[signature] 3/22/23

OFFICIAL SEAL
JANIS R GARRISON-ELMORE
NOTARY PUBLIC, STATE OF ILLINOIS
COOK COUNTY
MY COMMISSION EXPIRES 11/04/2024

/s/ Tyrese Crawford

**NAME** TYRESE CRAWFORD

**IDOC#** M20778
Stateville Correctional Center
P.O Box 112 Route 53
Joliet, Illinois 60434